1  Neil A. Goteiner (State Bar No. 083524)
   ngoteiner@fbm.com
2  C. Brandon Wisoff (State Bar No. 121930)
   bwisoff@fbm.com
3  Matthew S.L. Cate (State Bar No. 295546)
   mcate@fbm.com
4  Aviva J. Gilbert (State Bar No. 300091)
   agilbert@fbm.com
5  Hilary C. Krase (State Bar No. 318762)
   hkrase@fbm.com
6  FARELLA BRAUN + MARTEL LLP
   235 Montgomery Street, 17th Floor
7  San Francisco, California 94104
   Telephone: (415) 954-4400
8  Facsimile: (415) 954-4480

9
   Attorneys for Plaintiff International Swimming
10 League, Ltd.

11                    UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13

14
   INTERNATIONAL SWIMMING LEAGUE,          CASE NO. _____
15 LTD.,
                                            **COMPLAINT FOR VIOLATIONS OF**
16           Plaintiff,                     **THE SHERMAN ACT, 15 U.S.C. §§ 1, 2,**
                                            **AND THE COMMON LAW**
17      vs.
                                            **JURY DEMAND**
18 FÉDÉRATION INTERNATIONALE DE
   NATATION,
19
             Defendant.
20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

Page

I.      INTRODUCTION.................................................................................................1

II.     JURISDICTIONAL STATEMENT ...................................................................6

III.    PARTIES..............................................................................................................7

      A.      FINA...........................................................................................................7

           1.      FINA Derives Its Power From The Structure Of The Modern Olympiad. ........................................................................................7

           2.      FINA Leverages Its Market Dominance To Extract And Enjoy— And Largely Keep For Itself—Substantial Revenues From The Labor Of The World's Best Swimmers.......................................12

      B.      International Swimming League ..............................................................15

IV.     FINA'S UNLAWFUL COLLUSION TO UNREASONABLY RESTRICT COMPETITION ...............................................................................................16

           1.      ISL Principals And Their Innovative League Idea Emerge As Threats To FINA Dominance..........................................................17

           2.      FINA Threatens Member Federations Who Might Cooperate With ISL. ...............................................................................................18

           3.      FINA Offers To Drop Opposition To ISL In Exchange For $50 Million And Works To Undermine ISL Promotional Efforts. ....................19

           4.      ISL And Italian Swimming Federation Develop Plan For December 2018 Event........................................................................................20

           5.      FINA Threatens Swimmers And Compels The Aid Of Member Federations To Boycott The Turin Event And Thereby To Force Its Cancellation...................................................................................21

V.      FINA'S UNLAWFUL MONOPOLY AND MONOPSONY ...........................28

      A.      FINA's Unlawful Monopoly Power In The Market For Top-Tier International Swimming Competitions ...................................................28

           1.      The Organization And Promotion Of Top-Tier International Swimming Competition Constitutes The Relevant Product Market. ..........28

           2.      FINA Has Unlawfully Monopolized Or Attempted To Monopolize The Market For Top-Tier International Swimming Competitions...............30

      B.      FINA's Unlawful Monopsony Power In The Market For The Services Of Top-Tier Swimmers ...............................................................................32

           1.      The Services Of Top-Tier Swimmers Constitutes The Relevant Input Market. ..................................................................................32

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT

i

36144\7727946.1

2.      FINA Has Unlawfully Monopsonized Or Attempted To Monopsonize The Market For The Services Of Top-Tier Swimmers. ........33

FIRST CAUSE OF ACTION FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 ...............................................................................35

SECOND CAUSE OF ACTION FOR VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2.........................................................................38

THIRD CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS ................................................39

PRAYER FOR RELIEF..............................................................................40

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

1    Plaintiff International Swimming League, Ltd. ("ISL") alleges as follows:

2    **I.    <u>INTRODUCTION</u>**

3        1.    ISL brings this action against Fédération Internationale de Natation ("FINA") to

4    prevent and address clear antitrust violations arising from FINA's complete control, by unlawful

5    means, over the promotion and organization of international swimming competitions and its

6    efforts to ensure that FINA, and only FINA, can determine what swimming athletes will be paid

7    for their efforts.

8        2.    FINA calls itself the world's governing body for all aquatic sports.  As the

9    authorized gatekeeper to the Olympic Games' aquatic events, there can be no doubt that, as it

10   boasts on its own website, FINA "controls the development" of competitive swimming and diving

11   disciplines.

12       3.    This case is specifically about swimming.  It is about whether FINA's control over

13   swimming opportunities—at least as exercised outside of the Olympic Games and FINA's own

14   competitions—amounts to an unlawful restraint of the ability of the athletes, on whose bodies

15   FINA's income and power depend, to earn what they would command in a market free of FINA's

16   iron grip.  This case is also about whether FINA—entrenched in and fearful of losing total control

17   over lucrative swimming competitions—unlawfully wields its dominant influence to prevent

18   outside organizations from expanding opportunities for hundreds of world-class swimmers and

19   their millions of fans across the world.  FINA does so in a manner that not only restricts FINA's

20   competitors in the market for the promotion of top-tier international swimming competitions, such

21   as ISL, from entering the market, but also restricts opportunities for sponsors, event broadcasters,

22   licensees, and other related ancillary businesses that would benefit from an increased number of

23   top-tier international swimming competitions.  And this case is about whether FINA's

24   unreasonable market restraints and consolidated market power have unlawfully restricted the

25   ability of the world's top-tier swimmers from enjoying expanded opportunities to exploit their

26   own hard work, rather than having to continue to suffer the FINA-controlled exploitation of their

27   lifetimes' worth of training and labor.

28

4.      FINA has total control, or nearly total control, of the market for the promotion and organization of top-tier international swimming competitions.  It also has total control, or nearly total control, of the market for the purchase of top-tier swimmer services, rendering it, in effect, the sole buyer of the market supply.  ISL has sought to enter both markets, as an organizer, innovator, and promoter of top-tier international swimming competitions and as a buyer of the swimmer services necessary to put on such events.  ISL seeks to expand these market opportunities in order to provide the world's top-tier swimmers more opportunities to compete against each other and for increased pay for their services.  Among other goals, ISL intends to roll out in 2019 a 15-match, team-based series of meets featuring more than 300 top-tier swimmers.  It also plans, and has taken significant steps toward establishing, a permanent league that would feature similar competitions.  The league also offers, among other things, higher potential compensation for the world's top-tier swimmers.

5.      FINA, however, is determined to prevent ISL from entering the market.  FINA understands that a free market for top-tier international swimming competitions would preclude it from continuing to keep for itself the lion's share of profits earned from the swimmers' skills and efforts and the entertainment value it provides to spectators.  And FINA's power over the swimming world is so strong that it will crush ISL, and destroy the careers of swimmers who want to compete in ISL meets, absent the relief that ISL seeks.  FINA's source of power derives predominantly from its control over access to competition in the Olympic Games, which FINA has lorded over member national federations and the world's swimmers by implementing rules that: (1) prohibit athletes and member federations from having "any kind of relationship"—including "unauthorised relations" with other swimming events and organizers—with any entity FINA does not approve, and (2) threatens rule-breakers with a ban of up to two years from participation in FINA or FINA-approved events, including events used to qualify for the Olympic Games.  *See* FINA Rule GR 4.1; FINA Rule GR 4.5.

6.      FINA's insistence that the world's best swimmers may compete only on FINA's terms and its efforts to enforce that rule are nakedly anti-competitive.  The European Commission has already found that a similar "unauthorised relations" rule wielded by FINA's counterpart for

1  ice skating violates the European Union's competition laws.  Such rules, the Commission ruled in

2  its Commission Decision of December 8, 2017, "inherently aim at preventing athletes from

3  participating in events not authorised [by the rulemakers], resulting in the foreclosure of

4  competing event organisers . . . [who] could potentially harm the economic interests" of the

5  entrenched governing body.  *See* Provisional Non-Confidential Version of Decision ¶¶ 168-69

6  (available at http://ec.europa.eu/competition/antitrust/cases/dec_docs/40208/40208_1384_5.pdf).

7        7.      The same reasoning applies in this case, where FINA has implemented and

8  enforced rules in a manner that serves FINA's intent to foreclose competitors like ISL from

9  entering the market and prevent swimmers from effectively selling their services to entities other

10  than FINA or those that FINA explicitly approves.

11        8.      Indeed, FINA already has flexed its muscles to block ISL from hosting—and

12  swimmers from participating in—a competing event.  In early 2018, ISL began planning a top-tier

13  international competition that would feature a version of its team-based competition, ideally to

14  take place in the United States, home to many of the world's best swimmers.  ISL had enjoyed

15  early and enthusiastic support of USA Swimming, the sport's governing body for the United

16  States.  Thus, USA Swimming worked closely with ISL in spring 2018 to plan a competition for

17  December 2018, with both ISL and USA Swimming considering Las Vegas's Mandalay Bay

18  Resort and Casino or the University of Southern California as potential venues.  But, in response

19  to pressure from FINA, USA Swimming pulled out of negotiations for hosting the December 2018

20  competition in either location, or anywhere else.

21        9.      ISL accordingly had to seek other partners.  First it tried to pair with British

22  Swimming to host the competition in London.  But, like its American counterpart, British

23  Swimming folded under pressure from FINA to stop coordinating with ISL.  As explained by

24  USA Swimming's chief operating officer in a letter dated June 13, 2018, FINA "sees this

25  December event as a challenge."  As a result, he concluded, USA Swimming could not commit to

26  taking any part in ISL's plans, even as a non-host, passive participant, until it received "assurance

27  from ISL and FINA (in writing) that FINA is on board with the concept of the ISL and approves

28  of the concept" and, in short, "whether the ISL can actually exist alongside FINA."

10.     Ultimately, ISL teamed up with the Italian Swimming Federation.  The Italian federation had previously worked with Energy Standard Group, whose president is the driving force behind ISL, to host junior meets in 2017 and in April 2018.  Given its support for ISL's proposed format and dedication to expanding opportunities for the world's swimmers, the Italian Swimming Federation agreed to host the December competition in Turin, Italy (the "Turin Event").

11.     Despite the extensive planning and expenditure of resources by ISL and the Italian Swimming Federation, and despite their having entered into participation and appearance-fee agreements with more than 50 swimmers from around the world, FINA coerced its member federations into agreeing to, and participating in, an overt effort to shut down the Turin Event by threatening the swimmers with a ban from FINA events—including the competitions that would serve as the qualifying meets for the 2020 Olympic Games—if swimmers participated in the Turin Event.  FINA made its threats only to prevent competition and to maintain its grip on both its monopoly power in the market for top-tier international swimming competitions and its monopsony power in the market for the supply of top-tier swimmer services.  FINA has never offered, and cannot truthfully offer, any legitimate pro-competitive justification for its actions.

12.     Some of the world's top swimmers openly criticized FINA for its crackdown on the Turin Event, and some of FINA's national swimming federation partners, including USA Swimming, still expressed support for ISL's efforts.  *See, e.g.*, *Adam Peaty criticises decision to scrap International Swimming League*, BBC, Nov. 15, 2018, https://www.bbc.com/sport/swimming/46224766; Julian Linden, *Our golden girls unite for swimmers' rights*, Daily Telegraph, Dec. 4, 2018.  But after discussing among and between themselves, the federations reluctantly warned their respective swimmers that they risked sanctions by FINA and/or by the federations themselves if the swimmers participated in the ISL event.  The Italian Swimming Federation and ISL were thus forced to cancel the Turin Event, for which swimmers from all over the world had already signed up, and ISL lost its investment.

13.     FINA tried to explain to the world that its conduct was necessary to safeguard FINA's own schedule of competitions.  That explanation itself is proof of FINA's anti-competitive

1    motive.  But the circumstances leading up to its threatened swimmer ban laid bare a more

2    disturbing picture of its anti-competitive aims.

3         14.    Specifically, FINA had been in direct negotiations with ISL for much of 2018 over

4    how FINA might allow ISL to co-exist.  FINA made it clear, however, that such co-existence—

5    *i.e.*, FINA's agreement not to threaten the world's swimmers against participating in ISL events—

6    would come only at a steep price: FINA demanded $50 million from ISL and complete control

7    over most of the facets of the ISL league, including its name.  Not once during the negotiations

8    with ISL did FINA express concerns that, as it later claimed, that ISL's events would "add[] a

9    layer of complexity" to the calendar of swimming competitions such that the calendar could not

10   both allow for the Turin Event and also remain "coherent" and "healthy."  *See FINA Statement*,

11   Nov. 16, 2018, at http://www.fina.org/news/fina-statement-2.  Nor did it express to ISL any

12   concern over "[t]he harmonious development of the calendar," as FINA did in a December 3,

13   2018, letter to its member federations seeking further to justify its unlawful conduct.  Instead, it is

14   quite obvious that FINA's primary concern, as it explained in that December 3 letter, was over any

15   "challenges to its status."  FINA's purported "complexity" justification is precisely the type of

16   excuse that courts properly view with suspicion as nothing more than anti-competitive pretext.

17        15.    ISL refused to give in to FINA's extortionate demands that ISL pay FINA not to

18   engage in unlawful conduct.  FINA accordingly leveraged its overwhelming and absolute power to

19   impose, through its control over the Olympics, a group boycott of the Turin Event.  That episode

20   not only showcased FINA's complete power over the relevant markets, it also caused significant

21   financial harm, and threatened additional future harm, to ISL and the swimmers with whom ISL

22   and/or its affiliates had contracts, as well as to co-hosting organizations (*e.g.*, allied federations

23   such as the Italian Swimming Federation), potential event sponsors, broadcast-rights holders, and

24   other business and licensing partners.  It also harmed the markets for both the organization of top-

25   tier international swimming competitions and for the provision of top-tier swimmer services.  And

26   by its explicit anti-competitive conduct, FINA clarified to the entire swimming community that

27   FINA will continue to do whatever it takes to protect its stranglehold on non-Olympic events.

28

1    16.    Recognizing the damage its actions caused to the swimmers that FINA depends

2 upon, hearing of this then-potential litigation, and apparently attempting to assuage swimmers'

3 frustration and anger, FINA suddenly announced it would increase prize money available to

4 swimmers competing in the FINA World Swimming Championships (25m), a short-course

5 competition set for December 11-16, 2018, featuring top-tier swimmers competing in the type of

6 races most similar to those planned by ISL.  In other words, the mere threat of ISL's market entry

7 has already increased pay for swimmers in the market in which FINA has been unlawfully

8 suppressing competition.  That simple cause and effect  demonstrates one element of anti-

9 competitive harm— depressed swimmer compensation—that FINA's illegal stranglehold has

10 imposed on the market.

11    17.    ISL accordingly filed this action, seeking both injunctive relief against FINA's

12 enforcement of its anti-competitive "unauthorised relations" (sic) rules and damages to

13 compensate them for the real financial harm FINA's efforts already have caused.

14 **II.**    **JURISDICTIONAL STATEMENT**

15    18.    This Court has subject-matter jurisdiction over this case under section 4 of the

16 Sherman Act, 15 U.S.C. § 4, and under 28 U.S.C. §§ 1331, 1337.

17    19.    This Court has personal jurisdiction over FINA pursuant to section 12 of the

18 Clayton Act, 15 U.S.C. § 22 and *Go-Video, Inc. v. Akai Electric Company, Limited*, 885 F.2d 1406

19 (9th Cir. 1989). In particular, FINA's contacts with the United States are deep and wide.  On

20 information and belief, FINA has registered multiple trademarks with the U.S. Patent and

21 Trademark Office.  It regularly organizes major international aquatics competitions in the United

22 States.  Since January 2017, FINA has hosted the following multi-day competitions: the FINA

23 Artistic Swimming World Series 2018 (Los Angeles), the Women's Intercontinental Tournament

24 2018 (Davis, California), the Synchro America Open Long Island (New York), and the 6th FINA

25 World Junior Swimming Championships (Indianapolis).  Meanwhile, on information and belief,

26 FINA has entered into multiple agreements with U.S. swimwear manufacturers by which those

27 manufacturers must adhere to FINA's strict regulations governing the design and manufacture of

28 swimwear and related accessories in exchange for the right to be deemed FINA-approved articles.

1   U.S. companies that have entered into such agreements include TYR Sport, Inc., of Huntington

2   Beach, California, and AgonSwim of Nashville, Tennessee.  Finally, FINA promulgates various

3   rules and regulations governing the conduct of its membership, which includes national

4   federations such as United States Aquatic Sports, Inc. ("USAS"), members of those national

5   federations such as USA Swimming, and all U.S. swimmers who seek to compete in FINA-

6   sanctioned competitions. Thus FINA has, for example, controlled the conduct of Thomas Shields,

7   a class representative plaintiff in the related Class Action against FINA, who lives in Berkeley,

8   California.  Specifically, as discussed above, FINA directly threatened its swimming federation

9   members and swimmers, including those in the United States, with sanctions if they entered into

10  any relationships with, or competed in events organized by, ISL.  Thus FINA's conduct aimed at

11  Shields among other swimmers, directly caused antitrust injury to ISL.

12      20.     Further, on information and belief and as further described below, FINA

13  specifically and purposefully availed itself of the benefits and protections provided in this state

14  and district when it ordered, in October 2018 and in furtherance of its anti-competitive conduct,

15  the submission of a false Digital Millennium Copyright Act ("DMCA") copyright-infringement

16  notice to YouTube, LLC, an entity located in this district.  On information and belief, the false

17  submission asserted that three ISL-produced videos featuring only ISL material, interviews, and

18  information somehow infringed on FINA's copyright.  So FINA improperly leveraged U.S. law to

19  prevent further ISL promotion by demanding that YouTube pull down the material.  YouTube, at

20  least temporarily, did so.

21      21.     Venue is proper in this district under 28 U.S.C. § 1391(c)(3) because FINA is not a

22  resident in the United States and therefore may be sued in any judicial district.

23  **III.   PARTIES**

24      **A.     FINA**

25          **1.     FINA Derives Its Power From The Structure Of The Modern
                    Olympiad.**

26

27      22.     FINA is an association organized and existing in accordance with the laws of

28  Switzerland, and more particularly under article 60, *et seq.*, of the Swiss Civil Code.

23.     FINA traces its founding from the beginnings of the modern Olympic Movement, and its role in international aquatics competition today depends on its connection with how the Olympic Games are structured and governed.

24.     At the top of that structure stands the International Olympic Committee ("IOC"), a not-for-profit organization based in Lausanne, Switzerland.  In short, the IOC puts on and promotes the Olympic Games.  It does so primarily through coordination with two technically separate groups of entities.

25.     The first group is nation-focused, comprising 206 National Olympic Committees ("NOCs").  The IOC has exclusive authority to recognize NOCs, including the U.S. Olympic Committee.  The NOCs are tasked generally with promoting the Olympics and identifying and recommending host cities for the games.  They retain exclusive authority for representing their respective nations at the Olympic Games and any other competitions sanctioned by the IOC.

26.     The second group is sport-focused, made up of dozens of International Sports Federations.  As with NOCs, only the IOC has the authority to recognize these federations.  And the federations, like the NOCs, must comply with the IOC's governing Olympic Charter.  The International Sports Federations administer their respective sports and establish and organize the types and rules of competitions held at the Olympic Games.  Accordingly, these federations "monitor the everyday administration of their sports and guarantee the regular organization of competitions as well as respect for the rules of fair play." *See* The International Olympic Committee, "International Sports Federations," accessible at https://www.olympic.org/ioc-governance-international-sports-federations.  Among many others, IOC-recognized international federations include the likes of Fédération Internationale de Football Association ("FIFA"), the International Basketball Federation ("FIBA"), the International Skating Union, and FINA.

27.     Accordingly, and as far as the IOC is concerned, FINA governs *Olympic* swimming, diving, high diving, water polo, artistic swimming, masters and open-water swimming.  More particularly, athletes in those disciplines can compete in the Olympic Games only if they meet or beat qualifying criteria that FINA sets for the athletes.  And, in the cases of swimmers, FINA will recognize only those qualifying times that are met at FINA-approved qualifying events.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

36144\7727946.1

28.     Formed in 1908 as a collection of eight national aquatics organizations during that year's Olympiad in London, FINA now comprises 209 member federations.  These member federations are themselves national umbrella groups involving representatives of the various aquatic-sports disciplines.  The national federations may (and do) delegate sub-group entities to manage the FINA relationship as it pertains to the disciplines.  Thus, the United States' member federation is United States Aquatic Sports, Inc. ("USAS"), which designates USA Swimming, Inc., which is the—the "national governing body" of swimming in the United States.

29.     FINA is thus technically a collection of national member federations that actually compete horizontally with one another and with FINA itself, in that individual federations and FINA separately organize and promote top-tier international swimming competitions.  But by virtue of its governance structure and the practicalities of its day-to-day operations, FINA's decision-making and enforcement authority are in the hands of a small group of FINA officials who cannot be easily checked by member federations.

30.     FINA and its 209 member federations are governed primarily by a 25-member Bureau.  The Bureau's day-to-day power, in turn, is vested in an eight-member executive committee.  Bureau decisions and rule interpretations can be—but not always—appealed to the FINA General Congress.  The voting members of that General Congress, which technically under the FINA governing rules is "the highest authority of FINA," comprise two delegates from each member federation to represent its national interests in *all* aquatic sports.  *See* FINA Rule C 15.1; FINA Rule C 15.2.  Thus, for example, China has a population of more than 1.3 billion people and sent 45 swimmers to compete in the 2016 Olympic Games.  It is allowed two representatives in the General Congress.  So, too, is Maldives, an island nation of 436,000 that sent two swimmers to the 2016 Games.

31.     By design and under the FINA Constitution, the General Congress moves slowly. It meets only every two years.  A federation can call for a special session on matters that arise between those biennial meetings.  But doing so requires written request of one third of all 209 members.  Effectively, then, FINA is run by the FINA Bureau.  And between the Bureau's own

1    meetings, its executive committee handles all day-to-day business and accordingly retains the

2    majority of the real decision-making and rules-influencing power over FINA.

3         32.    Beyond the fact that its governing structure effectively empowers FINA leadership

4    to exercise coercive influence over member federations, such heavy-handedness is cemented in the

5    FINA rules themselves.  Every FINA member must "acknowledge in its national rules that FINA

6    *is the only recognized body in the world*" that may govern international aquatics.  *See* FINA Rule

7    C 7.5 (emphasis added).  FINA's Constitution forbids any member to set rules that conflict with

8    FINA's rules.  FINA Rule 7.3.  And, if and when FINA so requires, members must insert FINA

9    rules into their own governing documents.  FINA Rule 8.2.5.

10        33.    Among the various rules approved by the General Congress and Bureau is FINA's

11   prohibition against "unauthorised relations."  Thus, no FINA Member can "have *any kind of*

12   *relationship* with a non-affiliated or suspended body." FINA Rule GR 4.1 (emphasis added).

13   Further, a member cannot hold competitions with any non-affiliated body, nor can swimmers

14   compete in events that FINA has not approved.  FINA bylaws also govern international

15   competition and require any member that hosts, assists with the hosting, or affiliates in any way

16   with the hosting of such a competition to first obtain FINA approval.  *See generally* FINA Rule

17   GR 4.  This extends far beyond the run up to the Olympics and the Olympics Games themselves.

18        34.    These rules must be obeyed.  Member federations and swimmers alike face severe

19   punishment for violating FINA rules against unauthorized relationships or hosting international

20   competitions that FINA does not bless in advance.  Among other sanctions, FINA wields the

21   power to suspend the member federation or its swimmers, for up to two years, from participating

22   in any FINA competitions.  *See* FINA Rule GR 4.5.  For swimmers who participate in non-

23   sanctioned events, that could mean banishment from the slate of competitions FINA sets as

24   qualifying events for the Olympic Games, and thus a ban from the Olympics itself.

25        35.    Given the structure of FINA's governance and its gatekeeper role in the Olympics,

26   there is practically little that a given member federation—to say nothing of an individual

27   swimmer—can do other than comply with FINA's demands.  This gives FINA the ability to harm

28

1  competition in non-Olympic swimming, and it has exercised that power to cause anti-competitive

2  harm to swimmers, event hosts, swimming competition consumers, and other industry

3  participants.

4      36.    Each of the member federations primarily is concerned with identifying the athletes

5  who will represent the home country in the Olympic Games and ensuring they have sufficient

6  training and other support to prepare for the Olympics. Also, when necessary, the member

7  federations are the athletes' representatives regarding issues relating to FINA's qualifying events,

8  the format of such competitions, FINA acceptance of their own planned competitions, technical

9  regulations, and more. The Olympic Games are, in effect, the sole reason these organizations

10  exist, usually pursuant to a statutory dictate recognized by the law of their country as solely

11  responsible for identifying Olympic athletes in their sport—in the case of the United States, for

12  example, to obtain "the most competent amateur representation possible in each of the Olympic

13  Games, the Paralympic Games, and Pan-American Games." *See* 36 U.S.C. § 220503(4).

14      37.    Each member federation's chief focus on the Olympic Games necessarily leads to

15  members constantly engaging in multiple ongoing negotiations with FINA over issues pertaining

16  only to the Olympic Games (*e.g.*, timing of the meets that constitute qualifying events, the format

17  of such competitions, FINA acceptance of their own planned competitions). Moreover, those

18  negotiations with FINA are occurring across all of the aquatic sports disciplines.

19      38.    Member federations (or their specific-sport designees) also frequently host their

20  own events, sometimes including top-tier international competitions. For example, USA

21  Swimming organized a biennial series called Duel in Pool from 2003 through 2015, a competition

22  that pitted U.S. swimmers against their Australian or European counterparts. Likewise, the

23  Luxembourg federation organizes the yearly Euro Meet series. And the Italian federation hosts

24  the yearly Sette Colli Trophy. FINA allows such events to exist, but the members organize them

25  and, on information and belief, reap all (or most) of the financial benefit from putting them on.

26  The federation-organizers of these and the many other swimming competitions, international or

27  otherwise, must negotiate with FINA over several issues, including scheduling and if or when the

28

1    meets might constitute qualifying events for FINA's own competitions.  For example, the 21st

2    Euro Meet, set for January 25-27, 2019, is a qualifying event for the 2019 FINA World

3    Championships.

4           39.     The fact that member federations frequently disagree among themselves and with

5    FINA on various rules and scheduling relating to the Olympic Games, FINA competitions, and/or

6    member-federations events, combined with FINA's power structure, means that any given

7    member federation—and more particularly any given designee focused on a specific sport (*e.g.*,

8    USA Swimming)—retains limited political capital with which to negotiate with FINA.  And given

9    their legal mandate back home, member federations understandably must choose to expend that

10   capital with FINA on matters pertaining to the Olympic Games.  Other battles, including over

11   FINA dictates that have nothing to do with preparing for or holding the Games, are therefore

12   simply not worth it for the members to fight, or to risk fighting, even though they fall outside of

13   the specific Olympic mandate over which FINA has any actual authority from the IOC or from

14   anyone else.

15              **2.      FINA Leverages Its Market Dominance To Extract And Enjoy—And
                          Largely Keep For Itself—Substantial Revenues From The Labor Of
16                        The World's Best Swimmers.**

17          40.     By law, FINA is a non-governmental, putatively not-for-profit organization.  In

18   reality it is big business.

19          41.     No longer a small band of idealistic sport enthusiasts who would be stunned by the

20   monolith that today's Olympic Games have become, FINA sits atop one of the world's most

21   popular grouping of sporting events.  Its role as aquatics gate-keeper to the Olympic Games allows

22   it effectively to control every major aspect of the development of, and profit from, aquatic sports,

23   in every corner of the globe.

24          42.     It is a lucrative perch.  While numbers deriving specifically from swimming

25   competitions are not yet available to ISL, FINA overall enjoys a substantial share of IOC revenue

26   from selling broadcasting rights, sponsorships, ticketing, and other income derived from the

27

28

1  Olympic Games.  In all, FINA in 2016 and 2017 earned from the 2016 Rio de Janeiro Olympic

2  Games more than $31.9 million above its Games-related expenses.[1]

3      43.    Regardless of any exclusivity that FINA may enjoy over aquatic sports in the

4  Olympics, nothing gives FINA exclusive rights to control non-Olympic swimming for the entire

5  world.  But FINA nonetheless has leveraged its rights to organize Olympic swimming—rights

6  which ISL does not here challenge—to dictate the terms on which any international swimming

7  competition must be based.

8      44.    FINA earns major revenue from its own non-Olympic events.  It draws scores of

9  millions of dollars per year from member-affiliation fees, event fees from cities that FINA allows

10  to host its FINA-branded competitions, television broadcasting rights, licensing revenues, and

11  sponsorships.  In 2017, for example, and setting aside in-kind contributions, FINA took in more

12  than $57 million from its own events, well over half of that coming from host-city tribute and

13  television rights to FINA-branded events, including: the FINA Swimming World Cup, a year-long

14  series of short-course[2] events held across the globe; the FINA World Swimming Championships

15  (25 meters), a single short-course championship held every even-numbered year; and the FINA

16  World Championships, biennial competitions involving all the aquatics disciplines held every odd-

17  numbered year.  In short, aquatics in general, and swimming in particular, are money-making

18  machines for FINA.

19      45.    FINA keeps much of the wealth for itself.  In 2016, and across all aquatics events,

20  FINA awarded less than $5 million in prize money to the athletes who make it all possible.  Prizes

21  amounted to about $10 million in 2017, an increase owing at least in part to the blockbuster FINA

22  World Championships.

23  _____

24  [1] FINA reports its finances in Swiss francs, which at the time of this Complaint exchange roughly

25  1:1 with the U.S. dollar.  All FINA financial figures discussed in this Complaint are derived from
FINA's 2017 financial report, available at https://www.fina.org/sites/default/files/audit_report_-

26  _fina_-_2017_-_swiss_co_with_2_signatures-1.pdf.

27  [2] A "short course" event is held in a 25-meter or 25-yard pool, the latter of which is common in
NCAA and U.S. high school competitions. "Long course" events are held in 50-meter pools, the

28  size used for aquatic events during the Olympic Games.

46.     During the same two-year period, FINA spent nearly the same amount on those swimmer prizes as it did on its 30-40 administrators and employees: payroll charges averaged about $6.2 million each year.  And FINA spent a similar amount on "FINA Family" expenses—mostly meaning travel and per diems for certain FINA-appointed dignitaries.  All the while, FINA kept $18 million bottled up for maintenance on its new, lavish 43,000-square-foot headquarters.  That is just part of the more than $108 million FINA has set aside in dedicated reserves, including for event cancellation.  Another $11.6 million remains in reserve without FINA earmarking it for any purpose.

47.     Further, much of FINA's prize money is spread thinly to the upper-tier of the top-tier competitors.  The 2018 FINA Swimming World Cup is illustrative.  In all, FINA awarded $2.5 million in prizes for athletes' performances over the course of that seven-meet series.  Based on the announced awards and FINA's announced medals table at the end of the series, and excluding swimmer bonuses for setting new world records, about 60 percent of the prize money (roughly $1.5 million) went to only 10 swimmers.  The top two male and top two female swimmers took in a combined $1 million.  In contrast, FINA announced that 385 swimmers participated in the final meet.

48.     In short, and on the backs, legs, arms, and shoulders of the world's aquatic athletes, FINA earned $118 million in 2016 and 2017 revenues, excluding in-kind contributions.  It gave 12.5 percent—less than $15 million of that—back to the athletes in prize money.  This ratio is substantially lower than that enjoyed by athletes who compete in sports with competitive markets.

49.     As described herein, FINA is now attempting to prevent anyone but FINA from organizing or controlling top-tier non-Olympic international swimming events, including events where swimmers are competing only in their individual capacities or on teams that are not part of the swimmers' FINA member national federations.  Nothing gives FINA the right to: (1) dictate the terms of competition or compensation of swimmers who want to compete outside the Olympics as individuals or as part of a team not affiliated with FINA national federations, or (2) prevent others from organizing and profiting from such additional events for which there is lucrative current or potential demand.

B.     <u>International Swimming League</u>

50.    ISL is a corporation organized and existing under the laws of Switzerland.  It intends to create a worldwide, club-based swimming league and thereby to expand the competitive and financial opportunities of the world's best swimmers.

51.    ISL's primary goal is to promote swimming around the world by organizing and promoting competitions featuring an innovative team-based format at events around the world.

52.    ISL has extensively planned for the development of a worldwide league of swimming teams comprised of top-tier swimmers.

53.    ISL's principals have spent nearly a decade organizing international events and honing the ISL club model.  Its chief sponsor and promoter is Konstantin Grigorishin, a Ukrainian businessman who is a leading shareholder of the Energy Standard Group ("ESG").  ESG, which maintains its own swimming club (the "ESG Club"), remains active in supporting ISL and seeking to get the league up and running.  ESG played a central role in planning the Turin Event and entered into key contracts—including with both the Italian Swimming Federation and with many of the top-tier swimmers who were to compete—for that event to go forward.

54.    As a result of Mr. Grigorishin's influence and dedication to the development of the sport across the globe, ESG began sponsoring and hosting swimming competitions in Ukraine, Russia and Italy for junior athletes in 2013.  These events generally applied and developed the team-based competition format that ISL would later adopt for its own planned events and league.

55.    By 2016, ESG was hosting the Energy Standard Cup, which featured events for older athletes.  Many of these athletes have become prize-winners and record-holders at major international swimming competitions beyond those organized by ISL.

56.    By 2017, and at substantial expense of energy, time, and money, Mr. Grigorishin and others who would lead ISL had gained extensive experience in organizing and hosting international swimming competitions.  Their efforts enjoyed increased recognition and standing in the international swimming community.

57.    For example, in August 2017, ESG hosted its first "Energy for Swim" competition. That event, held in Rome and organized by the Italian Swimming Federation, featured competition

between several top-tier swimmers from ESG's Club and athletes from the United States, Italian, and Australian national swimming federations. ESG provided athletes with about $411,000 in appearance fees and charity contributions based on the athletes' performances. FINA was aware of ESG's 2017 event, but not yet considering it a threat, FINA limited its response to only token, unofficial opposition.

58. On the heels of that event's success, and with growing support from swimmers, coaches, and others in the competitive-swimming industry, Mr. Grigorishin and ESG began to move forward with their plans for ISL to organize and promote three events in 2018, with the expectation of granting and awarding $842,400 in total appearance fees and prizes. They also began laying the foundation to organize and promote ISL team-based competitions throughout the late summer and fall of 2019 featuring a dozen teams of 12 men and 12 women each—just under 290 swimmers—and more than $3.1 million in total prizes.

59. As further detailed below, this case arises from FINA's efforts to thwart those plans, including its successful measures to scuttle the Turin Event, and FINA's ongoing effort to prevent ISL from organizing and promoting its 2019 competitions. These efforts impacted the United States which is a potential host to these events, and which is home to many of the world's best swimmers and the residence of numerous top-tier swimmers who had signed up for the December 2018 before FINA forced its cancellation.

## IV. FINA'S UNLAWFUL COLLUSION TO UNREASONABLY RESTRICT COMPETITION

60. FINA, in concerted action with its member federations and other entities, has engaged in unlawful and unreasonable anti-competitive conduct to strangle competition in the market for top-tier international swimming competitions. FINA's concerted action with member federations and other entities also has unreasonably restrained competition for access to the supply of top-tier swimmers' services (*i.e.*, appearances and participation in swimming competitions).

//

//

//

1

                **1.**     **ISL Principals And Their Innovative League Idea Emerge As Threats To FINA Dominance.**

2

3        61.     FINA did not initially consider ESG's Energy for Swim competition in 2017 to be

4 a threat.  But that event's success, combined with word that ISL wanted to build on that success,

5 caught FINA's attention.  The nascent plans for what became ISL were now fully on FINA's

6 radar.  By September 2017, ISL-predecessor representatives were meeting with FINA Executive

7 Director Cornel Marculescu to discuss a path forward that would allow them to organize

8 international events featuring top-tier swimmers organized by teams that would compete in short-

9 course events.  After learning of ISL's intentions for future Energy for Swim events, FINA

10 initially expressed general support for ISL moving forward.

11        62.     ISL and FINA spent several weeks negotiating new terms with ISL from late

12 September 2017 through December 2017 over ISL's plans for a 2018 event.  ISL sought at a

13 minimum to secure FINA's agreement to stand aside and not to block ISL from hosting that single

14 event.  Those negotiations, however, broke down.

15        63.     ISL nonetheless moved forward.  By spring, ISL was in discussions with USA

16 Swimming for that national governing body to host, manage, and organize the ISL event in

17 December 2018.  As the result of these negotiations, ISL began planning to host its event in Las

18 Vegas.

19        64.     Meanwhile, on April 28-29, 2018, and with cooperation from the Italian Swimming

20 Federation, the ESG Club organized a junior meet in Lignano Sabbiadoro, Italy, drawing nearly

21 100 swimmers from Italy, Hungary, Slovenia, and Serbia.  FINA had approved that competition in

22 advance as a qualifying meet for the 3rd Youth Olympic Games in Buenos Aires.

23        65.     Focusing on its plans for a December 2018 competition that would use ISL's

24 innovative team-based format, ISL worked to obtain the support of FINA's member federations.

25 To that end, and on May 4, 2018, ISL entered into a memorandum of understanding with Ligue

26 Européenne de Natation, the FINA-recognized "continental federation" comprising the European

27 //

28 //

Farella Braun + Martel LLP
235 Montgomery Street, 17ᵗʰ Floor
San Francisco, California 94104
(415) 954-4400

36144\7727946.1

national federations.  ISL also, during a May 23-24, 2018, meeting in Turkey, presented its plans to representatives of the federations from the United States, Australia, United Kingdom, Brazil, France, Russia, and Ukraine.

### 2. FINA Threatens Member Federations Who Might Cooperate With ISL.

66. In response to ISL's outreach effort, however, and on or about June 5, 2018, FINA's Mr. Marculescu circulated a letter to every FINA member designed to cripple ISL's plans. ISL, he noted, "is neither recognised by nor affiliated to [sic] FINA." FINA would monitor the matter closely, he warned, and sanction anyone who violated FINA's rule on unauthorized relations.  In closing, Mr. Marculescu expressed his hope that all who received it would come away from his message with "a clear and mutual understanding of FINA's competence and jurisdiction in respect to international competitions."  No mention was made of any assessment of scheduling conflicts or other excuses later advanced as cover stories for this anti-competitive conduct.

67. The threats worked.  By around June 13, 2018, USA Swimming notified ISL via a letter of that date that it could not help ISL organize any competition until it received "assurance . . . that FINA is on board with the concept of the ISL and approves of the concept." By this point ISL had already begun looking for alternative partners, including British Swimming. But the USA Swimming representative warned that such a workaround would merely "postpon[e] the important decision of whether the ISL can actually exist alongside FINA."  USA Swimming also expressed its deep concern that a December 2018 event without FINA's direct blessing would put U.S. swimmers "at risk"—especially if "FINA sees this December event as a challenge." Fearful of how FINA would react, USA Swimming explained that "we want the assurance that FINA is willing to work with ISL before we commit."

68. Within weeks, and in direct response to Mr. Marculescu's June 5 letter, British Swimming likewise distanced itself from ISL's planned December 2018 competition.

//

//

### 3. FINA Offers To Drop Opposition To ISL In Exchange For $50 Million And Works To Undermine ISL Promotional Efforts.

69.     By mid-summer, ISL returned to FINA, seeking to salvage what it could.  On or around August 17, 2018, ISL CEO Ali Khan wrote to FINA, explaining the details of the competition, disclosing more than $2 million in combined appearance fees and prize money for the swimmers, and promising that ISL would of course hold the meet "according to FINA technical and doping control rules."  Mr. Khan also explained that ISL would work through a federation partner and seek FINA approval for the competition, which would aid in the "development of the sport of swimming to the mutual benefit of all the swimming community."

70.     FINA responded about a week later, in a letter sent by its outside counsel.  In that letter, FINA insisted that Mr. Khan's direct request was invalid; the host federation was required to seek FINA approval "for any international event that they intend to organize."  As nothing had yet been submitted by that organization, the matter was effectively closed: "FINA is neither bound nor willing to consider and discuss applications submitted by a sponsor" such as ISL.

71.     Mr. Grigorishin of ISL and Mr. Marculescu of FINA resumed direct negotiations over the ensuing weeks.  FINA insisted on unreasonable terms: event ownership and FINA-naming rights, plus payment of $50 million to FINA from ISL over 10 years.  ISL refused to give everything to FINA in exchange for FINA doing nothing more than agreeing to halt its anti-competitive threats.  Negotiations thus ended by mid-October.  By then FINA was complaining to ISL for trying to promote itself to the swimming community, noting in an e-mail by its top officers to Mr. Grigorishin on October 16, 2018, that ISL was releasing promotional videos and explaining that such material, and in particular a video appearing on the website www.SwimSwam.com, a swimming-industry news site, shouldn't be published because "FINA cannot recognize ISL."

72.     In fact, and on information and belief, FINA was more than merely disappointed in ISL's promotional video.  FINA, on information and belief, instructed its agent to submit a "takedown notice" to YouTube under the DMCA to have three ISL videos removed from SwimSwam's YouTube channel.  That notice necessarily required FINA's agent to assert that the ISL videos infringed on FINA's copyright.  That was false.  Nonetheless, and pursuant to standard

1   YouTube procedures, YouTube initially removed the three ISL videos from the SwimSwam

2   channel, only to allow them back up after SwimSwam established that the ISL content was not

3   infringing.

4            **4.      ISL And Italian Swimming Federation Develop Plan For December
                        2018 Event.**
5

6            73.      ISL had one final option.  Given ESG's prior experience putting on the April 2018

7   junior meet with the Italian Swimming Federation, ISL again turned to the Italian organization for

8   help coordinating its planned December competition.

9            74.      Thus, on or about October 17, 2018, the Italian Swimming Federation notified

10  FINA that it intended to host the Turin Event, officially named Energy for Swim 2018, shortly

11  before Christmas.

12           75.      As explained to FINA in a letter from the federation dated October 17, 2018, the

13  competition would include swimmers from countries other than Italy.  But, the Italian federation

14  president explained, under FINA's rules the Turin Event would not constitute the type of

15  "international competition" that required FINA approval because those swimmers would not be

16  formally representing their member federations.  The distinction mattered under FINA's rules.

17  Under the relevant FINA rules, an "international competition" is "any competition organised or

18  sanctioned by FINA, any Continental or Regional Organisation or any Member Federation in

19  which other recognised Federations, clubs or individuals participate."  *See* FINA Rule BL 12.1.

20  Such competitions require six months' minimum notice to FINA and must be approved by FINA.

21  Even if this rule passed muster under antitrust law, the plain language of the FINA rules also

22  provides that an "international competition" organized by a member federation, such as the Italian

23  Swimming Federation, does not need FINA approval if the competition is one "in which foreign

24  clubs or individuals *not representing their Member Federation* participate."  FINA Rule BL 12.3

25  (emphasis added).  Swimmers in the ISL event would not be competing as representatives of their

26  member federation.  Thus, FINA approval was, under the plain terms of FINA's own rules, not

27  //

28  //

1  necessary.  And, in any event, regardless of how the rule is interpreted, FINA's restriction against

2  any member or swimmer participating in an unauthorized event is anti-competitive, with the intent

3  and effect of eliminating competition.

4         76.  ISL, through its counsel, responded by trying to revive the prior MOU that FINA

5  and ISL were negotiating before FINA's unreasonable demands.  If nothing else, ISL sought a

6  standstill truce so that ISL and the Italian Swimming Federation could carry out the Turin Event

7  and not lose their respective investments in it, with FINA and ISL to resume discussions, after the

8  Turin Event, over future competitions.  FINA refused to enter the standstill arrangement.

9         77.  The Turin Event was to be held shortly before Christmas.  Despite long being on

10  FINA's radar—ISL had notified FINA of its intent for a late-December 2018 event no later than in

11  a letter to FINA dated August 17, 2018—FINA insisted at the last minute that its approval was

12  nevertheless necessary, knowing that its last-minute demand would make it impossible for ISL to

13  give six months' notice and would therefore allow FINA to threaten athletes, and ban them from

14  future events if necessary, for "unauthorised relations" if they participated in the meet.

15       **5.**     **FINA Threatens Swimmers And Compels The Aid Of Member**
                **Federations To Boycott The Turin Event And Thereby To Force Its**

16                  **Cancellation.**

17         78.  That is what happened.  Aware that the letter of its rules did not support its desired

18  outcome, and citing the "urgency of the matter," FINA's top officers on October 26, 2018,

19  circulated via e-mail a letter calling for its 25-member Bureau to vote to reinterpret the FINA

20  rules.  FINA now wanted to interpret the rules to mean that any competition involving

21  international swimmer participation needs FINA approval even if swimmers are competing solely

22  as individuals or on teams that are not part of their FINA national federations.  That interpretation,

23  of course, effectively makes swimmers, including U.S. swimmers, worldwide indentured servants

24  of FINA.  As FINA's captives, swimmers can never compete in any event to earn money for

25  themselves without FINA's advance approval.  FINA's interpretation, given FINA's market power

26  derived from its designation as the sole IOC-recognized international swimming federation, on its

27  face is thus as blatantly anti-competitive as it is astonishingly brazen.  The purpose behind FINA's

28

1  last-minute vote request was unstated in the October 26 e-mail calling for a vote.  But it was

2  unmistakably clear: the rules needed to be revised by FINA's "interpretation" to prevent ISL's

3  event from going forward.

4          79.      Thus, on October 30, the same day that the Bureau purportedly ratified FINA's rule

5  interpretation revision, FINA's Mr. Marculescu circulated a letter to all FINA members, notifying

6  them that the Turin Event "[was] not recognised by FINA."  He also explained that, pursuant to

7  the newly interpreted rules, FINA should have been notified of the competition more than six

8  months in advance.  Of course, FINA had long been on notice of the Turin Event and had been

9  negotiating with ISL over terms for its production, so this six-month notice excuse was a sham.

10  Moreover, even if FINA had been given no notice, which it had, FINA's 11th-hour rule

11  interpretation revision was purposefully designed to make timely notice impossible.  FINA further

12  explained that because no notice was given (which was not true), FINA had not approved the

13  competition.  Mr. Marculescu warned that all of the world's member federations should maintain

14  "a clear and mutual understanding of FINA's competence and jurisdiction in respect to

15  international competitions."  And he warned the dozens of swimmers who had entered contracts to

16  appear in the Turin Event that "FINA will further assess the development of this matter and will

17  consider consequences in application of [FINA punitive sanctions], as and where appropriate."

18          80.      ISL, in a letter sent by its counsel, urged FINA to rescind the vote and return to

19  discussions regarding a standstill truce that would allow the Turin Event to proceed as planned.

20  ISL's counsel  further explained in that letter that FINA's 11th-hour attempt to rewrite its rules

21  was both contrary to the letter and spirit of the FINA rules and, independently,  in obvious

22  violation of U.S. and EU competition law.  At that point there was still time for the Turin Event to

23  proceed.

24          81.      FINA refused to cease its illegal, anti-competitive conduct.  It instead doubled

25  down on its strategy to block the Turin Event and to destroy ISL.  Mr. Marculescu separately

26  wrote to the Italian Swimming Federation on the same day in an e-mail bearing the subject line:

27  "NON APPROVED EVENT – UNAUTHORISED RELATIONSHIPS."  The Turin Event, he

28  assured the federation, required FINA approval.  He noted also that, given that the competition

1   was set for December 21-22, 2018, and that the FINA rules required six months' advance notice,

2   any request for approval "would be clearly late."

3          82.    Through its clear threats to the world's top-tier swimmers, FINA now stood firmly

4   between member federations supportive of ISL's approach generally, and the Turin Event in

5   particular, and the swimmers seeking to expand their opportunities.

6          83.    FINA did not just leave it to its successful coercion of member federations to

7   convey FINA's threats against swimmers' participation in the ISL event.  FINA also directly

8   confronted top swimmers or their coaches.  During the fifth stage of FINA's World Cup series,

9   held November 2-4, 2018, in Beijing, Mr. Marculescu, accosted world-renowned swimmer

10  Katinka Hosszú's coach while she was warming up before a race.  He warned: if Ms. Hosszú

11  insisted on participating in ISL's event, she would be banned from competing in the upcoming

12  FINA World Swimming Championships.

13         84.    Over the half a dozen years since her first FINA World Cup series win in 2012, Ms.

14  Hosszú had become the exclamation mark in FINA's headline swimming competitions.  By the

15  time Mr. Marculescu threatened her coach in Beijing over ISL, FINA had thrice named Ms.

16  Hosszú "Swimmer of the Year."  In addition to her victory in 2012, Ms. Hosszú had won the

17  2013, 2014, 2015, and 2016 World Cup series and finished second in 2017 (which she went on to

18  do again in 2018).  She had won 12 individual gold medals at FINA's biennial World Swimming

19  Championships, including six in 2016.  Along the way, Ms. Hosszú had become the sport's top

20  prize-earner, the first to break $1 million.

21         85.    But at the prospect of seeing Ms. Hosszú swimming in an "unauthorized" event

22  hosted by a competitor, FINA threatened to cut her off completely and to destroy her career.

23         86.    Shortly after Mr. Marculescu's poolside pressure, and in light of FINA's despotic

24  command, member federations around the world fell in line.

25         87.    There was no doubt that the federations would support FINA's command and give

26  force to FINA's threat of sanctions.  The national federations exist primarily, if not exclusively, to

27  prepare and present swimmers for competition in the Olympic Games.  Their relationship with

28  FINA is necessarily delicate and subservient to FINA's demands: FINA, through its Bureau, has

sole authority to recognize national federations, and it may terminate any member "for significant violation of FINA Rules." *See* FINA Rule C 10.3.  Given FINA's repeated missives against ISL's efforts, there was no mistaking that allowing swimmers to participate would constitute a "significant violation." And, in any event, FINA had just displayed its willingness and ability to re-interpret and revise its rules as it saw fit to keep out any competition and to keep the swimmers in FINA's thrall.

88.     So, the federations did what FINA told them to do.

89.     On November 6, 2018, the Swiss federation sent out an e-mail in which it "explicitly propose[d]" to its swimmers "**to _not_ participate in the "Energy for Swim" [ISL] Event 2018!**" If Swiss swimmers ignored that directive, "the Swiss Swimming Federation, as a FINA member organization, would be forced by FINA, [sic] to ban you for at least 1 year from all competition measures."

90.     Likewise, a lawyer for the Russian Olympic Committee advised on November 12, 2018, the nation's swimming federation members that in light of the FINA directive, athletes participating in the Turin Event would be disqualified from competing in FINA and federation events for one to two years.  Thus, both the Swiss and Russian federation felt compelled to threaten sanctions beyond banning swimmers from just FINA events and the Olympics.

91.     USA Swimming representatives held a conference call with national team members to discuss the December 2018 Event and FINA's threat.  Swimmers were told by those representatives that in light of FINA's power over the sport—and particularly access to the Olympic Games—the national federation was in a difficult position.  Reluctantly, it informed the swimmers that it would have no choice but to comply with any FINA directive to punish swimmers who participated in the Turin Event.

92.     Federations around the world sent similar e-mails, letters, and had similar conference calls with their swimmers, underscoring the impossible position that FINA had put them in.  *See, e.g.* Julian Linden, *Our golden girls unite for swimmers' rights*, Daily Telegraph, Dec. 4, 2018 (quoting Australian federation chief executive: "[W]e're the meat in the sandwich. . . .  We support our athletes but at the same time we are also a part of FINA so we're

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

36144\7727946.1

1  pretty much in the middle.").  Critically, the federations, or at least several of the key federations,

2  specifically discussed the issue with each other before determining and agreeing that FINA left

3  them no choice but to put muscle behind FINA's threats.  *See id.* (Australian federation executive:

4  "We've discussed the issue with the US, South Africa, the UK and so on[.]").

5          93.      Given that the national member federations (and/or their designee for the sport of

6  swimming) exist to promote the interests of their athletes, however, there is no legitimate

7  explanation for why they would agree among themselves and with FINA to help enforce FINA's

8  threat to ban swimmers from the Olympics if they participated in the Turin Event.  The only

9  logical explanation for their doing so was to help ensure that only FINA and its member

10  federations would remain the only entities able to organize and promote top-tier international

11  swimming competitions and thereby profit from those events.

12          94.      While plans for the Turin Event crumbled under FINA's pressure, ISL and its allies

13  nonetheless tried again to salvage it.

14          95.      Although, FINA's last-minute rule reinterpretation was patently unreasonable,

15  USA Swimming, in an e-mail sent on or around November 6, 2018, urged ISL and the Italian

16  Swimming Federation nevertheless to accept FINA's determination that the Turin Event would be

17  an "international competition" and instead seek an "exception" to the six-month notice

18  requirement.  Such exceptions had been granted before, USA Swimming's representative noted.

19  And granting it again would allow ISL to develop its league approach—which USA Swimming

20  "continue[s] to believe is an excellent concept."  Absent FINA mercy, however, the picture was

21  dire, because "USA Swimming is also bound by FINA rules, and we (our athletes and USA

22  Swimming) are caught in a predicament."  FINA's positive reaction "would help solve this

23  immediate challenge for athletes and federations."

24          96.      But, having so successfully waged its war of intimidation against the federations

25  and swimmers—both personally and through member federations with no real choice but to

26  comply—FINA refused.  Thus, given the real threat to the livelihoods and dreams of the

27  swimmers facing FINA's threat of suspension, the Italian Swimming Federation and ISL canceled

28  the Turin Event on November 15, 2018, under protest.  The Italian Swimming Federation notice,

1    sent out via letter over the federation president's signature, bemoaned "the absence of any

2    explanation or evidence to genuinely justify FINA's actions," concluding "that FINA's true

3    motive is to safeguard its dominant position as the sole and exclusive license holder of aquatics

4    sports."

5           97.     News of the cancellation at FINA's hands spread across the sports world.  Athletes

6    criticized FINA on social media.  Adam Peaty, an Olympic gold medal winner and five-time

7    World Champion, reported on Twitter that he was "incredibly disappointed" that the Turin Event

8    was cancelled and suggested that swimmers "need to ask why."  *See Adam Peaty criticises*

9    *decision to scrap International Swimming League*, BBC, Nov. 15, 2018,

10   https://www.bbc.com/sport/swimming/46224766.  On the other side of the globe, Olympic gold

11   medalist Cate Campbell complained that FINA was clearly "putting swimmers at the bottom of its

12   priority list."  *See* Julian Linden, *Our golden girls unite for swimmers' rights*, Daily Telegraph,

13   Dec. 4, 2018.  She added "I can guarantee that just about any athlete in the world would have said

14   that this ISL is a good thing . . . but FINA's worried that it's going to cut down on its revenue."

15   *Id.*  News outlets, meanwhile, noted the obvious: the Turin Event evaporated only because of

16   FINA's threat.  *See, e.g.*, Graham Dunbar, *Swim meet canceled after FINA's threat to ban*

17   *athletes*, Associated Press, Nov. 15, 2018, https://www.washingtonpost.com/sports/swim-meet-

18   canceled-after-world-bodys-threat-to-ban-athletes/2018/11/15/8c4241d4-e8e8-11e8-8449-

19   1ff263609a31_story.html?utm_term=.fb66362c322c.

20          98.     For its part, having been called out for its failure to justify its anti-competitive

21   squeeze against ISL, FINA created after-the-fact pretexts for its nakedly anti-competitive conduct,

22   dissembling in a November 16, 2018, statement that its conduct was necessary to maintain a

23   "coherent" and "healthy" event calendar consistent with FINA's "long-standing agreements and

24   precedents."  The Turin Event, FINA said, "adds an extra layer of complexity."  *See FINA*

25   *Statement*, Nov. 16, 2018, at http://www.fina.org/news/fina-statement-2.  What that meant,

26   exactly, remained unexplained.  Neither did FINA provide any further detail or rationale for its

27   anti-competitive conduct in a December 3, 2018, letter to FINA members.  In that letter, sent over

28   Mr. Marculescu's signature, FINA reiterated its vague concern for the "harmonious development

1   of the calendar," and suggested that was the reason it exerted its overwhelming power to crush the

2   Turin Event.  Further, and highlighting the fact that FINA intends to limit competition and keep

3   itself, alone, atop the market, he wrote that "FINA will resist any challenges to its status as the

4   international non-governmental organisation governing the sport of swimming at the world

5   level[.]"

6          99.     Finally, on December 5, 2018, FINA revealed its true motives.  In response to

7   swimmer criticism (and awareness of this inevitable lawsuit), FINA announced that it would itself

8   be launching an "innovative" new competition in 2019 to attract "the best athletes" in the sport.

9   *See* Nick Hope, *Adam Peaty criticism leads to FINA promising to 'modernise,'* BBC, Dec. 5,

10  2018, https://www.bbc.com/sport/swimming/46449762.  FINA again maneuvered that the ISL

11  event was sprung on FINA at the last minute and allegedly could not be approved due to "short

12  notice."  *Id.*  But repeating this misdirection did not make it true.  And FINA could not hide

13  reality: Having just three weeks before rationalized its crackdown against ISL because the

14  additional ISL meets would unduly disrupt the FINA calendar, FINA now intended to add *its own*

15  additional contests to the race calendar—and, on information and belief—in a format that will

16  closely follow, if not outright copy, the team-based, short-course innovations that ISL and its

17  affiliates have developed for years.

18         100.    Meanwhile, ISL, through Mr. Grigorishin's letter to swimmers, vowed to pay the

19  dozens of swimmers who had signed up for the Turin Event with appearance-fee contracts half of

20  their fees even though FINA forced its cancellation.  Despite the setback, he said, ISL will

21  continue to plan similar competitions: "Our ambitious plans for 2019 remain undiminished."  The

22  world's top-tier swimmers would be able to participate in such future events without interference

23  from FINA.

24  //

25  //

26  //

27  //

28  //

1   **V.    FINA'S UNLAWFUL MONOPOLY AND MONOPSONY**

2       **A.    FINA's Unlawful Monopoly Power In The Market For Top-Tier International Swimming Competitions**

3

4           **1.    The Organization And Promotion Of Top-Tier International Swimming Competition Constitutes The Relevant Product Market.**

5       101.    The relevant product market for ISL's monopoly claim is the market for the

6   organization and promotion of top-tier international swimming competitions.

7       102.    FINA itself and other entities that FINA approves organize and promote

8   international competitions featuring the world's top swimmers.  These events are held in venues

9   around the world.  The event organizers sell tickets to these events.  These events also generate or

10  are able to generate broadcast rights, merchandise, sponsorships, and collection of royalties or

11  other income derived from FINA, or from event-related intellectual property rights.

12      103.    A commercially successful promotion of a top-tier international swimming

13  competition requires multiple events of different styles and distances.  It necessarily requires the

14  participation of top-tier swimmers.  Such athletes are generally deemed to be swimmers who have

15  reputations for winning international competitions or specific events at such competitions,

16  including but not limited to the Olympic Games, the FINA Swimming World Cup, the FINA

17  World Swimming Championships, and the FINA World Championships.  The top-tier swimmers

18  are often, but not necessarily, athletes who swam for NCAA Division I collegiate teams and/or are

19  members or prior members of their country's national team.  Top-tier swimmers are also those

20  who have either set national or world records in their respective events, or have closely competed

21  with or defeated those swimmers who have.  Such swimmers are well-known in the swimming

22  community and can and do attract a large audience of fans.  These athletes have almost universally

23  trained intensively since they were children.

24      104.    Top-tier swimmers enjoy brief careers.  The youngest are most likely to be in their

25  mid- to late teenage years, and those in their late twenties are generally considered to be in the

26  twilight of their careers.  Thus, even a two-year ban from FINA-approved competitions can cause

27  top-tier swimmers to lose significant earning potential and brand-development opportunities for a

28

1   substantial portion—as much as one-fifth or one-quarter—of their careers.  The mere threat of

2   such a ban is sufficient to coerce most or all swimmers not to defy FINA.

3       105.    The organization and promotion of top-tier international swimming competitions is

4   not reasonably interchangeable with the promotion of any other sporting event.  Consumers who

5   attend top-tier international sporting events do so because of their dedication to, and appreciation

6   of, the sport and its best athletes.  Given that dedication and appreciation, as well as the many

7   differences between competitive swimming and other sports, such as soccer, American football,

8   baseball, and the like, other sporting events—including other *aquatic* events, such as high-diving

9   and artistic swimming—are not interchangeable with top-tier international swimming

10  competitions.  For similar reasons, the organization and promotion of top-tier international

11  swimming competitions is not reasonably interchangeable with the promotion of any other form of

12  entertainment.  Similarly, the highly specialized skills required to participate in the market as a

13  supplier of talent—*i.e.*, a swimmer—means that other aquatic events are not substitute uses of

14  swimmers skills and generally cannot serve as a viable competitor for their services.  This means

15  that any firm that is able to exclude other organizers of competitive swimming events effectively

16  has both monopoly control over consumers (as well as ancillary participants in event production)

17  and monopsony control over swimmers.

18      106.    Indeed, if FINA or FINA-approved event organizers were to raise ticket prices,

19  increase sponsorship or host-city fees, and impose other higher costs related to the organization

20  and promotion top-tier international swimming events by a small, but significant amount over a

21  non-transitory period of time, those increases would not decrease the net income or profit that

22  FINA or the FINA-approved organizers enjoy from exploitation of this market.

23      107.    The relevant geographic product market is the entire world.  Top-tier international

24  swimming competitions are held in cities across the globe.  Competitions may be organized, in

25  effect, anywhere a sufficiently sized pool exists or may be installed, which means events can be

26  and are held without regard for climate or topography of any particular location.  Specifically,

27  several FINA events or FINA-approved events featuring top-tier swimmers from multiple

28  countries occur in cities around the world every year.  Further, top-tier international swimming

1   competitions are governed generally by the same technical rules and types of races, regardless of

2   where such competitions are held.  The existing top-tier international swimming competitions also

3   draw audiences and patrons from around the world.

4           108.    Moreover, FINA's conduct has caused obvious and actual anti-competitive effects.

5   Not least of these was  the forced cancellation of the Turin Event, a result that necessarily reduced

6   output of the market by depriving customers of a top-tier international swimming competition—a

7   group that includes fans, broadcasters, media, sponsors, and licensees—the opportunity to attend,

8   view or profit from such competitions.  The blatantly anti-competitive effects are so obvious that

9   the general contours of a market defined as set forth above are more than sufficient to allow the

10  jury to determine the scope and legality of FINA's monopoly power.

11          **2.      FINA Has Unlawfully Monopolized Or Attempted To Monopolize The
                     Market For Top-Tier International Swimming Competitions.**

12

13          109.    FINA's control over and power in the market for top-tier international swimming

14  competitions is so complete that FINA constitutes a monopoly.

15          110.    FINA obtained and maintains that monopoly power over the market through anti-

16  competitive conduct as alleged in this Complaint.  FINA's exclusive ability to control access to

17  the Olympic Games, among other high-profile and potentially lucrative competitions, grants it

18  immense power over the world's swimmers.  Further, FINA's rules against unauthorized

19  relationships serve, intentionally, to restrict competitors' access to the necessary inputs—chiefly,

20  the services of top-tier swimmers—to enter into and compete in the market.

21          111.    Specifically, and as set forth above, FINA grants itself complete authority under its

22  rules to ban a swimmer from participating in events that serve as the Olympic Games qualifying

23  events for no reason other than the swimmer competed in a top-tier international swimming event

24  that FINA did not itself organize or approve.  Whether FINA does or does not actually ban such a

25  swimmer, the threat is real and severe enough to devastate competitive swimming.  Because of the

26  importance of the Olympic Games to participants in the labor market, this threat essentially gives

27  FINA monopsony control over the labor market, which in turn provides its monopoly power over

28  the non-Olympic portion of the output market.

112.   As alleged below, FINA's power to so control and restrict access to the Olympic Games constitutes monopsony power over the market for top-tier swimmer services.  That unlawful power grants FINA the means to force all top-tier swimmers to deal exclusively with FINA and thereby to foreclose competition in the market for the organization and promotion of top-tier international swimming competitions.  It is this simple: If FINA tells top-tier swimmers that they cannot compete for the Olympic Games if they provide their services to ISL events, those swimmers are effectively *forced under economic coercion to back out of their contracts* with ISL and/or with ISL-affiliated entities to compete at ISL events.  FINA's anti-competitive strategy thus results in a complete restriction of the supply of top-tier swimmers, without which ISL and others cannot compete in the market for organizing and promoting such competitions.  It also serves to enforce a monopsony of that related labor market, giving FINA a 100 percent share, or nearly a 100 percent share, of all world-class swimmers.  The result is that FINA has a 100 percent share, or near 100 percent share, of top-tier international swimming events.

113.   FINA's exercise of such power is not merely theoretical.  Among other examples, FINA's suppression of the planned Turin Event constitutes direct evidence of FINA's monopsony power.

114.   In the alternative, FINA's conduct as described in this Complaint constitutes attempted monopolization.  Its efforts to prevent ISL from promoting and organizing an independent top-tier international swimming competition and to restrict the ability of top-tier swimmers from competing in ISL events were at a minimum likely to result in the monopolization of the market for promoting and organizing such events.  FINA intended to acquire such power over the market, as evidenced by, among other facts alleged above, its multiple statements regarding ISL's non-recognition and its overt threats to member federations and top-tier swimmers who might have otherwise participated in hosting or competing in ISL events.  FINA's conduct effectively prevented ISL from organizing its events and, if left unchecked, will continue to prevent ISL and others from competing in the market, such that FINA's attempted monopolization—if not already achieved—will be permanently realized.

**B.** **FINA's Unlawful Monopsony Power In The Market For The Services Of Top-Tier Swimmers**

    **1.** **The Services Of Top-Tier Swimmers Constitutes The Relevant Input Market.**

115.    The relevant input market for ISL's monopsony claim is the market for the organization and promotion of top-tier international swimming competitions.

116.    As alleged above, top-tier swimmers are generally deemed to be athletes who have won international competitions or specific events at such competitions, including but not limited to the Olympic Games, the FINA Swimming World Cup, the FINA World Swimming Championships, and the FINA World Championships. The top-tier swimmers are often, but not necessarily, athletes who swam for NCAA Division I collegiate teams and/or are members or prior members of their country's national team. Top-tier swimmers are also or alternatively those who have either set national or world records in their respective events or have closely competed with or defeated those swimmers who have. Such swimmers are well-known in the swimming community and can, and do, attract a large audience of fans. These athletes have almost universally trained intensively since they were children.

117.    As noted above, top-tier swimmers enjoy only brief careers that generally end by the time they reach 30 years old. They accordingly must do what they can to maximize their potential during the limited swimming career they can enjoy. Even aside from being barred from the Olympic Games, a two-year ban from FINA-approved events can be expected to result in major income loss for a substantial portion of their life as a top-tier swimmer.

118.    Top-tier swimmers are compensated in various ways. Those who are members of their national teams frequently enjoy some level of stipend or other direct financial support. Up to 60 members of the U.S. national team who have exhausted or have agreed to forego their eligibility to swim for collegiate teams, for example, are paid a monthly stipend of up to $3,000 per month. Beyond that, top-tier swimmers earn prize money depending on their level of success at international competitions, sponsorships or endorsements that to a significant extent depend on the swimmers' success in the pool.

119.    Athletes who are considered top-tier swimmers cannot reasonably switch to other non-swimming sports and perform at or near the same level.  Top-tier swimmers have generally spent their entire lives training their skill set and preparing their bodies for prowess in the pool. While the level of athleticism that top-tier swimmers inherited and developed is necessary for any crossover success in other, non-swimming sports, it is not sufficient for such crossover endeavors. Top-tier swimmers could not transition to other sports in materially sufficient numbers to prevent a buyer of their services from obtaining and exploiting monopsony power for top-tier swimmer services or to prevent that monopsonist from artificially suppressing the compensation paid to those swimmers by even a large amount for a long period of time.

120.    The relevant geographic market for the services of top-tier swimmers is the entire world.  There are only a few hundred such swimmers across the entire world, and while large proportions of these swimmers reside in a few countries (*e.g.*, the United States), top-tier swimmers can compete and earn reasonable compensation for their services only in a market that allows them to compete with the best swimmers, wherever they may reside.  Necessarily, top-tier international swimming competitions that rely on the swimmers' services include swimmers from multiple nations and are held throughout the world.

121.    Moreover, FINA's conduct has caused obvious and actual anti-competitive effects. Not least of these is the complete restriction on swimmers' participation in the Turin Event.  The anti-competitive effects of FINA's restriction of the input market are so obvious that the general contours of the input market defined as set forth above are more than sufficient to allow the jury to determine the scope and legality of FINA's monopsony power.

**2.    FINA Has Unlawfully Monopsonized Or Attempted To Monopsonize The Market For The Services Of Top-Tier Swimmers.**

122.    FINA's control over and power in the market for the services of top-tier swimmers is so complete that it constitutes a monopsony.  FINA obtained and maintains, or attempts to obtain and maintain, that power over the market through the anti-competitive conduct alleged in this Complaint.  FINA's exclusive ability to control access to the Olympic Games, among other high-profile and potentially lucrative competitions, grants it immense power and control over the

1   world's swimmers.  Further, FINA's rules against unauthorized relationships serve, intentionally,

2   to prevent top-tier swimmers from offering their services to organizers and promoters of top-tier

3   international swimming competitions that are not FINA-approved.

4         123.    Specifically, and as set forth above, FINA enjoys complete authority under its

5   rules—as set, interpreted, and enforced by FINA and its member federations—to ban a swimmer

6   from participating in events that serve as the Olympic Games qualifying events for no reason other

7   than the swimmer competed in a top-tier international swimming event that FINA did not itself

8   organize or approve.  Whether FINA does or does not actually ban such a swimmer, the threat is

9   real and severe enough to prevent swimmers from participating in non-FINA events on the

10   swimmers' hope that FINA will not enforce its rules and will not follow through with its ban

11   threat.  The threat is also sufficiently credible that countries' federations warn swimmers not to

12   participate in non-FINA events on pain of being banned, as alleged above.

13         124.    FINA's power and control grants it the means to foreclose top-tier swimmers'

14   ability to service non-FINA competitions, and specifically ISL, and to suppress the non-FINA

15   demand for those swimmers' services.  FINA's exercise of such power is not merely theoretical.

16   Among other examples, FINA's crackdown against the December 2018 Event unlawfully

17   prevented top-tier swimmers *who already had contracts to participate* from proceeding in that

18   event.  FINA thus with its boycott unlawfully deprived ISL of the opportunity to pay top-tier

19   swimmers for their services.

20         125.    In direct response to the Turin Event, and on the heels of forcing its cancellation

21   by leveraging its monopsony power to restrict the supply of top-tier swimmers available to

22   compete in that event, FINA on November 6, 2018, announced that it would increase the total

23   prize money available at the FINA World Swimming Championships, set for December 11-16,

24   2018.  Just days before announcing that increase, FINA had confirmed that prizes for its

25   championship competition would remain at just below $1.2 million.  But it had since sabotaged

26   the Turin Event, drawing criticism from swimmers and fans around the world.  In a sop to

27   swimmers, FINA now increased the total prize money from about $1.2 million to about $2

28   million.  Even in raising prize money, FINA demonstrated its market power: the ability to control

1    price, independent of any changes in market conditions.  This is a textbook definition of market

2    power.

3         126.     Moreover, FINA's conduct as described in this Complaint constitutes attempted

4    monopsonization of the market for the services of top-tier swimmers.  Its rules and efforts to

5    prevent top-tier swimmers from competing in ISL events—or in any other unauthorized event—

6    are at a minimum likely to result in the monopolization of this market.  FINA has intended to

7    acquire such power over the market, as evidenced by, among other facts alleged above, its

8    unambiguous market-restricting rules, its multiple statements regarding ISL's non-recognition,

9    and its overt threats to member federations and top-tier swimmers who might have otherwise

10   hosted or competed in ISL events.  FINA's conduct precluded dozens of top-tier swimmers from

11   participating in the Turin Event.  If left unchecked, FINA will continue to prevent top-tier

12   swimmers from offering their services to competing buyers in the market, such that FINA's

13   attempted monopsonization—if not already achieved—will be permanently realized.

14        127.     As a result of FINA's unlawful monopsony over the input market, swimmers see

15   lower compensation levels than they would earn in a competitive market.  They also suffer a

16   reduction in opportunities to compete.  Further, it diminishes the sport generally by dynamically

17   lowering the incentive for future top-tier swimmers to dedicate the significant energy and

18   resources into becoming the best and entering the market, an outcome that, by the fact of reduced

19   competition, makes it less likely that records will be broken or threatened by more swimmers,

20   which in turn lowers interest in the sport.

## FIRST CAUSE OF ACTION

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

23        128.     ISL incorporates and re-alleges the foregoing allegations as if set forth fully in this

24   paragraph.

25        129.     FINA successfully compelled the support of multiple national federations to agree

26   among themselves and with FINA to carry out FINA's conduct described above.  Those national

27   federations are economic actors independent from each other and from FINA.  Because the

28   member federations and FINA are competitors in the market for the promotion and organization of

top-tier international swimming competitions, the resulting agreements to act as described above constitute a horizontal agreement.  In the alternative, and as the result of its framework as set forth above, FINA is the instrumentality of its member federations and its conduct therefore is necessarily the result of a horizontal agreement.  Alternatively, even if the federations and FINA are not viewed as competitors, FINA's power over, and intimidation of, the federations, also establishes that FINA has organized a horizontal boycott.

130.    Those national federations, through promulgation and interpretation of FINA rules and FINA's threats to those federations, have entered into a continuing agreement, combination, or conspiracy in restraint of trade.

131.    The agreement, combination, or conspiracy is driven by the intent to restrain, and it certainly has the effect of restraining, competition in the market for both the supply of labor of world-class swimmers and the prices which those swimmers can command at international competitions.

132.    As a result of the FINA-compelled agreement, combination, or conspiracy between itself and its economically independent member federations, FINA enjoys exclusive control over top-tier international swimming competitions.  FINA either hosts such events itself or requires entities seeking to host such competitions to obtain FINA approval before those events may effectively be held.

133.    The FINA-driven agreement, combination, or conspiracy and in particular the conduct that resulted in the cancellation of the Turin Event, had the specific intent of suppressing ISL's efforts to enter the market and to broaden the opportunities for the world's top swimmers. FINA and its conspirators control the market for international swimming competitions completely, and the successful plan to block ISL from entering the market is a naked attempt to maintain that control and deprive swimmers of additional opportunities, thereby depressing the prices the swimmers may command for their participation and successes in international competitions. Further, the concerted refusal to deal with ISL absent ISL's total capitulation to FINA's demand for tribute, directly prevented ISL and the world's top swimmers from forming relationships or, in some cases, to see the relationships that have been formed, from bearing commercial fruit.  As

1    such, the FINA-driven agreement, combination, or conspiracy constitutes an unlawful boycott

2    against ISL that effectively deprived ISL of the supply of labor from the world's best swimmers.

3    The anti-competitive nature of this conduct is manifest. And FINA cannot provide any plausible

4    pro-competitive or other justification.  As such, the conduct constitutes a *per se* violation of

5    Section 1 of the Sherman Act.

6          134.    Further, the FINA-driven agreement, combination, or conspiracy has resulted in an

7    agreement, understanding, or concerted action between and among FINA and FINA's co-

8    conspirators that results in competitive and economic advantages to FINA over all other non-

9    FINA entities that are located in the United States or, like ISL, that intend to organize for

10   commercial purposes international competitions in the United States.

11         135.    The FINA-driven agreement, combination, or conspiracy has resulted in an

12   agreement, understanding, or concerted action between and among FINA and FINA's co-

13   conspirators that results in FINA having firm, anti-competitive control over the prices that the

14   world's top swimmers may command for their services.  Such control reduces compensation and

15   the number of opportunities to compete.

16         136.    The FINA-driven agreement, combination, or conspiracy is facially anti-

17   competitive and inherently suspect.  In particular, it is the result of concerted action that denies

18   ISL and other entities the ability to organize international swimming competitions featuring the

19   world's best swimmers unless they first obtain FINA approval under FINA's onerous,

20   extortionate, and anti-competitive terms.  The anti-competitive nature of the FINA-driven

21   agreement, combination, or conspiracy is obvious.  Anyone can see it without resort to an in-depth

22   analysis of the industry.  So, FINA's conduct should be found to constitute a *per se* violation of

23   Section 1 of the Sherman Act.

24         137.    Moreover, even if FINA were allowed to try to justify the conduct described in this

25   Complaint, FINA would fail.  There remain reasonably less-restrictive means to promote any such

26   conceivable alleged purpose behind FINA's conduct.  Accordingly, even under a rule-of-reason

27   analysis, the FINA-driven agreement, combination, or conspiracy violates Section 1 of the

28   Sherman Act.

138.    The FINA-driven agreement, combination, or conspiracy occurred in and reasonably restrained interstate commerce.  It has prevented ISL already from holding a planned event in the United States, as well as in Europe.  It has already deprived the top-tier swimmers who contracted with ISL for the Turin Event from realizing the full amount of their appearance fees and benefitting from the market exposure that their participation would engender.  And the continuing nature of the FINA-driven collusive conduct means that these U.S. swimmers—and others—will continue to be deprived of the ability to maximize their commercial value.  Further, the challenged conduct deprives millions of U.S. fans of swimming competition the ability to enjoy an expanded competition calendar.  All of these injuries to competition will continue until FINA is enjoined from further engaging in that activity.

139.    Pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, ISL seeks issuance of an injunction against FINA, preventing and restraining the violations alleged herein.

## SECOND CAUSE OF ACTION

### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

140.    ISL incorporates and re-allege the foregoing allegations as if set forth fully in this paragraph.

141.    FINA, either acting alone or with its co-conspirators as set forth above, has obtained for FINA: (1) a monopoly in the market for top-tier international swimming competitions and (2) a monopsony in the market for the supply of the services of top-tier swimmers.  FINA has willfully maintained that power by the anti-competitive conduct set forth above, not least by shutting out ISL from the market for hosting international swimming competitions and by destroying ISL as a potential competitor to FINA-sponsored or FINA-sanctioned international competitions.

142.    In the alternative, FINA, either acting alone or with its co-conspirators as set forth above, specifically intended to and tried to obtain for FINA the monopoly and monopsony power by engaging in the conduct described above.  Such conduct is likely to result in the monopolization and/or monopsonization of the relevant markets alleged in this Complaint.  If not stopped, FINA's goal of monopoly and monopsony power will be achieved, to the detriment of

1  swimmers, competing event organizers, and consumers of top-tier international swimming

2  competitions (including fans, broadcasters, media outlets, sponsors and licensees).

3       143.   FINA's conduct, whether alone or with its co-conspirators as set forth above,

4  occurred in, and unreasonably restrained, interstate commerce.

5       144.   Further, FINA's efforts, whether alone or with its co-conspirators as set forth

6  above, to obtain and maintain its monopoly power has harmed ISL and competition in the relevant

7  market as set forth above and will continue to do so until FINA is enjoined from further engaging

8  in conduct to preserve and protect its monopoly power.

9       145.   Pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, ISL seeks issuance of an

10  injunction against FINA, preventing and restraining the violations alleged herein.

11                        **THIRD CAUSE OF ACTION**

12              **Tortious Interference With Prospective Economic Relations**

13       146.   ISL incorporates and re-allege the foregoing allegations as if set forth fully in this

14  paragraph.

15       147.   With regard to the Turin Event, ISL was in several economic relationships that

16  probably would have resulted in ISL's economic benefit.  Not least of these relationships were

17  ISL's dealings with the Italian Swimming Federation, prospective buyers of event broadcasting

18  rights, and prospective event licensees.  ISL stood to gain financially from these relationships in

19  the form of ticketing, broadcast, and licensing revenue, among others.

20       148.   FINA, itself very much steeped in the relationships required to organize, host,

21  sponsor, and/or earn revenue from top-tier international swimming competitions, knew of or had

22  reason to know of ISL's relationships and the financial benefits which would flow from those

23  relationships.

24       149.   Despite knowing of ISL's relationships and ISL's potential to gain from those

25  relationships, FINA engaged in the conduct set forth above.  That conduct, *by FINA's unlawful*

26  *design*, was intended to disrupt ISL's relationships.  At a minimum, FINA understood that its

27  conduct would result in circumstances making it substantially likely that ISL's relationships would

28  be disrupted.

1    150.    FINA's conduct, as described above, forced the cancellation of the Turin Event,

2    thereby disrupting ISL's economic relationships related to and/or arising from that event.  That

3    disruption caused ISL financial harm in an amount to be proved at trial.

4                                            **PRAYER FOR RELIEF**

5            Accordingly, ISL prays:

6            A.      That FINA's conduct as described above be declared a violation of Sections 1 and

7    2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

8            B.      That the Court issue a preliminary injunction prohibiting FINA from unlawfully

9    interfering in any way with the ability of ISL or any other person or entity from organizing or

10   promoting swimming competitions, including but not limited to an injunction prohibiting FINA

11   from unlawfully enforcing any sanctions against either swimmers or FINA member federations

12   who participate in such competitions;

13           C.      That the Court issue a permanent injunction prohibiting FINA from unlawfully

14   interfering in any way with the ability of ISL or any other person or entity from organizing or

15   promoting swimming competitions, including but not limited to an injunction prohibiting FINA

16   from unlawfully enforcing any sanctions against either swimmers or FINA member federations

17   who participate in such competitions;

18           D.      That the Court enjoin FINA from any further violations of the antitrust laws;

19           E.      That judgment be entered for ISL and against FINA, including, as allowed by law,

20   the award of reasonable costs and reasonable attorneys' fees incurred;

21           F.      That ISL be awarded treble damages, as allowed by law;

22           G.      That ISL be awarded such other, further, or alternative relief as the facts and law

23   may allow and/or that the Court may deem just and proper.

24
25   Dated:  December 7, 2018                      FARELLA BRAUN + MARTEL LLP

26                                                 By:  _____*/s/ Neil A. Goteiner*_____
27                                                         Neil A. Goteiner

28                                                 Attorneys for Plaintiff  International Swimming League,
                                                   Ltd.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT                                          40                                        36144\7727946.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**JURY DEMAND**</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all claims and issues so triable.

Dated:  December 7, 2018                    FARELLA BRAUN + MARTEL LLP


By:  _____*/s/ Neil A. Goteiner*_____
        Neil A. Goteiner

Attorneys for Plaintiff  International Swimming League, Ltd.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

36144\7727946.1