# EXHIBIT 78

**In the Matter Of:**

INTERNATIONAL SWIMMING LEAGUE v. FEDERATION INTERNATIONALE DE NATATION

3:18-CV-7394-JSC

---

**Deposition of:**

*MIKE UNGER*

*September 24, 2019*

---



(719) 578-2062

www.peltonreporting.com

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Civil Action No:  3:18-CV-7394-JSC

_____

INTERNATIONAL SWIMMING LEAGUE, LTD.,
          Plaintiff
vs.

FEDERATION INTERNATIONALE DE NATATION,

          Defendant

_____


Scheduling Attorney for the Plaintiff:
MR. NEIL GOTEINER, ESQ.
Farella Braun + Martel, LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400
ngoteiner@fbm.com

**Appearances continued on page 2**

_____

30(b)(6) DEPOSITION OF USA SWIMMING
REPRESENTATIVE IN INDIVIDUAL CAPACITY:  MICHAEL UNGER

September 24, 2019

```
 1    APPEARANCES CONTINUED:

 2
      For the Defendant FINA:
 3    MR. CHRISTOPHER S. YATES, ESQ.
      MR. AARON T. CHIU, ESQ.
 4    Latham & Watkins, LLP
      505 Montgomery Street, Suite 2000
 5    San Francisco, CA  94111-6538
      (415) 391-0600
 6    chris.yates@lw.com
      aaron.chiu@lw.com
 7

 8    For the Witness:
      MR. BRENT RYCHENER, ESQ.
 9    Bryan Cave Leighton Paisner, LLP
      90 South Cascade Avenue, Suite 1300
10    Colorado Springs, CO  80903
      brent.rychener@bclplaw.com
11

12    PURSUANT TO NOTICE, the deposition of MICHAEL UNGER was

13    taken on behalf of the Plaintiff, pursuant to the Federal

14    Rules of Civil Procedure, at 90 South Cascade, Suite 1100,

15    Colorado Springs, Colorado, this date at 9:02 a.m., before

16    Sandi K. Pelton, RPR, RMR, CRR, and Notary Public.

17

18

19

20

21

22

23

24

25
```



1          WHEREUPON, the following proceedings were had:

2

3                          MICHAEL UNGER,

4     the deponent herein, having been first duly sworn to state

5     the whole truth, testified on the oath as follows:

6                          EXAMINATION

7     BY MR. GOTEINER:

8          Q.   Good morning.

9          **A.   Good morning.**

10         Q.   Mr. Unger, my name is Neil Goteiner, and I

11    represent ISL and the class representatives in this case.

12    And I am going to be asking you some questions.  Has your

13    deposition been taken before?

14         **A.   Yes.**

15         Q.   Okay.

16         **A.   Not on this case.**

17         Q.   I know.  Several times, or --

18         **A.   Yes.**

19         Q.   Okay.  So, you know the rules.  One thing is if

20    you -- I do want to stress, if you don't understand a

21    question, don't answer it.

22         **A.   I understand that.**

23         Q.   Okay.  I know, but I want to emphasize that.

24         **A.   I appreciate that.**

25         Q.   If something I said is badly stated in terms of



1   being unintelligible, just tell me you don't understand it,

2   and what you don't understand, I will try to rephrase it.

3          Now, there may be objections.  I am sure there

4   will be objections from time to time.  I may not pay

5   attention to them.  It is not because I am being

6   disrespectful.  I have thought about the objection.  I have

7   decided I don't want to change anything.  So, I am just

8   disagreeing with the objection.

9        A.   May I stop for a second?

10       Q.   Yes.

11       A.   May I get one of the waters?  You can throw it.

12   It is good.

13       Q.   That's it in terms of what I wanted to say.  You

14   are here as a 30(b)(6) witness for USA Swimming and also in

15   your individual capacity; is that right?

16       A.   I don't know what 30(b)(6) means.

17       Q.   Okay.  You are testifying on behalf of USA

18   Swimming?

19       A.   I believe so, yes.

20       Q.   Okay.  And did you speak with anyone at USA

21   Swimming, aside from your attorneys, in connection with

22   getting prepared for this deposition?

23       A.   No.  Just -- just myself, essentially, and our

24   attorney at USA Swimming.

25       Q.   That is Lucinda McRoberts?



1      A.   That's correct.

2      Q.   And did you review any pleadings in connection

3  with this case in preparation for your testimony?

4      A.   I think I read parts of the initial complaint.  I

5  am not sure if -- or lawsuit.  I don't know what -- legally

6  what that would be.

7      Q.   All right.

8      A.   When it first came out in December of '18, or

9  maybe it was in January of '19.  I can't remember the actual

10  date when it came out.  But I think I remember reading parts

11  of it.  I remember seeing some things where it was referred

12  to about USA Swimming, and I realized, oh, that's me.

13      Q.   What do you mean by that?  I am being facetious.

14  You don't have to answer that question unless you want to.

15  What did you mean when you said that, I guess I should ask?

16      A.   I was the only person at USA Swimming that was

17  working on this.  There were some others that were doing

18  some secondary work.  But I was the only person that was

19  working on this.

20      Q.   Approximately when did you first become aware of

21  ISL or Energy Swim?

22      MR. YATES:  Objection to form.  Compound.

23      A.   I was approached in 2016 at the Olympic Games in

24  Rio de Janeiro by Andrea Di Nino, who was a long-time friend

25  of mine, who I had worked with on many other occasions.  An



1    Italian coach, and also ran a swim club.

2             And he came to me and said that there is a

3    possibility for a new product in the swimming world, a new

4    competition product.  And, so, we talked about that in 2016,

5    August, early August.  And not much happened over some

6    months.  So, that was the first time.

7        Q.   Okay.  Did you come to the opinion that it was a

8    new competition product?

9        A.   I am -- I have been around swimming a long time.

10   I have been at USA Swimming for 26 years.  I thought to

11   myself, we have done that before.  We -- we started a new

12   product in 2003 called the Duel in the Pool.

13            And, honestly, the -- the league that they were

14   talking about, team versus team, country versus country,

15   club versus club, was something we had done before in this

16   country.  The NCAA system is exactly that.  So, I thought,

17   okay, this is interesting, but I don't know how new it is

18   going to be.

19       Q.   Compared to what FINA was doing, was it

20   different?

21            MR. YATES:  Objection to form.

22       A.   I didn't know what -- in 2016, I can't answer

23   that question.  I didn't know what they were really talking

24   about yet.

25       Q.   Okay.  Did there come a time when you knew what



1    they were talking about?

2         A.   Yes.  I was supportive of the 2017 Energy

3    Standard event in Rome, and was the person that put together

4    the U.S. team, which we sort of did through our federation,

5    USA Swimming, and directly with athletes as well.

6              And the Energy Standard event took place in early

7    August in Rome.  And it was slightly different than FINA,

8    yes.  But not much different than what we had done.  So, we

9    thought it was interesting and good for athletes.

10        Q.   And why was it good for athletes?

11        A.   Just gave the athletes another chance to compete.

12   Any opportunity for athletes to compete and potentially

13   raise some revenue for themselves.  Earning a living is a

14   good -- is generally a good thing.  Not always, but

15   generally a good thing.

16        Q.   Why is it generally a good thing?

17             MR. YATES:  Objection.  Form.

18        A.   So, it generally is a good thing because we are

19   supportive of athletes' rights and opportunities for

20   athletes to make money; however, that needs to be -- I work

21   at USA Swimming.  Our ultimate goal is -- from a competition

22   standpoint and a performance standpoint, is to win Olympic

23   gold medals, win world championship gold medals, medals in

24   general, and put forward the best team in the world, which

25   we have for many years, fortunately.



1          When athletes and coaches have to balance our

2   training schedule, another professional obligation schedule,

3   with competitions and other opportunities, there has to be

4   some balance.  And, so, I think that's the almost always

5   situation, if I could explain that like that.

6          Q.   Okay.

7          A.   Does that make sense?

8          Q.   It does.  Did you see it either being this

9   balance with what ISL was attempting to do with USA

10  Swimming?

11         MR. YATES:  Objection to form.

12         A.   I -- initially, that was not a question.  It was

13  really not an issue.  Over time I thought it could be a

14  problem, and I voiced that with the ISL people I work with

15  on many occasions.

16         Q.   Okay.  And did you see a way of resolving it

17  by --

18         A.   Yes.

19         Q.   -- 2018?

20         A.   No.  It wasn't even an issue in 2018, because it

21  was very minor then.  It was more what was going to happen

22  in 2019, 2020, 2021, and blossoming into more competitions,

23  which could be good, but then, again, that balance needs to

24  be kept.

25         Q.   What were the competitions up until May of 2018



1    that were discussed?

2         A.   Well --

3         Q.   That were discussed with you?

4         A.   The one that actually had taken place was in Rome

5    in 2017, August.  But the ones that were talked about were a

6    series of maybe 12 or 16 teams meeting on five or six

7    different occasions.

8              The plans were being drafted, and drawn up, and

9    were being shown to some of the likely participating clubs

10   and countries and coaches even.  And there was concern from

11   a number of people that there were going a little too fast,

12   and that they were -- had too many competitions that were

13   going to be out there early in this stage.

14        Q.   This was in the early part of 2018?

15        A.   Yeah.  Actually, it was in May of 2018.  So, yes.

16        Q.   Okay.  And that had -- and you became aware of

17   that in Turkey?

18        A.   I was aware before Turkey, but acutely aware in

19   Turkey.

20        Q.   Okay.  And -- but you -- you did want to proceed

21   with ISL in an event in the United States, correct?

22             MR. YATES:  Objection.  Form.

23        A.   We were investigating whether an event in the

24   United States was the right thing to do.

25        Q.   Right.



MIKE UNGER
INTERNATIONAL SWIMMING LEAGUE v. FEDERATION INTERNATIONALE DE NATATION   September 24, 2019

13

```
 1        A.   And, so, at that point -- again, we are advancing
 2   some months now from when we started.
 3        Q.   Right.
 4        A.   But in May of 2018, yes, we were still inquiring
 5   and looking, and we had done site visits on a couple of
 6   sites, but we weren't there yet.  We were still in the
 7   process.
 8        Q.   Of doing what?
 9        A.   Due diligence on our side.  Due diligence with
10   venues, with just everything.  It was all moving down the
11   same path, but -- or parallel paths, I should say, but we
12   were still investigating whether it was the right thing to
13   do.
14        Q.   In 2018 --
15        A.   Yes.
16        Q.   -- you -- you were writing various people that
17   ISL wanted to proceed in Las Vegas as a venue; is that
18   right?
19             MR. YATES:  Objection.  Form.
20        A.   Well, yes.  We had -- to be honest with you, we
21   had proposed a number of sites.  And if you look at some of
22   the emails, in fact, there were a stack of sites that were
23   proposed.
24             We narrowed it down -- they narrowed it down for
25   us, the ISL contacts that I had, and ultimately we decided
```



```
1    to take a visit to two cities.  To Las Vegas -- this is

2    early May of 2018 -- to Las Vegas and to Los Angeles to see

3    the University of Southern California campus or complex.

4              While there, I told the ISL -- there were two

5    gentlemen with me from ISL.  I told them point-blank, this

6    would be -- I know that Las Vegas is sexier and has more

7    glitz to it.  But that is not the best choice right now.

8              This choice right now, we are in May, and you are

9    talking about an event in December, that is six -- six and a

10   half months away.  That is extraordinarily tight to do

11   anything.  And I advised them to pick USC, because that was

12   a sure thing in the first year.

13             And I am -- I have come from an event background.

14   You don't take chances like that.  So, I advised them that,

15   but they didn't go with that they really wanted to pursue

16   the Las Vegas angle.

17        Q.   And as I recall, in Turkey --

18        A.   Yes.

19        Q.   -- you made some comments to the group and

20   announced that the event -- the planned event was going to

21   be in Las Vegas?

22        A.   I don't recall saying that.

23        Q.   Okay.  Okay.  Did you see any documents which

24   reported you as saying that?

25        A.   I don't believe I saw any documents that reported
```



1   me as saying that.  I don't believe I said that.  We had not

2   signed any deal yet.  We were strictly investigating at that

3   point.  And, I mean, we were serious about it.

4           I am -- I don't want to minimize our intent or

5   our thought process on it.  But there were still a lot of

6   details that had to be worked out if -- if Las Vegas was

7   going to be the city.

8       Q.   Right.  But I thought either you or someone else

9   at ISL -- not ISL -- at USA Swimming had pointed out that

10   these details were not, quote, insurmountable, unquote.  Do

11   you recall that?

12          MR. YATES:  Objection to the form.

13      A.   I don't recall that.  I'm sorry, I don't --

14      Q.   Yeah.  Please.  We will get to documents soon

15   enough.

16      A.   Sure, sure.  Okay.

17      Q.   I am trying to get an overall view of what all

18   was going on during this period.

19      A.   Yeah.

20      Q.   Prior to -- but you recall that you sought

21   approval around this time in May?  You recall that you

22   sought approval from Cornel Marculescu about doing the event

23   with ISL?

24          MR. YATES:  Objection to form.

25      A.   I had -- I don't recall specifically.  I had



1   conversations with Cornel on many occasions about -- about

2   20 different topics.  So, I don't recall specifically about

3   whether we sought approval from FINA.

4        Q.   Okay.

5        A.   I want to go backwards a little bit.

6        Q.   Okay.

7        A.   We communicated with FINA on a regular basis

8   about our conversations with the ISL team.  We -- we were

9   transparent as transparent could be about, "Cornel, this is

10  what we are doing and talking about."

11            And we told ISL, "Hey, we are talking to FINA and

12  telling them everything.  We are -- we are right down the

13  middle.  We want to work with both of you."

14            But -- but we did not -- we didn't seek approval

15  from Cornel on this.  I don't believe we did.

16       Q.   Okay.  The documents -- have you looked at some

17  documents?

18       A.   I have looked at documents.  I don't -- I don't

19  recall that specifically.

20       Q.   Okay.  All right.  We will -- you don't have to

21  remember everything.  That's why we have the documents.

22       A.   I don't remember everything.

23       Q.   I am not suggesting you should.  Let's go -- when

24  you say you wanted to go right down the middle, what do you

25  mean by that?



```
 1        A.   We have a -- I worked at -- as I said, 26 years.
 2   We have a lengthy relationship with FINA.  A very positive
 3   relationship with FINA.  We do many, many things on many
 4   different topics.
 5            And, so, we appreciate FINA.  We do not always
 6   agree with FINA.  We have discussions and debate about that
 7   like any organization would.  So, we have a good -- but I
 8   would consider it a very positive relationship.  We also
 9   have a very positive relationship with ISL.  And I think I
10   have proven my own worth with ISL that I back them, and we
11   put a team forward for 2017 to help support the event in
12   Rome.
13            And then had continued conversations, and was an
14   honest and contributing partner with them through the --
15   through the -- those months leading up to when some
16   challenges took place.  And, so, I -- we wanted to work with
17   both parties.
18        Q.   Okay.
19        A.   And, Neil, I would say to you, and I will
20   probably say this many times today, we told FINA on
21   countless occasions, "You must get to the table with ISL."
22   And we told ISL on more occasions, "You must get to the
23   table with FINA."
24        Q.   I have seen that.
25        A.   I have said that hundreds of times, and that is
```



1    not hyperbole.

2         Q.   I see reflection of that.

3         A.   Okay.

4         Q.   Let's go back a little bit.

5         A.   Okay.

6         Q.   So, whatever conversations you were having with

7    ISL, you would report to FINA.

8         A.   I am -- not report -- not tell every detail, but

9    if something -- generally, yes.

10        Q.   Let me rephrase the question.

11        A.   Yes.

12        Q.   In terms of developments with ISL, in terms of

13   status of the potential event, you would report that to

14   someone at FINA, generally?

15        A.   Not -- not always, but in -- in general terms,

16   yes, we would say, hey, we are working with FINA, or we are

17   working with ISL.  They are inquiring about this or that.

18   It wasn't like when there was news I would go to tell Cornel

19   something.

20        Q.   All right.  And Cornel was your main contact

21   there?

22        A.   Cornel is the main contact at FINA.

23        Q.   All right.  Was and is?

24        A.   Is the main contact at FINA.

25        Q.   Forever?



 1       A.   Yeah.

 2       Q.   All right.  And what about Neuburger?  I thought

 3  you had some contact with him as well?

 4       A.   I have contact with Dale Neuburger as well.

 5       Q.   Okay.  And I saw a couple of references in your

 6  writings that Dale Neuburger is strongly against ISL.  Do

 7  you recall your comments to people about that?

 8            MR. YATES:  Objection to form.

 9       A.   I think I wrote something to that effect on one

10  or two occasions.

11       Q.   Okay.  I saw it only twice.

12       A.   Right.  I saw one, but I -- there may have been

13  another, right.

14       Q.   And was that always the case with Dale Neuburger,

15  if you recall?

16            MR. YATES:  Objection.  Form.

17       A.   I don't -- I don't remember.  I don't remember

18  exactly.  I mean, at some point he let me know that there

19  was some -- there was some concerns from his side.

20       Q.   Who did he represent, by the way?

21       A.   I can't answer that question.

22       Q.   Okay.  Well, he was -- had a -- he was vice

23  president of FINA, correct?

24       A.   Yes.

25       Q.   And he was -- and in 2018, he was on the board of



```
 1    USA Swimming, correct?
 2         A.   That's correct.  Ex officio on our board, but,
 3    yes.
 4         Q.   And the -- the mission of USA swimmers -- one of
 5    the missions of USA Swimming is to assist USA swimmers,
 6    correct?
 7         A.   That is -- in so many words, that's pretty
 8    direct, but, yes.
 9         Q.   And we talked about competition.  You want USA
10    Swimming teams to win, correct?
11         A.   That's correct.
12         Q.   And that's important to USA Swimming?
13         A.   Yes.
14         Q.   And your allegiance is to the USA swimmers, not
15    to foreign swimmers, correct?
16         A.   That is correct.
17         Q.   Okay.  And FINA's job is something -- FINA's
18    mission is something different, correct?
19              MR. YATES:  Objection.  Form.
20    BY MR. GOTEINER:
21         Q.   That is a bad question.  That is an example of
22    where he made a point.
23         A.   Thanks for going after yourself.  That's good.
24         Q.   I am not proud.  The -- okay.  Let's proceed for
25    a minute in a somewhat linear fashion for at least a few
```



1      A.   Even to the point of -- and this is how

2   transparent -- to prove some transparency to you.  And I

3   know the date specifically for some other odd reasons, but

4   on February 8th of 2018, Tim Hinchey, our CEO at USA

5   Swimming, and I were visiting with the FINA office and with

6   Cornel Marculescu and a variety of his staff in Lasone,

7   Switzerland.  That was in the morning.  And we used a FINA

8   car to drive us to Geneva in the afternoon for a meeting

9   with ISL.  Konstantin Grigorishin, Andrea Di Nino, Ali Khan,

10  David Rouger.  Another gentleman.

11          THE WITNESS:  You are going to need help with

12  names, I know.  Sorry.  And I can help you on a break.

13     A.   But that afternoon we went to a meeting with ISL,

14  and we told FINA we were meeting with ISL, and we told ISL

15  we had just come from meeting with FINA.  It was very sort

16  of open about what we were doing.

17     Q.   Right.  Now, I understood there were some

18  disagreements between USA Swimming and Cornel about an ISL

19  USA joint meet, correct?

20          MR. YATES:  Objection to form.

21     A.   **Initially, I don't believe that was the case.**

22     Q.   Not initially, but by the time of that -- well,

23  by the time of the February 8th meeting --

24     A.   **Yes.**

25     Q.   -- in Lausanne, do you recall leading up to that



1    and in the meeting there was some disagreement about whether

2    or not USA Swimming should work with ISL and putting on a

3    meet in the United States?

4              MR. YATES:  Objection to form.

5         A.   I don't recall that in the meeting.

6         Q.   Do you recall the subject of the speed skating

7    decision --

8         A.   Yes, I do --

9         Q.   -- from the commission -- from the European

10   commission?

11        A.   I do remember that case.

12        Q.   And you remember that very case came up in this

13   Lausanne meeting with Cornel?

14        A.   I do not remember that, but I do know the case.

15        Q.   Okay.  And do you recall that you specifically

16   told me that that -- in our conversation in November that

17   that meeting came up, and Cornel had some opinions on it?

18             MR. YATES:  Objection to form.  What meeting are

19   you referring to?

20        A.   Now that you say that, yeah, I do remember a

21   little bit about that.

22        Q.   Okay.  Tell me what you remember about the

23   discussion with Cornel Marculescu at the February 8th

24   meeting about the speed skating case.

25             MR. YATES:  Counsel, can you -- you attempted to



1   refresh the witness' recollection by referring to, it sounds

2   like, an ex parte communication with the witness.

3            MR. GOTEINER:  A what?

4            MR. YATES:  Ex parte communication with the

5   witness.  He was represented by counsel.

6            MR. GOTEINER:  No, he wasn't adverse.

7            MR. YATES:  Why don't you lay a little foundation

8   and have --

9   BY MR. GOTEINER:

10       Q.   Why don't you answer the question, okay?  Just

11   tell me what was discussed.

12       **A.   Discussed with you or with --**

13       Q.   No, no.  With -- with Cornel Marculescu in that

14   group regarding the speed skating decision.

15            MR. YATES:  Objection to form.

16       **A.   Honestly, until you reminded me of that, I did**

17   **not really remember the details of that -- of that -- that**

18   **we even had discussed that on February 8th.**

19       Q.   Okay.  Well --

20       **A.   That's not -- I am telling you the truth,**

21   **because --**

22       Q.   I believe you.

23       **A.   I do not -- I mean, we met with Cornel on -- as I**

24   **said, we were not meeting with Cornel to talk about ISL.  We**

25   **met with Cornel on about 10 different topics.  And that was**



1    one that came up through the course of the day.

2        Q.    Well, it was on the agenda, correct?

3        A.    I can't recall if it was on the agenda, but it

4    could have been on the agenda.

5        Q.    I will represent to you it was on the agenda.

6        A.    Okay.

7        Q.    If need to, we will get to it.  But I would like

8    to just try and refresh your recollection about why that

9    decision came up.  You say you know about the decision?

10       A.    I do know about the decision.

11       Q.    What is your understanding of it?

12       A.    That the European Labour Court, I believe it was,

13   voted or decided in favor of athletes having the ability to

14   work with another organization besides the ISU, which is the

15   International Skating Union.  I think that's probably a fair

16   summary of that.

17       Q.    Okay.  And do you recall the reason that came up

18   was because Cornel Marculescu and perhaps others at FINA,

19   were taking a position inconsistent with the speed skating

20   case?

21             MR. YATES:  Objection to form.  Lacks foundation.

22   Assumes facts.

23       A.    I -- I understand, as I remember, that Cornel

24   didn't really think that that case applied to what was going

25   on in FINA.



```
 1        Q.   That's correct.  And he told you, first of all,

 2   it did not apply to the United States; it was a European

 3   decision, correct?

 4             MR. YATES:  Objection to form.

 5        A.   Again, you remember.  I don't.

 6        Q.   Okay.

 7        A.   It is very possible, but, yes, I don't remember

 8   exactly that.

 9        Q.   Okay.  And do you recall that in that discussion

10   people started talking about antitrust violations if FINA

11   proceeded to go beyond their mandate?

12             MR. YATES:  Objection to form.

13        A.   I don't recall.

14        Q.   Do you recall shortly thereafter or in the

15   context of discussions at USA Swimming that that issue came

16   up, that FINA was going to be on its mandate and could be in

17   violation of the European commission decision in the speed

18   skating case?

19             MR. YATES:  Objection to form.

20        A.   Within USA Swimming's conversations?

21        Q.   Yes.

22        A.   I do not recall that.

23        Q.   So, you have no other recollection now of why

24   that speed skating case came up?

25             MR. YATES:  Objection.  Form.  Lacks foundation.
```



```
1    Assumes facts.  You haven't established it actually did come

2    up.

3                 MR. GOTEINER:  Do you know, let's go off the

4    record for a second.

5                       (Discussion off the record.)

6    BY MR. GOTEINER:

7        Q.   So, let's proceed.  All right.  Do you recall any

8    other discussions with FINA about ISL at about the time of

9    the February 8th meeting?

10       A.   I don't, actually.  I remember the circumstances

11   that we were there.  But I don't specifically recall what

12   was discussed ISL-wise.  In fact, you obviously had to

13   prompt me for -- to remember a little bit more about the

14   speed skating case.

15       Q.   You mentioned that there were tensions that did

16   arise between FINA and USA Swimming regarding USA Swimming's

17   desire to work with ISL.  When did they arise?

18       A.   I think I became most acutely aware of that

19   concern on Memorial Day of 2018.  So, late May of 2018.

20       Q.   And, so, was this -- well, you were at the Turkey

21   event.  Did you call Cornel from the Turkey event to speak

22   with him about what happened?

23       A.   I don't remember.

24       Q.   Okay.

25       A.   I actually -- no, I don't believe I did.
```



```
 1    meeting in Turkey?

 2         A.    Yes.

 3         Q.    Okay.  And Tom Avischious is who?

 4         A.    He is one of our -- senior director for sports

 5    development.

 6         Q.    Okay.

 7         A.    Works with our clubs around the country.

 8         Q.    All right.  You recall writing this email?

 9         A.    Seeing it now, I recall writing it.

10         Q.    Okay.  So, it says, "We are being" -- in the

11    second paragraph, he wrote, "Good appearance and prize

12    money.  We are being asked to host in Las Vegas.  But FINA

13    doesn't like it."

14               Who at FINA didn't -- told you that they didn't

15    want you to host in Las Vegas?

16               MR. YATES:  Objection to form.

17         A.    The specifics of what you just asked aren't -- I

18    would interpret what I wrote slightly differently.

19         Q.    Okay.

20         A.    FINA doesn't like -- not necessarily us hosting

21    in Las Vegas.  FINA doesn't like the event in general.

22    There is concern about the event, about this league.

23         Q.    About the event that was to be in Las Vegas?

24         A.    No.  No.

25               MR. YATES:  Objection.  Mischaracterizes.  I will
```



```
 1   suggest, you guys are probably making it difficult for
 2   Sandi.  You are talking over each other a lot.
 3           THE WITNESS:  I apologize for that.
 4   BY MR. GOTEINER:
 5       Q.   So, "it" meaning what?
 6       A.   FINA doesn't like, in general, the concept of
 7   this league.
 8       Q.   Okay.
 9       A.   Not necessarily the Las Vegas part.
10       Q.   And do you recall that is what you meant when you
11   wrote this?
12       A.   Definitely.
13       Q.   You said, "Right now turning into a battle
14   between ISL and FINA."
15           Do you see that?
16       A.   Yes.
17       Q.   And do you recall who was participating in the
18   battle?
19       A.   Well, honestly, it was a battle between the
20   personalities of two people.  It was Cornel Marculescu
21   representing FINA, and apparently -- and I don't know
22   specifically, but Konstantin Grigorishin from ISL.
23       Q.   Okay.
24       A.   Can I give you one piece of background that may
25   help you?
```



1      Q.   Sure.

2      A.   FINA's antenna on other organizations in the
3   sport went up some months before ISL.

4      Q.   Okay.

5      A.   The American Swimming Coaches Association was not
6   a fan of FINA on a variety of topics and started talking
7   about a world swimming association.

8      Q.   Uh-huh.

9      A.   And, so, I believe that when ISL came along,
10   timing was not good.  And FINA was of some concern that
11   there was some connection between the American Swimming
12   Coaches Association's efforts and ISL.

13      Q.   Okay.  And I saw some emails, and I know what you
14   are talking about.  Why don't you look at Exhibit 14.

15      A.   What do I do with this one?

16      Q.   Just leave it there.  So, here is an email from
17   you to Lindsay Mintenko, who I understand is a colleague of
18   yours; is that right?

19      A.   Yes.  She works with me, yes.

20      Q.   And you wrote, "The big obstacle still remains
21   the ISL relationship with FINA.  We will not do anything to
22   upset the FINA relationship.  Spent 30 minutes on the phone
23   this morning with Cornel.  Oh, boy, this is a tough topic.
24   I can explain more when we talk."

25           Do you recall anything about the conversation?



 1       A.   Conversation with Lindsay?

 2       Q.   No.  With Cornel.

 3       A.   I recall that Cornel was upset that we were

 4   involved with this -- efforts with this league.

 5       Q.   Well, he had gotten an email that said that you

 6   had said there was going to be a meet in Las Vegas.

 7            MR. YATES:  Objection.  Form.

 8       A.   I don't know that.

 9       Q.   I know.  We will show it to you.  And there was

10   an email between him and Neuburger.  So, why -- why -- you

11   returned from Turkey?

12       A.   Uh-huh.

13       Q.   You just returned.  I think you were there the

14   24th and 25th?

15       A.   Sounds about right.

16       Q.   Okay.  And he speaks to you.  You tell him that

17   Las Vegas was mentioned; that this is a discussion, correct?

18       A.   I don't recall specifically.

19       Q.   Do you recall generally telling him that --

20   speaking to him about a planned meet in Las Vegas?

21            MR. YATES:  Objection.  Form.

22       A.   I don't recall specifically whether I mentioned

23   Las Vegas or not.

24       Q.   Do you recall generally?

25            MR. YATES:  Objection to form.



1      A.   I -- I would be guessing to know exactly what I

2   said.

3      Q.   Why was he upset?  You come back from Turkey and

4   he was upset.  What did he tell you he was upset about?

5           MR. YATES:  Objection to form.

6      A.   I --

7           MR. YATES:  Asked and answered.

8      A.   I can't -- I can't go inside of his head to know

9   what he was upset about, specifically.  And you are asking

10   me to recall whether I said something to him on the phone

11   about Las Vegas, and I don't recall.

12      Q.   Okay.  You needed his approval for the meet,

13   correct?

14           MR. YATES:  Objection to form.

15      A.   I would have to go back to some of the FINA rules

16   to see if we needed FINA approval.  I believe we did,

17   according to -- I believe we did.  If it was run a certain

18   way.  I would have to go back to look at the FINA rule book

19   on that to answer if we needed his approval.

20      Q.   Okay.  Let's put it this way:  You were making it

21   clear to everyone you were speaking to at that point in time

22   that you would not proceed with the Las Vegas event with ISL

23   unless Cornel approved it?  Weren't you telling people that,

24   everyone you spoke with about this?

25      A.   Yes.



1       Q.   That's a pretty scary sanction against USA

2  swimmers and USA Swimming, isn't it?

3            MR. YATES:  Objection to form.

4  BY MR. GOTEINER:

5       Q.   Wasn't it?

6       A.   Yes.  We took it very seriously.

7       Q.   And, therefore, you needed approval from Cornel

8  before you could proceed working with ISL; is that correct?

9            MR. YATES:  Objection to form.

10      A.   I don't recall whether we -- in a general sense,

11  yes, we wanted FINA to approve of this competition.

12      Q.   And specifically, not just generally,

13  specifically you were absolutely focused as the chief

14  operating officer of USA Swimming on getting that approval

15  before you could continue with ISL; is that correct?

16      A.   Yes.  Except that we were -- whether the

17  competition was held in Las Vegas or not at that point was

18  not material to us.  It was important, but it wasn't --

19  there was no urgency to host it.

20           We weren't looking for extra work.  But our

21  relationship with ISL was contingent upon -- I mean, we

22  wanted to make sure that our athletes weren't going to be

23  walking into the crosshairs by representing -- by

24  participating when they shouldn't have been participating.

25      Q.   And by "the crosshairs," you mean the crosshairs



 1    of being sanctioned by FINA?

 2         A.    **Potentially, correct.**

 3         Q.    All right.  But you were excited to do this meet

 4    with ISL, you wrote?

 5         A.    **Yes.  We thought this was a good opportunity.**

 6         Q.    You were -- and you were excited because you

 7    thought it would be a great thing for USA swimmers, correct?

 8         A.    **Potentially correct, yes.**

 9         Q.    Okay.  But that's what you were assuming?

10         A.    **Yes.**

11         Q.    All right.  Let's go to -- I just -- never mind.

12               MR. GOTEINER:  30 will be another of Mr. Unger's

13    emails to Ali Khan.

14                     (Deposition Exhibit 30 was marked.)

15    BY MR. GOTEINER:

16         Q.    Sir, this is -- I will identify it for the record

17    while you look at it.  This is a June 4 email from you to

18    Ali Khan dated June 4.  You wrote this email?

19         A.    **Can you just give me -- yes, I wrote it, but give**

20    **me a second to read it.  I am not a super fast reader.**

21         Q.    Take your time.

22         A.    **Yes.**

23         Q.    And you were being accurate with Mr. Khan?

24         A.    **Yes.**

25         Q.    Well, here he says, "We care about our



1   relationship with FINA and want to make sure it approves of

2   this competition series."

3           So, you wanted to make sure that FINA approved of

4   this specific Las Vegas competition, correct?

5       A.   Not Las Vegas.  The series in general.

6       Q.   What series?

7       A.   The competition -- the competition could have

8   been in London or somewhere else as well.  We didn't know at

9   this point that it was going to be Las Vegas.

10      Q.   Well, you --

11      A.   So --

12      Q.   You had written several emails by this point in

13   time to people in Las Vegas that they were coming?

14      A.   No, I did not.

15      Q.   Or they were planning on coming, no?

16      A.   No.  We -- look, we had investigated.  We were

17   still in a -- we never got to a contract state with MGM.

18   Not once.

19      Q.   Right.

20      A.   So, we -- I mean, yes, we were very interested in

21   hosting.  Yes, we wanted FINA's approval on the series.

22   Series being, in general, this concept from ISL.

23      Q.   Okay.  And you knew that the -- you knew that

24   several of the so-called series were going to be in the

25   United States?  That was the plan, correct?



1    A.   That was the initial plan, yes, that there would

2    be some clubs in the U.S. and some clubs from mostly Europe.

3    Q.   And they would be competing at venues in the

4    United States, correct?

5    MR. YATES:  Objection to form.

6    A.   Yes.  May I -- may I state something?

7    Q.   Of course, you can state something.

8    A.   So, in 2018, there was one competition that was

9    planned in December -- or that was on the schedule for

10   December.  But the Turkey meeting and all of the other

11   discussions leading up to that, where this would be an

12   ongoing series.  So, when I write "series," I am talking

13   about, yes, one competition chunk in 2018 December.

14        But there were going to be multiple events in

15   2019, 2020, 2021.  Quite elaborate plan, which was -- which

16   looked very -- very interesting to us, but when I say

17   "series," I am talking about that.  Not specific to one

18   site.

19   Q.   Okay.  And --

20   A.   I hope that makes sense.

21   Q.   It does make sense.  Thank you.  But you wanted

22   to make sure that you got approval from FINA before you

23   could proceed, correct?

24   A.   That is accurate.

25   Q.   All right.  And it not only included for all of



1      the series, but for any one competition, correct?

2          A.   That would be correct.

3          Q.   So, now does this refresh your recollection that

4      in the midst of your emails with ISL and the promoter in

5      Las Vegas that you specifically mentioned to Cornel that

6      there was this upcoming -- that the initial event was

7      probably going to be in Las Vegas?

8              MR. YATES:  Objection to form.

9      BY MR. GOTEINER:

10         Q.   You still have no memory?

11             MR. YATES:  Objection.  Form.

12         A.   I remember general conversations with Cornel

13     about this overall series and about -- but I can't recall

14     whether or not I talked about Las Vegas specifically.

15         Q.   Would you have -- do you think at that point in

16     time you would have hid that it was probably going to be in

17     Las Vegas --

18             MR. YATES:  Objection.  Form.

19     BY MR. GOTEINER:

20         Q.   -- from Cornel?

21             MR. YATES:  Mischaracterizes the witness' prior

22     testimony and assumes facts.

23         A.   I wouldn't have -- I wouldn't have hid that.

24         Q.   Okay.

25         A.   I just don't -- again, you are asking me to



1    recall a conversation, or many -- one of many conversations.

2    I can't remember exactly what I said to him about this.

3        Q.   That's okay.  Do you recall there was a May 11

4    meeting, board of directors, and also an international

5    committee at USA Swimming on or about May 11?

6        A.   I don't -- it is probably earlier than that.  The

7    board typically meets the 1st of May, but possibly, yes.

8        Q.   And do you recall that Las Vegas was mentioned as

9    a potential venue?

10       A.   It may have been.

11       Q.   Do you --

12       A.   I can't recall specifically.

13       Q.   Okay.  Do you recall that Neuburger was there?

14       A.   No, I don't recall if Dale was there or not.

15       Q.   There was -- as I recall the document, but this

16   is --

17       A.   Let me rephrase.  Dale is usually at the board of

18   directors' meetings -- was usually at the board of

19   directors' meetings and the international relations

20   committee meetings.  By common practice, he would be there.

21   I don't recall if he was specifically at that meeting.

22       Q.   Okay.  Do you recall -- did you take a look at

23   the agenda in preparation for your testimony today?

24       A.   The agenda from that?

25       Q.   Yeah.



1      A.   No, I did not.

2      Q.   There was a phrase under which ISL appeared on

3  the agenda.  It was called "autonomy sovereignty."  Do you

4  recall that?

5      A.   Yes.

6      Q.   What was that about?

7      A.   So, we have strategic priorities within the

8  international relations committee.  We have had for a number

9  of years.  Probably eight, nine, ten years.  And there are

10  six categories that we -- that we -- I have identified as

11  are key to the international relations.

12      Q.   Okay.

13      A.   Athlete safety is one of those.  We had an

14  athlete die in 2010 at the international open water event.

15  So, that is -- that is one.  Clean sport is one of those.

16  So there is an anti-doping effort by our organization.

17          One of the other ones is autonomy and sovereignty

18  of sport.  And one of the most important things that we do

19  is that we are -- have the ability to select our own Olympic

20  team.  This is getting off the topic slightly, but that is a

21  paramount thing for USA and our performance at the Olympic

22  Games.  Other sports don't have that luxury.  We do.

23          And, so, that's a pretty technical response to

24  you, but under autonomy and sovereignty, what we don't want

25  is for FINA or any other body to tell us how to select our



1    Olympic team.  And, so, that's a big topic.  FINA knows that

2    topic.  FINA knows how we feel about that topic.

3            But along with that, I think we put ISL in

4    there -- I put ISL in that agenda, or was on the agenda,

5    because we wanted to explain to the body of the

6    international relations committee, mostly volunteers, what

7    was going on with the situation.

8        Q.   Situation?

9        A.   With ISL and the opportunities that we had.

10       Q.   What did that have to do with your need to

11   control the makeup of the Olympic team?

12       A.   It was under the broad topic of athlete

13   sovereignty.  So, the main purpose for that specific line in

14   our strategic priority is because we want to maintain

15   autonomy to select our Olympic team.  Occasionally, other

16   topics may arise that would fall into that category.  And

17   when we address that strategic priority at each meeting, we

18   would bring that up to the group.

19       Q.   Did it come up that Rule -- FINA's Rule 4 could

20   threaten your ability to select your Olympic team if a

21   particular swimmer had swam in an ISL meet?

22           MR. YATES:  Objection.  Form.

23       A.   I don't recall specifically if that came up.

24       Q.   Do you recall generally that would have come up?

25       A.   I don't.



1        Q.   Okay.  But you recall the threat of the Rule 4

2   sanction directly attacked USA Swimming's ability and

3   authority to choose who goes on the Olympic team?

4             MR. YATES:  Objection to form.

5        A.   **Your comment made some assumptions there, and I**

6   **want to --**

7        Q.   Tell me I am wrong.

8        A.   **No, no, no.  Our concern with rule GR 4 was that**

9   **it could affect athletes negatively if a violation of that**

10  **rule took place, and FINA pursued that against us, it could**

11  **affect an athlete's ability to participate at the Olympic**

12  **trials and, therefore, the Olympic Games.**

13       Q.   All right.  Was that discussed at the meeting?

14       A.   **I can't recall if it was discussed at the**

15  **meeting, but we knew that.**

16       Q.   And you discussed it at USA Swimming, correct?

17       A.   **It was -- we had discussed it internally,**

18  **correct.**

19       Q.   All right.  So, this was the hammer, if you will,

20  that FINA was holding over ISL, correct?

21            MR. YATES:  Objection to form.

22       A.   **I can't answer that question.**

23       Q.   Well, you felt it was a hammer that they were

24  holding over your head, correct?

25       A.   **Not against ISL.**



```
 1              MR. YATES:  Objection.

 2    BY MR. GOTEINER:

 3         Q.   Against USA Swimming?

 4              MR. YATES:  Objection to form.

 5         A.   Correct.

 6         Q.   You thought it was a hammer that FINA was holding

 7    over USA Swimming's head, that is, Rule 4, correct?

 8              MR. YATES:  Objection to form.

 9         A.   We were concerned -- the term "hammer" is your

10    term.  We were very concerned about how that rule might be

11    interpreted if an athlete swam with -- with an unauthorized

12    body.

13         Q.   Sir, you generally didn't -- at this point in

14    time, around -- after you returned from Turkey, you did not

15    trust at all Cornel's interpretation of the FINA rules; is

16    that right?

17         A.   I can't recall that.

18         Q.   All right.

19              MR. GOTEINER:  I don't mean to build the drama.

20    I need to find a document.

21                   (Brief pause.)

22              MR. GOTEINER:  Exhibit 31 will be a Mike Unger

23    June 14 email to Tim Hinchey.

24                   (Deposition Exhibit 31 was marked.)

25    BY MR. GOTEINER:
```



1      Q.   Sir, before we get to this email, I am going to

2    ask you a question.  You don't recall any of

3    Mr. Marculescu's comments to you about this time, around

4    this time, May, June time, about ISL and his concerns about

5    ISL?

6      A.   The specifics?  I know in general sense, he was

7    not happy with ISL.  Specifically, I am not recalling why he

8    was so upset.  I know that they had attempted to meet on a

9    couple of occasions.  I don't actually know if that

10   happened.  They said they met.  They both said they met.

11   But the circumstances around it didn't seem clear to me.  I

12   don't know exactly --

13     Q.   You know nothing in -- you know nothing about his

14   concerns about --

15     A.   He didn't -- I know that he was concerned about

16   the ISL leader, and didn't know what his background was, and

17   was -- so -- look, I think that he felt that there might be

18   some question about whether they were trying to infiltrate,

19   take over the sport, for instance, and become -- so, I think

20   that was a -- I don't know if it was -- I didn't think that

21   was factual or actual, but that may have been part of it.

22     Q.   Well, you thought -- he told you that he was

23   concerned about this competition coming from ISL for the

24   swimmers, correct?

25          MR. YATES:  Objection to form.



1    A.   I can't -- again, I am not recalling -- I wish I

2  recalled the specifics for you of the actual conversation or

3  conversations.  I just don't -- and I am not going to make

4  it up.  You don't want me to.

5    Q.   Nope.  Okay.  But you can't recall anything else

6  specifically in his -- go two steps back.  You spoke with

7  Cornel Marculescu many times over the course of one week,

8  correct?

9         MR. YATES:  Over one week?

10        MR. GOTEINER:  Over one week.

11   A.   Which week?

12   Q.   Any week during this period of time.

13        MR. YATES:  Objection to form.

14   A.   No.  Not necessarily.

15   Q.   Okay.  But often you spoke with him many times

16  over the course of a week?

17   A.   It could be.  It just depended on whether we were

18  working on a specific project or not and needed mutual help.

19   Q.   Already.  Well, let's talk about the May, early

20  June period --

21   A.   Okay.

22   Q.   -- of 2018.  Do you recall speaking to him a lot

23  during this period of time?

24   A.   I recall the Memorial Day conversation, and I

25  don't recall if there were other conversations.



1        Q.   Okay.  And what else do you specifically recall

2    about the Memorial Day conversation?

3        A.   As I have characterized, I remember that he was

4    not happy and was upset that we had attended the meeting.

5    That's why when you asked me before if I called him from the

6    meeting, I don't think I did, because I don't think I would

7    have done that.

8             But he was upset we had attended the meeting.  He

9    was -- and he was concerned about this series and this --

10   this organization.  I can't tell you the specifics as to

11   why.

12       Q.   Okay.  So, why don't we look at this exhibit.

13   Here you wrote that, "Dale is working hard against this."

14            This is one of the times I saw that you said Dale

15   is working hard against this.

16       A.   Yeah.

17       Q.   When you say "this," you meant what?

18       A.   This series.

19       Q.   Okay.  And you thought he was trying to show he

20   was loyal to FINA?  That was your view, correct?

21            MR. YATES:  Objection.  Form.

22       A.   Yes.  That's what I wrote.

23       Q.   Okay.

24       A.   There are specifics about that, though, that I

25   don't know if you are aware of that there was this gentleman



1    Barelli, was a FINA vice president as well, and was also the

2    president of LEN, which is the European swimming

3    organization.

4          And there had been a conflict, and Barelli had

5    gone after Dale Neuburger on an ethics charge related to

6    Dale's actual full-time job and Barelli's efforts to become

7    the LEN president.  And Barelli ran against another

8    gentleman from the Netherlands, and the gentleman from the

9    Netherlands hired -- the firm that the -- the Lausanne,

10   Switzerland, part of the firm that Dale worked for -- so,

11   Dale worked in the U.S., but this firm is based in

12   Switzerland, to help him with that election, the Dutch

13   gentleman.

14        Q.   Thanks.  I am generally aware of that.

15        A.   The case came forward and was thrown out by CAS.

16   It was dismissed.  So, there, hence, is the point about the

17   relationship or maybe lack of relationship between Neuburger

18   and Barelli.  That was my point there.

19        Q.   No.  That's fine.  Did it ever come up in

20   discussion that Dale Neuburger had a conflict of interest in

21   supporting FINA's view versus ISL?

22             MR. YATES:  Objection to form.

23        A.   I don't believe so.

24        Q.   Did you have a view about whether he had a

25   conflict of interest?  He was a director of USA Swimming



```
 1    now, correct?

 2              MR. YATES:  Objection to form.  Mischaracterizes.

 3    BY MR. GOTEINER:

 4         Q.   Is he a director of USA Swimming at this point?

 5         A.   Ex officio, yes.

 6         Q.   What do you mean ex officio?

 7         A.   Voice but no vote.

 8         Q.   But no vote?

 9         A.   As a past USA Swimming president -- he was

10    president from '98 to 2002.  As a past president, he was on

11    the board of directors with voice but no vote.

12         Q.   Did you believe that in taking positions against

13    ISL and these USA/ISL potential meets that he was assisting

14    the swimmers?

15              MR. YATES:  Objection to form.

16         A.   I think he was being -- and this is -- when I --

17    when you asked about conflict of interest, I had never

18    thought about that before.  I always thought he was looking

19    out for USA Swimming in general to not become a target of

20    GR4.

21         Q.   Does that suggest to you that he had a big

22    conflict?

23         A.   No, it doesn't suggest.  It suggests that he is

24    wanting us to be careful because of our -- our -- the issue

25    of what might happen if an athlete and/or a federation
```



51

1   violated GR4.

2          Q.   But what about change in GR4, or making sure it

3   wasn't a ploy against USA Swimming and the swimmers?  Did

4   you consider that?

5              MR. YATES:  Objection.  Form.

6          A.   I can't answer that.  I haven't -- I am not sure

7   I thought about that.

8          Q.   What I understood were some discussions at USA

9   Swimming to talk to Dale specifically about that point that

10  he should not be --

11         A.   Who had those discussions?

12         Q.   At USA Swimming.

13         A.   Who had those -- who had those discussions?

14         Q.   That people at USA Swimming were talking about

15  Dale's position as being anti-USA swimmer, and anti-USA

16  Swimming, the organization.

17             MR. YATES:  Objection.  Lacks foundation.

18  Assumes facts.

19         A.   I don't -- I mean, we were in the middle of a

20  very tricky position.  I don't recall that specific

21  conversation.

22         Q.   Okay.  Do you recall --

23         A.   Can you tell me who had those conversations?  It

24  might help me.

25         Q.   We will get to that.



1        A.    I'm sorry, I just --

2        Q.    That's fine.  We will get to that.  We will get

3    to that.  Do you recall -- why don't we go on to -- let's

4    stick with this email for a second.

5        A.    Sure.

6        Q.    It said, "Cornel said he was okay with the meet,"

7    you wrote, "if it followed FINA rules, but then he had all

8    these other comments about ISL (which didn't have any

9    bearing against the rules) to push against this."

10            Do you recall why you wrote that?

11       A.    I think the other comments, and I don't recall

12   all the specifics of it, but the other comments were

13   about -- it was a personality issue.  I think that -- I

14   think -- I don't know specifically about it.  I could

15   only -- I don't want to guess, so I won't guess.

16       Q.    Do you recall any rule that was not being

17   followed by you and ISL in planning this event?

18            MR. YATES:  Objection to form.  Mischaracterizes.

19   Assumes facts.  Argumentative.

20       A.    At this point, and on this date, I don't recall.

21   Later on I do recall in October or November whether the meet

22   had been pushed to -- or had located to Italy, to Torino, I

23   believe.  I do recall that not all the -- that not all

24   parties were adhering to all the rules at that time.  That

25   ISL could have done one thing that would have certainly



1    helped or at least pushed FINA to give an answer on whether

2    the meet could take place in Italy in December.

3         Q.   But -- first of all, your opinion was it wouldn't

4    have changed anything if ISL had complied with that rule,

5    correct?

6              MR. YATES:  Objection to form.

7         A.   Are you talking about my -- my opinion back in

8    October, November?

9         Q.   Yes.  Yes.

10        A.   It may not have changed it, but it would have

11   forced FINA to actually give a firm decision on where it

12   stood and why there was a problem.

13        Q.   But do you recall that you wrote in an email that

14   you spoke with Cornel Marculescu, and the first time you

15   spoke with him in October before he wrote -- before that

16   memorandum was sent out he agreed with you that Italy did

17   apparently comply with the rule?

18             MR. YATES:  Objection to form.  Lacks foundation.

19   Assumes facts.

20        A.   I can't remember.  You are recalling a

21   conversation you and I had in November, but I can't recall

22   that.

23        Q.   I am recalling a document you wrote.  But we can

24   get to the document.  We will get to it.  You don't recall

25   writing it?



1      Q.   You don't recall anyone talking about his need to

2   control?

3           MR. YATES:  Same objections.

4      A.   Again, I believe that he had major concerns about

5   ISL and its full intention long-term.  I don't know what the

6   specifics were that caused him to have such a reaction about

7   this competition.

8      Q.   Well, sir, do you recall mentioning to anyone

9   that Mr. Marculescu had euro signs in his eyes, and he was

10   too concerned about money?

11          MR. YATES:  Objection to form.

12     A.   I have said -- I can't remember that specific

13   comment, but I have said that knowing that -- you have to

14   know that Cornel is -- is -- the deal is important to

15   Cornel.  And, so -- and finances are super important to

16   Cornel.  I have worked with him for a long time.  I know

17   that specifically.

18     Q.   You worked with him for a few years at FINA,

19   correct, or at least a year, I think?

20     A.   No.

21     Q.   Did you work with him at FINA?

22     A.   I have never worked with him for FINA -- at FINA.

23   I spent three and a half years helping FINA with the FINA

24   World Cup around the world from 2003 to around 2007.  Not

25   paid.  Just essentially volunteer to help run some



1    competitions.

2        Q.   You never -- you don't recall the phrase that you

3    thought he had euro signs in his eyes that you applied to

4    him?

5        A.   And I may --

6             MR. YATES:  Objection.  Form.

7        A.   Sorry.  I can't recall specifically who I said

8    that to.  I can't --

9        Q.   Do you recall generally saying it?

10       A.   Yes.

11       Q.   And you thought he was too concerned about money?

12            MR. YATES:  Objection to form.

13       A.   I can't recall that.

14       Q.   Okay.  You mentioned that FINA was using GR4 in

15   asserting unauthorized relations.  That refers to the FINA

16   handbook, correct?

17       A.   Uh-huh.

18       Q.   Is that a yes?

19       A.   I'm sorry.  I was drinking.  Yes.

20       Q.   That's all right.  Yes.  Okay.  Did -- I take it

21   that Mr. Marculescu specifically told this to you, that's

22   what he was thinking about doing, right?

23            MR. YATES:  Objection to form.  Vague as to time.

24       A.   I don't recall.  I do recall Dale Neuburger

25   talking to us about -- or me about GR4.  I can't recall



57

1   Cornel specifically making that reference.  And he may have.

2   I just don't recall.

3        Q.   Well, how would -- okay.  When Dale Neuburger

4   spoke about FINA, you understood that he was working with

5   Cornel Marculescu on ISL issues, correct?

6             MR. YATES:  Objection to form.

7        A.   Can you restate the question?

8        Q.   Sure.  When you spoke with Mr. Neuburger in

9   200- -- throughout 2018, when he was talking about ISL

10  issues, you knew he was working with Mr. Marculescu,

11  correct?

12       A.   Yes.  I have known Dale a long time.  I would

13  have assumed that he would be -- I would understand that he

14  would be speaking with his FINA hat on, because he

15  represents FINA on the board of directors, or for the FINA

16  bureau, but I would also take into consideration that he

17  would look at USS Swimming and not want to put us in a bad

18  spot either.

19            I don't want to -- I don't know what that balance

20  would be, but I think there was balance in his comments.  We

21  usually heeded Mr. Neuburger's comments.  At least

22  understood where he was coming from.

23       Q.   You had to heed his comments, had to heed his

24  comments, didn't you, given the fact that he was speaking

25  for FINA?



1          MR. YATES:  Objection to form.  Mischaracterizes

2     the witness' prior answer.

3          A.    No.  I mean, he clearly would give his opinion,

4     but, I mean, not -- not necessarily.  It would be his

5     opinion.

6          Q.    Right.  But when he gave his opinion, you knew he

7     was speaking for FINA?

8          MR. YATES:  Objection to form.

9          A.    I thought I just said that, that when he spoke

10    from FINA, we -- when he spoke, we knew that he was giving

11    advice or comments from FINA, but with a U.S. perspective.

12         Q.    Why don't you describe for a minute why you

13    believed that USA Swimming had to listen and follow FINA's

14    instructions.  Why were they so important to USA Swimming's

15    existence?

16         MR. YATES:  Objection.  Form.

17         A.    That's a broad question.  We have a long-standing

18    relationship with FINA.  We -- but we don't always agree

19    with what FINA says and tells us, but we certainly have a

20    long-standing relationship in a -- generally a very positive

21    sense.

22         So, we are obligated to understand and follow the

23    FINA rule book.  And this was clearly -- well, wasn't

24    clearly, but a rule was being used, GR4, that could

25    adversely affect our athletes.



1    Q.   Well, it is more than that, isn't it?  So, I

2    understand that point you have made.  But isn't it also

3    because that USA Swimming is inextricably involved in

4    negotiations with FINA on a lot of issues?  Isn't that

5    correct?

6         MR. YATES:  Objection to form.

7    A.   USA Swimming works with FINA on multiple topics.

8    Q.   And, for instance, those negotiations assist USA

9    as swimmers, for instance, timing of meets to qualify for

10   the Olympics, correct?

11   A.   That is very much correct.

12   Q.   And there is a spillage of one issue over to the

13   other issue; isn't that correct?

14   A.   That is correct.

15   Q.   And these -- this involved USA FINA negotiation

16   relationship really ties USA's hands; isn't that correct?

17        MR. YATES:  Objection to form.

18   A.   Your characterization of tie hands, I would say,

19   has to be carefully considered.

20   Q.   Okay.

21   A.   The world is full of nuances, right?  You know

22   that.  I know that.  So, that's, in fact, what we do.  When

23   we have a challenge on something with FINA, do you know what

24   we do?  We go to FINA and we tell them about the challenge.

25   We sit down and talk about it like adults.



1      Q.    Right.

2      A.    So, we do that all the time with FINA on multiple

3    topics.  There are probably eight to ten different topics at

4    any one time that are ultimately at play with FINA.  So,

5    yes, we want to adhere to the rules and work with FINA.  But

6    we don't -- we are not blind about it.  And if we don't like

7    something FINA has done, we say so.

8      Q.    And you started to say so in the latter part of

9    2018 with respect to ISL, didn't you?

10     A.    We -- we were questioning why -- we didn't

11   understand why there was so much concern over this series.

12     Q.    And what changed the -- what tilted the

13   negotiating table was the lawsuit; isn't that correct?

14           MR. YATES:  Objection to form.

15     A.    Which lawsuit?

16     Q.    The lawsuit against FINA that the swimmers filed.

17   That was one event that tilted the negotiating table so

18   that USA Swimming felt they had more leverage; isn't that

19   right?

20           MR. YATES:  Objection to form.

21     A.    I think that the lawsuit didn't necessarily.  The

22   reaction from FINA -- the reaction from FINA, or response

23   from FINA that they made a statement that there would be no

24   GR4 penalties, I think, took everyone's blood pressure down

25   to a very manageable level.



1   ask yourself the question about whether you can actually

2   exist alongside FINA?

3              MR. YATES:  Objection.  Form.

4   BY MR. GOTEINER:

5        Q.   Is not that what you are saying?

6              MR. YATES:  Objection to form.

7        **A.   I'm sorry, I was reading while you were speaking,**

8   **and I missed your question.**

9        Q.   I will tell you what --

10       **A.   We have been steadfast in our opinion that the**

11  **two organizations needed to figure out how to exist for the**

12  **ISL competitions to -- and get clearance for those**

13  **competitions so that athletes around the world would not be**

14  **put in jeopardy.**

15       Q.   And if that agreement could not be reached

16  between ISL and FINA, you were suggesting that ISL ask

17  itself the question about whether it can even exist

18  alongside FINA?

19             MR. YATES:  Objection to form.  Mischaracterizes

20  the document.

21       **A.   That's what I wrote, yes.**

22       Q.   Okay.  And you would also -- I mean, you also had

23  a similar idea about this point in time, because you viewed

24  the June 5 memo from FINA as not a good sign for ISL's

25  existence, correct?



1          MR. YATES:  Objection to form.  Compound.  Vague.

2     Assumes facts.

3          A.   The June 5 memo was challenging, because it

4     really put the focus onto GR4.

5          Q.   And do you recall writing an email to the effect

6     that that is not a good sign for ISL's existence?

7          A.   It would be great for you to show me that email

8     so I could refresh my memory.

9          Q.   It would be great if I could find it.  And I am

10    not.

11         A.   I'm sorry.

12         Q.   Do you recall that you got an advance copy of the

13    June 5 memo?

14         A.   Yes.

15         Q.   And had you discussed it with Cornel before you

16    received it?

17         A.   He mentioned something to me at the end of May

18    that he was -- that they were writing a letter, but I didn't

19    get any of the specifics at that time.  But they were

20    writing a letter about the current status.  That was at the

21    end of May.  I do remember seeing a version, but I think it

22    was maybe just a day before it was sent to all of national

23    federations.

24         Q.   Did he say why he sent it to you first?

25         MR. YATES:  Objection to form.  Assumes facts.



1      A.   No.

2      Q.   Did he tell you he was sending it to you first

3  before he sent it to others?

4      A.   I don't remember.

5               (Deposition Exhibit 38 was marked.)

6      Q.   This is a June 5, 2018, email from you to various

7  people at USA Swimming.  And it says for your information,

8  "To those who are aware of the International Swim League,

9  this is not a good sign for its existence.  FINA flexing its

10 muscles."

11          Do you recall writing this?

12     A.   Yes.

13     Q.   And do you recall talking with other people about

14 the thought in this email?

15     A.   I don't recall who I spoke to about this, but it

16 was clearly a -- not a good sign for this memo to come out

17 for the ISL and for those that wanted to participate.

18     Q.   Okay.  And --

19     A.   All nations, all athletes that were

20 participating.

21     Q.   Why do you keep saying "all nations, all

22 athletes"?  Why do you keep adding that?

23     A.   Because it was -- we were all -- there were a

24 stack of national federations that were all in this

25 together.



1        Q.   Why are you adding that to your testimony?  I
2   would like to get a sense of why, why you think it is
3   relevant.
4        A.   I have never thought about it.
5        Q.   Okay.
6        A.   Just thought it was -- it is like -- it was a
7   worldwide problem.  It was not just a U.S. problem.
8        Q.   But at the moment there was only one -- as far as
9   you knew, there was only one planned event, correct?
10            MR. YATES:  Objection to form.
11       A.   June -- there was one planned event for 2018, but
12   there were multiple events for 2019.
13       Q.   But I am talking about planned.  There were no
14   planned events for 2019, were there?
15       A.   I don't believe so.
16       Q.   Okay.  So, this was a very USA-specific threat,
17   correct?
18            MR. YATES:  Objection to form.  Mischaracterizes.
19   Lacks foundation.  Argumentative.  Assumes facts.
20       A.   May I ask why you say just a U.S. issue?
21       Q.   Because that was the only event that was planned.
22   It was -- let's put it this way:  This was the only event
23   that was being discussed at this point and in the process of
24   planning; that is, the Las Vegas event, correct?
25            MR. YATES:  Objection to form.  Same objections.



MIKE UNGER
INTERNATIONAL SWIMMING LEAGUE v. FEDERATION INTERNATIONALE DE NATATION    September 24, 2019

94

1   Also mischaracterizes the record.

2        A.   At this point, we were still discussing with

3   Las Vegas to hold an event.  But there were also other sites

4   that were holding -- potentially going to hold the event as

5   well.  We knew that there were two sites in Europe -- well,

6   I had been told there were two sites in Europe that were

7   also being considered.

8        Q.   For this event?

9        A.   Yes.

10        Q.   To be hosted by USA Swimming?

11        A.   Not hosted by USA Swimming.  But they told us all

12   along -- "they" being ISL told us all along that Las Vegas

13   was a site, but there was also one or two sites in Europe.

14   Ultimately, we found out that -- we thought that London was

15   going to be the other site.

16        Q.   Well, London had been mentioned, but by this

17   point in time you had talked about, in your correspondence,

18   that Grigorishin wanted to do it in Las Vegas and had, as

19   you said today in your testimony, disregarded your

20   recommendation for Los Angeles?

21           MR. YATES:  Objection to form.  Mischaracterizes

22   the record.

23   BY MR. GOTEINER:

24        Q.   Is that correct?

25        A.   They had eliminated Los Angeles, but we didn't



1    know full well that it definitely was going to be in

2    Las Vegas.  They had told us that Las Vegas was very much

3    what they wanted to do.  But it was not a done deal yet,

4    because we had so many details still to work out.

5         Q.   I understand the details were to work out, but

6    they were all details that were focused on the Las Vegas

7    event; isn't that correct?

8              MR. YATES:  Objection to form.

9         A.   **Mostly correct.**

10        Q.   Entirely correct.  There were no details about

11   any other site in the world except Las Vegas, according to

12   the correspondence; isn't that correct?

13             MR. YATES:  Objection to form.  Completely

14   mischaracterizes the record.

15   BY MR. GOTEINER:

16        Q.   Isn't that correct?

17             MR. YATES:  You are --

18   BY MR. GOTEINER:

19        Q.   As far as you know?

20             MR. YATES:  You are making stuff up now.

21   BY MR. GOTEINER:

22        Q.   As far as you know, there were no other -- so,

23   answer my question, please.

24             MR. YATES:  Objection to form.

25        A.   **What was your question?**



 1        Q.   The details you were -- I said there were no

 2   details about any other site in the world except Las Vegas

 3   according to the correspondence that you saw, correct?

 4             MR. YATES:   Objection to form.   Mischaracterizes.

 5        A.   Las Vegas was the site in the U.S. that we were

 6   working towards.

 7        Q.   Okay.

 8        A.   We also knew about London being a potential site

 9   as well.

10        Q.   Right.   But there were no details being worked

11   out for London, correct?

12             MR. YATES:   Objection to form.

13        A.   That would not have come from me.   That would

14   have come from ISL.

15        Q.   Right.   But you didn't know of any details for

16   London, did you?

17        A.   It would not be appropriate for them to have

18   shared those with me.

19        Q.   Why not?

20        A.   Because they were -- I believe the ISL was

21   looking at two sites, two bidders, potentially, for hosting

22   this competition.

23        Q.   When did you start speaking with Mr. Buckner

24   about the London site?

25        A.   I don't recall.   We had many conversations,



1   because Jack Buckner and I were -- and USA Swimming were in

2   correspondence and communication, but I don't remember -- he

3   had said sometime that London was also being considered, and

4   they were in the same predicament that we were in.

5        Q.   Okay.  But I just wanted to make sure what was

6   happening at this point in time.  And it is Las Vegas that

7   you were working on, correct?

8             MR. RYCHENER:  I will object.  He has answered

9   that.

10  BY MR. GOTEINER:

11       Q.   It was Las Vegas that you, Mr. Unger, were

12  working on, correct?

13       A.   That is correct.

14       Q.   Okay.  Do you know Sam Ramsamy?  Do you know Sam

15  Ramsamy?

16       A.   Sam Ramsamy?  Yes.

17       Q.   On a first-name basis?

18       A.   Yes.

19       Q.   Did you and he ever talk about Mr. Marculescu?

20       A.   No.

21       Q.   Now, in contrast to the Las Vegas event, there

22  were no details with respect to the other event series

23  discussed with Cornel; is that correct?

24             MR. YATES:  Objection to form.  Assumes facts.

25       A.   Can you be more specific about "event series"?



MIKE UNGER
INTERNATIONAL SWIMMING LEAGUE v. FEDERATION INTERNATIONALE DE NATATION September 24, 2019

107

```
1    time you received this memo, that you got USA lawyers

2    involved in the discussion?

3              MR. YATES:  Which memo are you talking about?

4    BY MR. GOTEINER:

5         Q.   This email we just reviewed.  The one in front of

6    you.

7              MR. YATES:  Objection to form.  Mischaracterizes

8    the record.  Assumes facts.

9    BY MR. GOTEINER:

10        Q.   Do you recall getting lawyers involved in the

11   discussion at about this point in time?

12             MR. YATES:  Same objections.

13        A.   I don't recall.  It would have been normal for us

14   to talk with our lawyers on occasion, but I don't recall

15   specifically or generally whether we reached out to legal

16   counsel.

17        Q.   Did Neuburger ever mention to you that FINA's

18   ultimate weapon was FINA's sanction or approval of an event?

19             MR. YATES:  Objection to form.

20        A.   I don't remember him ever saying that.

21        Q.   Do you recall anyone ever saying that?

22        A.   I don't remember.

23        Q.   Now, Tim Hinchey is the CEO of USA Swimming?

24        A.   Yes.

25        Q.   And you are the COO?
```



1       A.   Yes.

2       Q.   Did you -- do you recall having any disagreements

3  with him with respect to USA's position vis-à-vis FINA?

4       A.   Actually, Tim and I, I think, agreed 100 percent

5  on this.  We knew that we were in a tricky situation.  And,

6  so, I don't recall us having disagreements on this.

7       Q.   You call it tricky.  The word you used was

8  precarious, correct?

9       A.   Precarious is also a good word for this.

10       Q.   Isn't precarious a better one than just tricky,

11  because it was danger to USA Swimming and danger to the

12  swimmers?

13            MR. YATES:  Objection to form.

14       A.   I am not sure that is a question.

15            MR. YATES:  That is a good point.

16  BY MR. GOTEINER:

17       Q.   Sometimes we argue with the witness.  Let me ask

18  you something.

19       A.   I have had numerous times today where I wanted to

20  say more things, and I realized that it would just be a

21  conversation, and we would have trouble.

22       Q.   Not only that, it leads to other questions.  So,

23  that's why you were told not to do that.  So, anyway.

24            Why don't we go on to 41.  But, you know, why did

25  you use the word "precarious"?  You know, you used it at



1    least twice that I saw in memos.  That is a precarious

2    situation that FINA is putting you in.  Precarious means

3    dangerous.

4            MR. YATES:  Objection to form.

5    BY MR. GOTEINER:

6        Q.   And I am asking why you used the word

7    "precarious."

8        **A.   I think when writing, I may have used the word**

9    **"precarious."  I always used the word "tricky" when I speak**

10   **to people about this situation.  Always.  And I have been**

11   **with me for the last two years.**

12       Q.   I am sure you do, but you do use the word

13   "tricky," okay?  But I have also seen you use the word

14   "precarious" when you are trying to make a point that it is

15   dangerous.  Do you recall doing that?  Use precarious?

16           MR. YATES:  Objection to form.

17       **A.   If you are reading my emails, certainly I am not**

18   **going to remember all of my emails, and what I specifically**

19   **wrote in those emails.**

20       Q.   I understand.

21       **A.   So, you would have to show it to me.**

22       Q.   Didn't you think it was dangerous what was going

23   on between -- if you look at what FINA was doing, and what

24   they were threatening you with, USA Swimming with, what your

25   obligations to the swimmers were, as you have described



1    earlier in the deposition, don't you think it was putting

2    not only USA Swimming but the swimmers themselves in a

3    precarious position?

4              MR. YATES:  Objection to form.  Mischaracterizes

5    the record.  Argumentative.  Assumes facts.  Calls for

6    opinion conclusion.

7        **A.    It put those athletes in a tough spot, but it**

8    **also put USA Swimming in a very tough spot as well.**

9        Q.   And you don't want to use the word "precarious"

10   now?  Let's not use the word "precarious."  Let's use the

11   word "dangerous."

12             Wasn't FINA putting both USA Swimming and the USA

13   swimmers in a dangerous position by its threats?

14             MR. YATES:  Objection to form.  Same objections.

15       **A.    If you are saying that the athletes would be**

16   **sanctioned and risk penalty of suspension, that's a very**

17   **serious, serious concern.**

18       Q.   Why can't you use the word "dangerous"?  They

19   have only 10 or 12 years of, you know, life, you know, as

20   professional swimmers.  And it would just ruin it if they

21   couldn't go to the Olympics.

22             Why doesn't USA Swimming -- and I am asking USA

23   Swimming, I am talking to you in your position as a 30(b)(6)

24   witness for USA Swimming, why doesn't that put swimmers in a

25   dangerous position?



1              MR. YATES:  Objection.  Form.

2         A.   You are categorizing it as dangerous, and it is

3    potentially dangerous.

4         Q.   And if USA Swimming were suspended, that would

5    also be a dangerous situation for USA Swimming, correct?

6         A.   Yes.

7              MR. YATES:  Objection to form.

8              MR. GOTEINER:  Thanks.

9                   (Deposition Exhibit 41 was marked.)

10             MR. YATES:  I have never seen someone work as

11   hard to implant words into a witness' testimony.  The record

12   speaks for itself.

13             MR. GOTEINER:  Do you know how restrained I am?

14             MR. RYCHENER:  I agree.

15             MR. GOTEINER:  You agree with that?  All right.

16   BY MR. GOTEINER:

17        Q.   Exhibit 41.  This is a December 14 email from Tim

18   Hinchey to Ahmed El-Awadi with a copy to Mike Unger.  Was

19   Mr. Hinchey being accurate in his email?

20        A.   Which portion of the email?  The entirety, or

21   specific?

22        Q.   Well, the, "As I am sure you've seen, read, or

23   been told, Cornel has announced his version of the ISL

24   format by FINA."  Is that accurate?

25        A.   It is Tim's impression of it.  I think it is



112

1    mostly accurate.

2         Q.   Do you view there as being any inaccuracies in

3    the sentence?

4         A.   No.  I would say that it was similar -- that the

5    FINA event is similar to the ISL event because it provided

6    athletes with a opportunity to compete, but also make a good

7    amount of money.  And "good" being in swimming terms good.

8    And, so, I think that was what Tim was referring to when he

9    is talking about how similar the competitions could be.

10        Q.   Okay.  And it goes on to say, "He's putting

11   pressure on us to host and kick off the series."

12             Is that accurate?

13        A.   He asked us to host the event.

14        Q.   But it didn't say that.  It says, "He's putting

15   pressure on us."  Is that accurate?

16        A.   Tim is -- I think pressure, there was no pressure

17   he could put on us, though.  We could say no.  We were free

18   to say no if we didn't want to host this event.  But he was

19   putting pressure on us to host the event.

20        Q.   And --

21        A.   He was -- and he was after us to make sure we

22   hosted.

23        Q.   But were you resisting his request?

24        A.   No.  We were -- we were certainly contemplating

25   it.



1          Q.   Well, do you recall having any conversations

2    where people at USA Swimming were annoyed that FINA had

3    successfully kept ISL out of the United States and was

4    instead putting on ISL's type format under FINA's brand?

5               MR. YATES:  Objection to form.

6    BY MR. GOTEINER:

7          Q.   Do you recall having any -- any conversations

8    like that?

9          A.   No.

10              MR. YATES:  Objection.  Form.

11         A.   No.  I have not.  I do not.

12         Q.   All right.  Did the thought occur to you?

13              MR. YATES:  Objection to form.

14         A.   No.  We thought this was FINA's reaction to have

15   an event that was similar to ISL and to offer athletes up

16   that opportunity.  I don't know what FINA's thought process

17   was to start the event.  Not privy to that.

18              But we are good actors with FINA.  And we have

19   been good actors with ISL.  When FINA came to us and asked

20   us to host, we strongly considered.

21              MR. GOTEINER:  Okay.  It is a little before

22   12:00.  Let's eat.

23              MR. RYCHENER:  What is the game plan for the day?

24              MR. GOTEINER:  That is a good question.  Let's go

25   off the record for a second.



MIKE UNGER
INTERNATIONAL SWIMMING LEAGUE v. FEDERATION INTERNATIONALE DE NATATION   September 24, 2019

114

1                    (Discussion off the record.)

2                    (Recess from 11:52 a.m. to 12:46 p.m.)

3                    (Deposition Exhibit 42 was marked.)

4    BY MR. GOTEINER:

5         Q.   Does this refresh your recollection that by

6    May 24 ISL was clear with you that they wanted to have the

7    meet in Las Vegas?

8              MR. YATES:  Objection to form.

9         A.   Yes.  But they were still -- even -- even still.

10   You are dead-on.  It says Las Vegas on here.  But it was

11   never a finalized we are definitely coming to Las Vegas.

12        Q.   No.  I never asked you that.  But they told you

13   that they wanted to come to Las Vegas?

14        A.   That's right.

15        Q.   And you have explained that there were some

16   details to work out, and the record shows that there were

17   some points that were still open?

18        A.   Correct.

19        Q.   That were not insurmountable.

20             MR. YATES:  Objection.  Form.

21   BY MR. GOTEINER:

22        Q.   That was the status of May 24, correct?

23        A.   That is very fair.  That is a fair

24   characterization.

25        Q.   And it is accurate?



1      A.   It is accurate.

2      Q.   Okay.

3      A.   And when you say -- and I am looking at my

4   coworker Dean Ekeren's email that you just showed to me.

5   This is -- and specifically talking about how difficult it

6   is to -- when we say details to work out, there were

7   significant details to work out.

8      Q.   But they were not insurmountable, according to

9   USA's evaluation?

10      A.   They were not insurmountable, but they were going

11   to be a massive challenge.  Let's just call it that.

12   Because normally when we do events, we have a year, two

13   years.

14          I have been working on the Olympic Trials -- next

15   year's Olympic Trials in Omaha for the last three and a half

16   years.  We have a lengthy period of time to work on

17   something.  However, this was going to be difficult.  This,

18   the MGM arena, Mandalay Bay arena where we were planning

19   on -- intending to bring the event had no --

20      Q.   I am not asking any of these questions.  I am

21   just making one question.

22          MR. RYCHENER:  Let him finish his answer.

23      A.   That was rude.

24      Q.   I'm sorry.

25      A.   That was rude.



116

1      Q.   I only have a very little amount of time.

2      **A.   I understand.   Then don't ask me -- I'm sorry.**

3      Q.   I am only asking you to listen to the question

4  and answer the question.

5      **A.   I will stop.**

6      Q.   Okay.   That's all I am saying.

7      **A.   Proceed, please.**

8          MR. YATES:  Let me interpose an objection and

9  notation.  The witness was in the midst of an answer that

10  clearly counsel did not like, and he cut him off.

11          MR. GOTEINER:  I didn't have a problem with it.

12  It was not responsive to the question.

13          MR. YATES:  It was perfectly responsive.

14              (Reporter interruption.)

15  BY MR. GOTEINER:

16      Q.   At this time, at this point in time, May 24, you

17  were committed to attempt to work out the details in the

18  budget, correct?

19          MR. YATES:  Objection.  Form.

20  BY MR. GOTEINER:

21      Q.   When I say "you," I mean USA Swimming and you

22  personally.

23      **A.   Yes.  We were working on a budget.  At this**

24  **point, in reference to this email, the budget was not set**

25  **yet, even though we had presented to them a budget.**



```
 1                MR. YATES:  Objection to form.  Mischaracterizes

 2    the record.  Assumes facts.

 3         A.   Honestly, I don't think it was about the USA/ISL

 4    event.  It was about ISL in general.  It wasn't specific to

 5    hosting in Las Vegas.

 6         Q.   No, I heard you say that.

 7         A.   That was -- it was more about, "Why are you

 8    participating in this?"

 9         Q.   But he knew perfectly well, and you knew

10    perfectly well that if he -- if he said it was unauthorized,

11    that would stop the Las Vegas event, correct?

12                MR. YATES:  Objection to form.

13         A.   Likely we would have to take a step back at that

14    point and re-evaluate the situation.

15         Q.   Okay.  So, your answer is, yes, it would have

16    stopped?

17                MR. RYCHENER:  Objection.

18    BY MR. GOTEINER:

19         Q.   It would have stopped -- when you say "stepped

20    back and re-evaluate," it would have stopped you from going

21    forward until you could figure out a new path, correct?

22                MR. YATES:  Objection to form.

23         A.   We would have stopped, stepped -- and stepped

24    back and re-evaluated the situation to make sure we were

25    taking the right steps.
```



156

1       Q.   Yeah, but you made it clear that you wouldn't go
2   forward unless they approved it.
3       A.   I understand that.  But we would still stop
4   and -- had is -- we have jumped back and forth between May
5   to October to November to May to March.  It is really -- you
6   are asking me to go back and forth in that.  That is very,
7   very tricky.  That's tricky.
8       Q.   Okay.  Well, that is why I am asking you to focus
9   on this call.
10      A.   I know that, but I am trying to say, I have
11  answered it.  We would have stopped and -- and said, wait a
12  minute, we are going to put a pin in this right now and
13  decide what we are going to do.  And I don't make those
14  decisions unilaterally.
15           I would go to my -- to Tim Hinchey, my boss.  I
16  would go to the chairman of the board.  I would go to others
17  to make -- to say this is the situation.  So --
18      Q.   We do know what you did, because you -- you wrote
19  several emails on the 6th of June saying, "We can't go
20  forward with this."
21           MR. YATES:  Objection.
22  BY MR. GOTEINER:
23      Q.   And you wrote one on the 14th.  I mean, you wrote
24  several emails and said, "We can't go forward without their
25  approval."



1       A.   Right.

2       Q.   So, we don't have to guess.  And, you know, you

3  knew, Cornel knew -- well, Cornel indicated to you on this

4  call that he knew he could stop this event if he told you it

5  was unauthorized?

6            MR. YATES:  Objection.

7  BY MR. GOTEINER:

8       Q.   He told you that?

9            MR. YATES:  Object to the form.

10                     (Reporter interruption.)

11           MR. YATES:  This entire line mischaracterizes the

12  record and assumes facts.  And, unfortunately, counsel is

13  mischaracterizing things and the timing once again.

14                     (Reporter interruption.)

15                     (Previous question read.)

16      A.   No, he did not tell me that.  I don't believe he

17  told me that.  To the best of my recollection, I don't

18  believe he told me that.

19      Q.   Well, you don't recall one way or the other; is

20  that right?

21           MR. YATES:  Objection.

22      A.   I don't -- I don't believe that anything like you

23  said was ever said to me by Cornel.  So, the answer to that

24  would then be no.

25      Q.   Okay.  Well, then, on Exhibit 15, on the next



1    day, you write to him, May 29th, "Thanks.  Appreciate the

2    conversation today.  You have our assurance to support FINA.

3    And our intention to send a strong team as possible to

4    Hangzhou in December."

5             Do you see that?

6        A.   I do see that.

7        Q.   And he attached to you this article about the

8    "London Freezes Assets of Uranian Businessmen."

9             Do you see that?

10       A.   I do.

11       Q.   Did he talk about the Uranian businessmen in the

12   conversation with you, namely, Konstantin Grigorishin?

13       A.   I don't recall on that conversation.  He had

14   mentioned him in the past.

15       Q.   Okay.

16       A.   But I don't remember if it was on that

17   conversation.

18       Q.   And when you said, "You have our assurance to

19   support FINA," what did you mean by that?

20       A.   That we do support FINA.  That if FINA says that

21   this competition is not authorized, that we are in a very

22   difficult position, and we will not pursue.

23       Q.   Okay.  And, so, you were telling him, you were

24   sending that signal to him, you were making it very clear to

25   him, correct?



159

1        A.   Correct.

2             MR. YATES:   Objection to form.

3   BY MR. GOTEINER:

4        Q.   But at that point in time, you are saying he had

5   not told you that it was unauthorized; that is, when you

6   wrote this May 29 email, you believe he had not told you

7   that it was unauthorized?

8        A.   I don't believe so.

9        Q.   Okay.  But --

10       A.   It may have come later on, but I -- but I

11  don't -- I don't believe so.  I don't think he said it in

12  such words.

13       Q.   Well, you said before the June 5 letter that he

14  was intent on -- you told Jack Buckner from British Swimming

15  that FINA was intent on derailing the ISL efforts.

16       A.   We discussed that earlier.

17       Q.   Okay.  Well, that was clear.  You knew by then

18  that FINA was stopping the Las Vegas event, right?

19            MR. YATES:   Objection to form.  Mischaracterizes

20  the record.

21       A.   But --

22       Q.   Right?

23       A.   But as you said, you -- the words you used were

24  not what happened on the phone call.  So, that's why I was

25  answering no.  He did not say that, that I could stop this



1    event.

2         Q.    When did he -- when did you form the conclusion

3    that you wrote that he is intent on derailing the ISL

4    efforts?

5         **A.    I think I just gleaned that over time knowing**

6    **full well that he was not in favor of this competition.**

7         Q.    That is what I was trying to get at before.  So,

8    you knew when you were talking with him in that half-an-hour

9    conversation that he was not going to allow this competition

10   to proceed?

11        MR. YATES:  Objection to form.

12        **A.    I didn't know what the end was going to be at**

13   **that point.**

14        Q.    Well, you --

15        **A.    I -- I realize that.  But my -- my impression is**

16   **not exactly -- actually, what was -- my assumption at that**

17   **point was that it was not going well and not looking good,**

18   **and the event was going to be -- would not take place.  Or**

19   **that FINA was going to object to this competition.**

20             **But, again, as I said before, I am not -- I don't**

21   **know everything, and I can't -- I am not clairvoyant.  I**

22   **can't see that.**

23        Q.    Okay.  Look.  Let me just focus on a simple

24   point.  On June 4, you write that -- that FINA is intent on

25   derailing the ISL efforts.  Now, you -- you inferred that



1  from something that was said or was written, and that you

2  said would have been from Cornel.  So --

3       **A.   May not have been from Cornel.**

4       Q.   Okay.  So, from -- how did you form this

5  conclusion, then?  You conveyed to British Swimming that

6  FINA -- that Cornel and FINA were intent on derailing the

7  ISL efforts?

8       **A.   I don't remember the exact details of how I came**

9  **to that conclusion.**

10      Q.   Do you remember -- okay.  I am not asking you for

11  your exact details, whatever, a year later.  I am asking, do

12  you generally recall what led you to conclude that they were

13  intent --

14          MR. YATES:  Objection to form.

15      **A.   I would probably state -- or I will state that I**

16  **probably triangulated discussions or conversations with Dale**

17  **Neuburger.  And, obviously, listening to Cornel on May 28th,**

18  **knew what the sentiment was from FINA.**

19      Q.   Okay.  And then also who told you at that point

20  in time that they were going to use the GR4 rule on

21  unauthorized relations as the basis for putting the kibosh

22  on ISL?

23          MR. YATES:  Objection to form.  Completely

24  mischaracterizes the record.  Assumes facts.

25  BY MR. GOTEINER:



1    I am not sure I heard you exactly.

2         Q.   Why don't you tell me, what is the process that

3    USA Swimming, or to the best of your knowledge, any of

4    FINA's other 208 member federations would undertake to go

5    about getting FINA's approval for a particular event?

6         A.   I am going to answer your question with a

7    real-life example.

8         Q.   Perfect.

9         A.   Is that okay?

10        Q.   Perfect.

11        A.   So, we came up with an event called the Duel in

12   the Pool.  The Mutual of Omaha Duel in the Pool,

13   specifically.

14        Q.   I remember that.

15        A.   In 2003.  And we ran the event, USA versus

16   Australia.  And what we did was we submitted a request to

17   FINA in the appropriate time frame in the FINA rule book for

18   approval of the competition.

19             It was a country-versus-country competition.  It

20   was very much like Cal swimming against Stanford.  It would

21   be a dual meet with points scored, and all of that.  That is

22   typically how it goes.  If that satisfies the answer.

23        Q.   That does.  And is it your understanding that if,

24   for example, South Africa wanted to host an event, it would

25   go through a similar process?



1      A.   Yes.

2      Q.   And you talked about, you know, an appropriate

3   time frame within the FINA rule book for approval of the

4   competition.  What did you mean by that?

5      A.   Well, I don't know when it came to be, but it

6   says that that request must be in six months prior to the

7   actual event.  So, I can't -- I don't know when that came to

8   be.  And, in fact, sometimes I think that we have -- we may

9   have violated that at some point.  I just don't know.  But I

10  now know it is six months, in particular, because in light

11  of this specific circumstance.

12     Q.   And I think in earlier testimony you talked about

13  the FINA World Championships, for example.  Correct?

14     A.   Yes.

15     Q.   And how far in advance are those events

16  scheduled?

17     A.   This -- well, just as an example, this summer in

18  2019 they awarded the 2025 and 2027 world championships.

19     Q.   So, the FINA calendar is set a long way in

20  advance; is that fair?

21     A.   Sometimes, yes; and sometimes no.  And it is a

22  big frustration when it is a no.

23     Q.   But for events such as the world championships,

24  the calendar is set a long way in advance; is that fair?

25     A.   Generally, yes.  I would just add in 2014 and



1   2015 FINA moved the world championships by a week.  In 2014,

2   it moved it a week earlier.  And 2015 moved it a week later.

3   And caused significant issues for USA Swimming, because they

4   moved it on top of our national championships.

5         Q.   When were the 2018 FINA World Championships, if

6   you recall?

7         A.   Where were they?

8         Q.   When?

9         A.   When they were awarded?

10        Q.   No, when did they take place?

11        A.   Oh, I'm sorry.  December 11 to 16.  I think it

12   was 11 to 16.

13        Q.   In China?

14        A.   Yes.

15        Q.   When did you first begin discussions with --

16   strike that.

17             When you first began discussions with ISL, you --

18   your understanding was that ISL intended any competitions to

19   be FINA-approved competitions, correct?

20        A.   I think the early conversations were, yes, this

21   would be approved by FINA.

22        Q.   And, in fact, the only way USA Swimming would

23   consider partnering with ISL was if an event or the events

24   were recognized and approved by FINA, correct?

25        A.   Yes.



 1      Q.   And, in part, that is because the Ted Stevens Act

 2   obligates USA Swimming to follow FINA's rules, correct?

 3           MR. GOTEINER:  Seeks legal opinion.

 4   BY MR. YATES:

 5      Q.   That is your understanding?

 6      **A.   Yes.  I do -- I know enough about the Ted Stevens**

 7   **Amateur Supports Act to know, yes, we cannot prohibit**

 8   **competition.**

 9      Q.   You have made clear -- strike that.

10           You made clear to ISL from the beginning of your

11   discussions with them that USA Swimming's position was that

12   any ISL events needed to be approved by FINA, correct?

13      **A.   That is correct.**

14      Q.   And that position was a precondition for USA

15   Swimming to partner with ISL to host an event in the U.S.,

16   too, correct?

17      **A.   Yes.**

18      Q.   Take a look at what counsel for ISL had you look

19   at as Exhibit 7.  I think it is in the binder that he gave

20   you.

21      **A.   Hang on a second.  Okay.**

22      Q.   Do you have Exhibit 7 in front of you?

23      **A.   I believe so, yes.**

24      Q.   Exhibit 7, just so the record is clear from a

25   time perspective, this is an email exchange on March 16th of



1   2018, correct?

2       A.   Yes.

3       Q.   And an email exchange between you and Dale

4   Neuburger, correct?

5       A.   Yes.

6       Q.   And in your email to Mr. Neuburger, which is

7   talking about the ISL, you indicate that, "We have told them

8   that if FINA says 'no' to this, that the USA would have a

9   hard time taking part."

10           Do you see that?

11      A.   Yes.

12      Q.   And "them" there means ISL, correct?

13      A.   Yes.

14      Q.   You indicated earlier that you met with ISL in

15  Switzerland in February of 2018, correct?

16      A.   Yes.

17      Q.   And is that because ISL is headquartered there,

18  to your knowledge?

19      A.   No.

20      Q.   Why did you meet with them in Switzerland?

21      A.   ISL -- we had told -- I had told the couple of

22  contacts that I have with ISL that we were meeting with

23  FINA?  And they said, "Well, we might be able to be in" --

24  not Zurich -- "in Geneva.  Would you have time to meet with

25  us?"



1          And we said, "Sure."

2     Q.   And, so, you were -- you were at a meeting with

3     FINA in Lausanne, Switzerland, correct?

4     A.   Yes.

5     Q.   And you traveled in a FINA car to go meet with

6     ISL in Geneva, Switzerland, correct?

7     A.   That is correct.

8     Q.   So, all of those meetings occurred in

9     Switzerland, correct?

10    A.   Yes.

11    Q.   Okay.  And at the meeting in February of 2018,

12    you expressly told the ISL representatives that FINA would

13    need to approve of the ISL events and series, correct?

14    A.   Yes.  I -- I said this this morning, and I will

15    say it again right now.  It is over 100 times I told ISL

16    they needed to be on the same page with FINA and figure out

17    the differences.

18          And I -- and told Cornel that, too, with FINA,

19    that they please figure out this -- figure this out.  It is

20    putting a lot of stress on a lot of people.

21    Q.   But you told ISL, "Go get in a room with FINA and

22    make sure that FINA approves of this proposed series of

23    events," correct?

24    A.   Yes.

25    Q.   Okay.  And at the time, I think you testified



 1   this morning, it was a proposed series of events.  There was

 2   going to be one event in December of 2018, and then perhaps

 3   some additional events in 2019 and beyond, correct?

 4        **A.   Yes.**

 5        Q.   Okay.  But for -- strike that.

 6             But for 2018, your understanding at least as of

 7   February of 2018 was that the proposal would be that there

 8   would be one event, one ISL event in 2018?

 9        **A.   In 2018, in 2018, yes, there was only due to be**

10   **one event.**

11        Q.   And you recall telling ISL in February of 2018

12   that if FINA says no to the proposed series of events, then

13   USA Swimming would have a hard time taking part?

14             MR. GOTEINER:  Asked and answered.

15        **A.   I -- I don't know specifically if it was at the**

16   **2017 -- excuse me, the February 8th, 2018, meeting.  It was**

17   **on many occasions.  I don't specifically recall whether --**

18   **or generally recall whether it was discussed at that meeting**

19   **in Geneva.**

20        Q.   And in your email, Exhibit 7 to Mr. Neuburger,

21   you indicate, "Possible site Singapore, though they have

22   asked us about the USA hosting," correct?

23        **A.   That is correct.**

24        Q.   So, at this point in March of 2018, you

25   understand -- you understood that ISL was looking at



177

1    potential venues throughout the world; is that fair?

2        A.   Yes.

3            MR. GOTEINER:  Misstates his testimony.

4    BY MR. YATES:

5        Q.   Was ISL also discussing the potential of hosting

6    its December 2018 event in London?

7        A.   They had talked about three or four sites.  They

8    talked about two sites in Europe.  The Singapore was talked

9    about.  The U.S. was -- they were inquiring about it at that

10   time.

11           So, there was a lot still on the table.  And now

12   we are talking the middle of March.  That is nine months

13   away.  Yeah.  Right.  That is nine months away would the

14   competition be.

15       Q.   Now, let me just -- let me be very clear.  This

16   is the one time I think I will do it.  Hopefully I won't do

17   it more than once.  Let me ask you a couple of questions

18   about 2019 right now, okay?

19       A.   Okay.

20       Q.   Okay.  In 2019, the ISL is putting on events,

21   correct?

22       A.   Yes.

23       Q.   And the ISL has an upcoming event in Australia,

24   correct?

25       A.   No.



1        Q.   I thought there was going to be an event in

2    Australia.

3        A.   Not that I know of.

4        Q.   Where -- where do you understand the ISL to be

5    putting on events in 2019?

6        A.   We are -- we are very much involved with that, so

7    I know exactly when and where they are going to be.  October

8    5 and 6 will be in Indianapolis.  October 12 and 13 will be

9    in Budapest.  October -- the following weekend in October

10   will be in Louisville, Texas.  The following weekend after

11   that will be -- I'm sorry.  I have missed Budapest.

12             I am going to start again.  Make it easy for you.

13   So, Indianapolis October 5, 6.  And on successive weekends

14   we will be in Italy; and then Louisville, Texas; and then

15   Budapest.  And then there will be a break for about three

16   weeks or four weeks.

17             They will have back-to-back weekends in November,

18   like, 16, 17 in Washington, D.C.  Actually at College Park,

19   Maryland, followed by the following weekend in London.

20   Another three- or four-week break.  And then the event in

21   Las Vegas.  And December 19, 20, or 20, 21, I can't

22   remember.  20, 21.

23       Q.   So, fair to say that the ISL is putting on events

24   throughout the world in 2019?

25             MR. GOTEINER:  Misstates his testimony.



1          A.    Yes.   That is correct.

2          Q.    Okay.   You mentioned London.   You mentioned

3    Budapest.   You mentioned the United States.   Correct?

4          A.    Yes.

5          Q.    All right.   And to the best of your knowledge,

6    are those events approved and on the FINA calendar?

7          A.    They are all on the FINA calendar -- that I know

8    in the U.S. we submitted four, except for one.

9          Q.    So, is it fair to say that in 2019 a path was

10   found to comply with FINA's rules and had the ISL put on

11   events in the United States and other countries?

12         A.    Yes.   There -- yes.   That's accurate.

13         Q.    Okay.   Let's go back a little bit in time.   When

14   precisely do you recall first having discussions with

15   representatives of ISL?

16         A.    I mentioned this morning, this was early August

17   of 2016, with Andrea Di Nino in Rio de Janeiro.   We then had

18   continued conversations through a good portion of 2017 and

19   continued.   In fact, never stopped having conversations with

20   ISL.

21         Q.    Do you recall having discussions or

22   communications with Mr. Hinchey, the CEO of USA Swimming,

23   about ISL in the April 2018 time frame?

24         A.    At that time, in that time frame, we were talking

25   to -- Tim and I -- Tim Hinchey and I were talking quite



1   often about this, because it was a challenge to us.

2        Q.   Why don't you take a look at what I will have our

3   court reporter mark as next in order.  49.

4                    (Deposition Exhibit 49 was marked.)

5        A.   I got it.  Thank you.

6        Q.   You are very good.  You read from the bottom up,

7   which is always a tricky thing for witnesses with emails.

8   So, I appreciate you taking the time to do that.

9             So, Exhibit 49 appears to me to be some emails

10  that you exchanged with Mr. Hinchey in April of 2018; is

11  that right?

12       A.   Yes.  That's correct.

13       Q.   Okay.  And in your email of April 6th to

14  Mr. Hinchey, you are asking him about attending an ISL

15  meeting in Turkey in late May; is that right?

16       A.   Yes.

17       Q.   And Mr. Hinchey's response is he would like

18  to see more progress on, "A) FINA approval."  And,

19  "B) financial offer to us before we travel."

20            Do you see that?

21       A.   Yes, I do.

22       Q.   Spoken as a true CEO, he mentioned the finances.

23       A.   Yes.  I will stop.

24       Q.   So, let me ask you a question.

25       A.   Sure.



1        Q.   What was your understanding of why FINA approval

2   of ISL was important to Mr. Hinchey as of April 9th of 2018?

3        A.   Well, we were aware of the challenges with the --

4   with the rules and with FINA's position on this, and we were

5   concerned about it.  And, so, Tim was rightfully so saying

6   let's -- let's make sure that -- we don't want to go -- you

7   don't want to get so far down the road that you can't back

8   up.

9            So, we were trying to proceed very cautiously

10  throughout this entire time.  And, in fact, on numerous

11  occasions Tim and I had conversations, and he said to me,

12  "We are taking all correct steps on this.  And we have done

13  nothing wrong in this."

14           So, that to me was like, okay, we are done -- we

15  had done -- we have done proper work on this.  But we still

16  wanted to make sure that FINA was okay with it.

17       Q.   Now, in May of 2018, I believe that you testified

18  this morning that you conducted a couple of site visits

19  along with representative of ISL?

20       A.   Yes.

21       Q.   In Los Angeles and Las Vegas?

22       A.   Yes.

23       Q.   I think you testified this morning that at that

24  time you understood that ISL was also considering London for

25  a December 2018 ISL event; is that right?



1      A.   I didn't think he was in touch with the current

2   situation.  I hate to be so blunt.

3      Q.   That is fine.  Now, Mr. Khan's response was --

4   strike that.

5           Mr. Khan's email at the top of the first page of

6   Exhibit 53 was in response to an email you sent him and some

7   concerns you raised on the 4th of June of 2018, correct?

8      A.   Yes.

9      Q.   And in your email you indicated that, "USA

10  Swimming remains very interested in participating in the

11  ISL; however, we are aware that FINA is potentially

12  concerned about this relationship."

13          Do you see that?

14     A.   Yes.

15     Q.   And then you asked, essentially, for an update on

16  ISL discussions with FINA, correct?

17     A.   Yes.

18     Q.   That response was in reaction to a draft MOU,

19  memorandum of understanding, that Mr. Khan had sent to you

20  and Mr. Hinchey, correct?

21     A.   Yes.

22     Q.   Now, no MOU, memorandum of understanding, was

23  ever signed between ISL and USA Swimming, correct?

24     A.   No.  As I referenced this morning, there was a --

25  a -- an intent to participate with clubs.  A document that



 1    was -- that we signed in February of 2018, but there was

 2    nothing further to that.

 3         Q.    Do you recall if the draft memorandum of

 4    understanding that was sent by ISL indicated that Swiss law

 5    would apply to the agreement?

 6         A.    I don't recall that.

 7         Q.    Do you recall that the draft MOU that was sent by

 8    ISL indicates that any disputes between USA Swimming and ISL

 9    would be decided in Switzerland?

10         A.    I don't recall that either.  Sorry.

11         Q.    You don't recall one way or the other?

12         A.    No.

13         Q.    Fair enough.

14         A.    It may have been in there, but I don't -- I have

15    not looked at that MOU recently.

16         Q.    Let's look at Exhibit 54.

17                    (Deposition Exhibit 54 was marked.)

18         Q.    Do you see it has got the same initial email from

19    Mr. Khan, and then your response from June 4th of 2008 as we

20    looked at in the prior exhibit?

21         A.    Yes.

22         Q.    And then do you see that there is an internal ISL

23    email that discusses your response?

24         A.    Yes.

25         Q.    Okay.  And Mr. Khan appears to forward your email



1  response to a variety of his ISL colleagues, correct?

2      A.   Yes.

3      Q.   Okay.  And this all occurs on June 4th, the day

4  before FINA issued its memorandum of June 5th to all 209

5  member federations, correct?

6      A.   Yes.

7      Q.   And in his email at the top of the first page of

8  Exhibit 53, Mr. Khan writes, "It seems crystal clear what

9  USA's position is.  USA's priority is not ISL commercial

10  terms but FINA's position.  To be fair to Mike, when I met

11  him in New York, he was pretty clear that FINA's support was

12  important and relevant.  Without FINA, his support was

13  unlikely."

14          Did I read that correctly?

15      A.   Yes.  I think you maybe mentioned Exhibit 53, but

16  it was -- you are talking about Exhibit 54.

17      Q.   My apologies.

18      A.   Okay.

19      Q.   And then let me ask you a question:  Do you

20  recall meeting with Mr. Khan in New York?

21      A.   Yes.

22      Q.   And when did that occur?

23      A.   Oh, man.  That is a good question.  We were on a

24  site visit for the Golden Goggles at the New York Sheraton.

25  I'm sorry for the stream of consciousness now.  I am trying



1    to think when that was.

2            It was probably in -- it was like spring of --

3    February, March time frame, maybe even April time frame of

4    '18.  I was with two coworkers, so I remember that.  We went

5    across the street.  I know exactly where we were.  I just

6    cannot tell you the date of that.

7        Q.   Fair enough.  Do you recall indicating to

8    Mr. Khan at that meeting in February, March of 2018 that

9    FINA support was important and relevant, and without FINA

10   support your support was unlikely?

11       A.   I think he -- he characterizes what I have --

12   what I said, or -- the tenor of our meeting accurately.

13       Q.   And then do you see that there is a reference in

14   the next paragraph to, "This is why at the time through

15   consultation with KG, we dropped USA region from Sportcel

16   host-city process."

17           Do you see that?

18       A.   Yes.

19       Q.   Do you have an understanding what that refers to?

20       A.   Well, they were -- Sportcel is an international

21   sport conference, and I don't exactly know, but they were

22   going to that conference to have meetings with some

23   potential cities, I believe, as perhaps host cities around

24   the world.

25       Q.   And did you understand that the USA region had



```
 1    been dropped by ISL at some point in time?

 2         A.   That was news to me.  When I just read that, that

 3    was complete news to me.

 4         Q.   So, ISL never told you that?

 5         A.   No.  The following sentence is also --

 6         Q.   News to you; is that fair?

 7         A.   Yes.  I am trying to think the dates we visited

 8    there in early May at Mandalay Bay.  So, this was a month

 9    after.  So, okay.  That was news to me as well.

10         Q.   So, ISL never told you as part of your

11    discussions with them that ISL had dropped the USA region

12    after consultation with Mr. Grigorishin at some point in

13    time?

14              MR. GOTEINER:  Misstates what the document says.

15         A.   I -- ISL had never told us that we had been

16    dropped from the process.

17         Q.   Did ISL ever tell you that it had dropped London,

18    Hungary, or any other potential city, host city, from the

19    process?

20         A.   No, it hadn't.

21         Q.   Let's take a look at what we will have marked

22    next in order.

23                   (Deposition Exhibit 55 was marked.)

24         A.   Okay.

25         Q.   All right.  Now, Exhibit 55 begins with an email
```



1    dated June 13, 2018, from you to three individuals at ISL,

2    correct?

3        A.   Yes.

4        Q.   And first of all, who is Mr. Rouger?

5        A.   Mr. Rouger is a long-time friend who had done

6    work at the French Swimming Federation, and then moved on to

7    LEN, the European swimming body.  And had left his position

8    at LEN and was working for UEFA, U-E-F-A, which is

9    international -- European football.  But he was the main --

10   one of my main contacts -- because we knew each other well,

11   was one of my main contacts within ISL.

12       Q.   And, so, he was working at a consulting firm, but

13   he was consulting on behalf of ISL?

14       A.   Well, he was -- I think he works full time for

15   UEFA, and then he had a side gig where he was helping

16   consult with ISL.  David told me on a couple of occasions

17   that he had been given the U.S. because of his relationship

18   with me.

19       Q.   And also, you also sent this email to

20   Mr. Di Nino?

21       A.   Andrea Di Nino.

22       Q.   Also of ISL, correct?

23       A.   Yes.

24       Q.   And then Tolis also of ISL?

25       A.   So, Apostolos Tsagkarakis is a Greek guy.  Swam



1    Q.   You just don't recall, sitting here today?

2    A.   **Yeah.  No, I don't.**

3    Q.   Fair enough.  So, then, but your understanding,

4  at least as of June 13th of 2018, was the ISL plan was to

5  have the December 2018 event in London, England?

6    A.   **Correct.**

7    Q.   And then if you go to -- strike that.

8         If you go to, I think, Mr. Rouger's response.  I

9  think it is on the same page --

10   A.   **Yes.**

11   Q.   -- of Exhibit 55, he indicates, "We are never

12 against having an agreement with FINA.  We will be ready and

13 happy to meet with FINA representatives."

14        And then, essentially, he asks you to contact

15 FINA and to schedule a meeting on ISL's behalf?

16        Do you see that?

17   A.   **Yes.**

18   Q.   What was your reaction to that request?

19   A.   **Well, they were asking me to serve as the**

20 **intermediary between ISL and FINA.  I had thought they had**

21 **already made contact with ISL, so I was curious as to why**

22 **that was the case.  But maybe they thought that -- I don't**

23 **know what they thought.  I would be -- I would be assuming**

24 **too much.**

25   Q.   Okay.  Well, if you go to the top of Exhibit 55,



1   do you see there is an email from you to Mr. Hinchey?

2      **A.   Yes.**

3      Q.   And in your email you indicate to Mr. Hinchey,

4   "Can't believe they don't have this already," meaning an

5   introduction.  And then you continue, "And makes me question

6   what they have been telling us about FINA."

7           Do you see that?

8      **A.   This is from Tim to me.**

9      Q.   I'm sorry.  You are correct.  Let me -- let me

10  start that again.  You are correct.  I misread the email.

11          Exhibit 55 includes an email from Mr. Tim Hinchey,

12  the CEO of USA Swimming, to you, correct?

13     **A.   Yes.**

14     Q.   And he says -- he is referring to the request

15  from ISL that you make an introduction to FINA on ISL's

16  behalf.  Do you see that?

17     **A.   Yes.**

18     Q.   And then he says, "Can't believe they don't have

19  this already.  And makes me question what they have been

20  telling us about FINA."

21          Do you see that?

22     **A.   Yes.**

23     Q.   Do you recall discussing that with Mr. Hinchey at

24  or about that time?

25     **A.   Yes, I do.**



MIKE UNGER
INTERNATIONAL SWIMMING LEAGUE v. FEDERATION INTERNATIONALE DE NATATION September 24, 2019

207

1        Q.   What do you recall about that?

2        A.   It says it here, but Tim was adamant that, "You

3   will not be going to that meeting.  That is not the position

4   you want to put yourself in."  We were -- we were quite

5   frustrated at this point that -- that not more had been done

6   to -- to solve this problem.

7        Q.   You told ISL directly many times to go talk to

8   FINA, correct?

9        A.   Yes.

10       Q.   And your understanding when you were in

11  discussions with them about potentially hosting an event for

12  ISL was that ISL was working with FINA to get approval,

13  correct?

14       A.   Say that again.  I'm sorry.

15       Q.   Sure.  Your understanding when you were in

16  discussions with ISL about potentially hosting an ISL event

17  was that ISL was actually working with FINA to get approval,

18  correct?

19       A.   Yes.  That -- that is that they said.  They said

20  that they were continuing negotiation and discussion.  And

21  we were hopeful that the September -- I think it is the

22  25th, 26th meeting, something like that, in Lausanne of 2018

23  was going to help cure that.

24                  (Deposition Exhibit 56 was marked.)

25       Q.   Let's take a look at next in order.  I think we



1    are up to 56.

2        A.    Go ahead.

3        Q.    Okay.  Have you had a chance to review

4    Exhibit 56?

5        A.    I remember it.

6        Q.    Okay.  And Exhibit 56 is an email from yourself

7    to a gentleman named Sid Greenfeig?

8        A.    Greenfeig.

9        Q.    Greenfeig, at MGM Resorts?

10       A.    Yes.

11       Q.    And your email is sent April 23rd of 2018?

12       A.    Yes.

13       Q.    Okay.  And in your email you are basically

14   beginning to try to get some information about whether it

15   would be feasible to host an event in December of 2018 at

16   the MGM Resort in Las Vegas?

17       A.    Yes.

18       Q.    And counsel for ISL kind of cut you off when you

19   were talking about some of the issues you were trying to

20   work out with respect to hosting a potential event in

21   Las Vegas.  What were they?

22       A.    So, there is no pool.  This is an interesting

23   thing.  We take a -- a permanent pool, and we can use it in

24   a temporary situation.  It is a very, very odd circumstance.

25   And we can -- they call it a pop-up pool, some do.  You can



1    take the pool and you can drop it into a site.

2            We do this for our Olympic Trials in Omaha,

3    Nebraska.  It is not an easy thing to do.  And, so, in a

4    very, very tight time frame, this was the biggest concern,

5    we were going to have to build two pools, an eight-lane,

6    25-meter pool, and then a warm-up pool that would be

7    somewhere else in the building, in about a five- or six-day

8    period, because the venue could only give us so many days.

9    It was only open for so many days.

10           This is a tall task.  And the pool company is

11   called Myrtha, M-y-r-t-h-a, and they are a sponsor of USA

12   Swimming.  So, we have great, great friends at Myrtha.  But

13   that was the biggest concern.  And any venue operator is

14   going to have enormous concern, because you are now putting

15   the weight of a pool on a floor, which could have pipes for

16   ice underneath.

17           It could have -- there are other considerations.

18   You are also talking about a union town in many -- many

19   locations, in Las Vegas.  You -- the other tight time frame

20   was this event was due to go until December 21st, or even

21   December 22nd.  And there was enormous fear about not being

22   able to clear out and what we call strike, which means to

23   leave the building, to clean up, by Christmas Eve or

24   Christmas day.

25           So, there was -- there were some serious concerns



210

1    around this.  And that was -- that was some of it.  That

2    was -- that was one specific part.

3        Q.   And were you still working on those concerns in

4    June of 2018?

5        A.   By then we had, I think -- it depends on what

6    date, but I think we had mostly taken a step back.  I think

7    I frustrated Sid Greenfeig, because we were in discussions,

8    and then there was some of the FINA stuff was going on

9    with -- some of the political stuff was going on, and we

10   took a step back, and we told him we need more time.  But

11   he -- he was running out of time.

12       Q.   You never -- strike that.

13            USA Swimming never signed a contract with MGM,

14   correct?

15       A.   No.

16       Q.   Did USA Swimming sign a contract with any vendor

17   that would have been necessary to host an event, an ISL

18   event, in December of 2018?

19       A.   No.

20       Q.   You didn't sign a contract with Myrtha, the pool

21   company?

22       A.   No, no.

23       Q.   Looking at -- looking at Exhibit 56, if you go to

24   the second page.

25       A.   Yes.



1      Q.   Do you see there is a heading in the middle of

2   the second page which reads "2018 International Swim

3   League"?

4      **A.   Yes.**

5      Q.   And then there is some information that follows?

6      **A.   Yes.**

7      Q.   Did you get the information that follows from

8   ISL?

9      **A.   Generally, yes.  I -- I did a one-page summary,**

10  **which is what this is, in sort of my English terms, for a**

11  **variety of groups, including the MGM folks.**

12     Q.   In your one-page summary, you list potential

13  sites for the December 2018 ISL event as "Melbourne,

14  Australia; London, England; Los Angeles/Las Vegas.  Site to

15  be finalized soon."

16          Do you see that?

17     **A.   Correct.**

18     Q.   And that was a true statement as of that time?

19     **A.   Yes.  That was maybe -- that was in the February,**

20  **March, April time frame.  I can't recall exactly when this**

21  **was authored.**

22     Q.   Okay.  Fair enough.

23              (Deposition Exhibit 57 was marked.)

24     Q.   You can put that aside.  Let's look at what has

25  been marked as Exhibit 57.



  1        A.    Got it.

  2        Q.    Okay.  So, Exhibit 57 consists of originally an

  3   email from Mr. Rouger representing the ISL, and then some

  4   correspondence between yourself and Mr. Hinchey, correct?

  5        A.    That is correct.

  6        Q.    Okay.  Now, the email at the bottom of the -- of

  7   Exhibit 57, which it is a one-page document, that is the

  8   email dated June 11, 2018, from Mr. Rouger representing ISL

  9   to you, correct?

 10        A.    Yes.

 11        Q.    And he copies, I think, the same group of

 12   colleagues at ISL that we talked about before?

 13        A.    Yes.  Tolis and Andrea.

 14        Q.    Okay.  And in Mr. Rouger's email, he essentially

 15   tells you that on June 11th that ISL was planning to host

 16   the December 2018 ISL event in London, England, correct?

 17        A.    Yes.

 18        Q.    Okay.  And then you reported that to Mr. Hinchey

 19   in your email in the middle of Exhibit 57, correct?

 20        A.    Yes.

 21        Q.    In fact, you say -- essentially, you say,

 22   "British Swimming will be the host likely in London."

 23              Do you see that?

 24        A.    Yes.

 25        Q.    You can put that aside.  Let me ask you one



240

1  privy to it, but that's what my understanding of Sportcel

2  was.

3       Q.   Okay.  So, that was your understanding, but it

4  was never explained to you explicitly, correct?

5       A.   I have no idea.  Never explained to me

6  explicitly, no.  Sportcel is similar to SportAccord, I

7  believe.  And I could be wrong.

8       Q.   It doesn't matter.

9       A.   Okay.

10       Q.   I just want your best testimony.  In Exhibit 55,

11  there was this discussion of a potential London meet.  But I

12  just want to be clear on something.  The possible London

13  competition didn't come to be discussed in this sense until

14  the Las Vegas meet collapsed, correct?

15            MR. YATES:  Objection to form.  Mischaracterizes

16  the witness' prior testimony in the record.

17  BY MR. GOTEINER:

18       Q.   Correct?

19       A.   We were proceeding with Las Vegas, but didn't

20  know that London was completely off the table.  We -- they

21  had told us, "We want to come to Las Vegas, but that doesn't

22  mean we are coming to Las Vegas."  So --

23       Q.   Go ahead.  Did they tell you that, that, "We want

24  to come to Las Vegas but we" -- ISL -- "don't mean that we

25  are coming to Las Vegas"?  Is that what you are saying?



MIKE UNGER

INTERNATIONAL SWIMMING LEAGUE v. FEDERATION INTERNATIONALE DE NATATION     September 24, 2019

241

1          MR. YATES:  Object to form.

2      A.   My understanding was that I don't know that Jack

3   Buckner at British Swimming knew they were coming to Las

4   Vegas.  They may have been telling us they were coming to

5   Las Vegas, but whether or not they had told London they

6   weren't coming to London, I didn't know that.

7      Q.   Okay.  I am just curious.  Did you have any --

8   let me phrase it differently.

9          When they told you that they were coming to Las

10  Vegas --

11     A.   Yes.

12     Q.   -- and you wrote to --

13     A.   Dean Akron.

14     Q.   -- with the exclamation point, they are coming to

15  Las Vegas, did you have any reason to believe at that point

16  that they were BS'ing you and they were really going to

17  London?

18         MR. YATES:  Objection to form.

19     A.   I am firmly planted with feet on the ground, so

20  we fully expected them to want to come to Las Vegas, but we

21  also knew that they could possibly change it and go to

22  London.  We had so many details to work through still, as I

23  mentioned throughout the day today, that there could have

24  been a change.

25     Q.   Okay.  But I am just trying to understand.  What



242

1   was the -- did you have any basis to believe that they, as

2   of late May, would jettison Las Vegas and go to London

3   instead?

4        MR. YATES:  Objection to form.

5        A.   I believe they would come to Las Vegas if we

6   could get everything worked out.

7        Q.   Okay.  Go ahead.  You want to say more?

8        A.   But, however, I know that because there was a lot

9   to get worked out -- London was an existing facility.  It

10  existed.  There was a pool with water in it.

11       Q.   Right.

12       A.   Las Vegas did not have that.  So, as I mentioned

13  before, and described the details of how to get a pool

14  built, they would have been smart that they were continuing

15  on both tracks.

16       Q.   They might have been smart, or would have been

17  smart, but you are speculating about London, aren't you?

18       MR. YATES:  Objection to form.

19       A.   There is a bit of speculation there, sure.

20       Q.   Okay.  And Myrtha didn't tell you that the pools

21  could not be built in time, did he?

22       A.   Myrtha -- Myrtha had some serious concerns.

23       Q.   I know they had serious concerns.  But they never

24  told you it could -- they could not handle the pool building

25  and deconstruction, did they?



1       A.   No.  They hadn't said that.

2       Q.   Okay.

3       A.   Yet.

4       Q.   I am trying to make sure the record is clear.

5       A.   Yes.  Okay.

6       Q.   Okay.  All right.  So, as far as you knew, the

7   London competition did not come to be until after Vegas

8   collapsed, correct?

9            MR. YATES:  Objection to form.  Mischaracterizes

10  the record.  Lacks foundation.

11  BY MR. GOTEINER:

12      Q.   Go ahead.

13      A.   Honestly did not pay much attention that the

14  London event had -- was -- I always believed the London

15  event was still there.  I don't believe it ever completely

16  went away.

17      Q.   When you say "the event," there was no event.

18  There was a possibility of a London event?

19      A.   Correct.  There was a possibility of an event

20  anywhere for that matter.  But I believed that, yes, we are

21  coming to Las Vegas, is what they told me.  And I believed

22  that.

23      Q.   Okay.

24      A.   However, I still believe that they were telling

25  London, "We don't know; we don't know; we do not know."  But



244

```
 1    Jack Buckner didn't know that the event was definitely

 2    coming to Las Vegas.
```

```
 3         Q.   Well, I -- did Buckner ever indicate to you at

 4    any point in time either before or after June 5 that they

 5    were telling him that, "Las Vegas might not go and we might

 6    come to London instead"?

 7         A.   I don't know that.

 8         Q.   All right.

 9         A.   Clearly, and we learned from -- I learned June

10    11, is when David Rouger wrote to me to say that we have an

11    event that will be arranged in London.

12         Q.   Right.  That was after June 5?

13         A.   It was after June 5, right.

14         Q.   Okay.  The -- now, you know, you testified before

15    that -- and we were talking about this email that Tim wrote,

16    and Tim didn't want to put -- did not want you to be at that

17    meeting that ISL asked for.  Do you recall that?

18         A.   Yes.

19         Q.   Okay.  And he didn't want to -- he didn't want to

20    put ISL in the middle between --

21         A.   USA Swimming.

22         Q.   Sorry.  He didn't want to put USA Swimming in the

23    middle between ISL and FINA for several reasons, but he told

24    you not to go to that meeting, correct?

25         A.   That is correct.  Well, may I restate?
```



1      Q.   Yeah.

2      A.   He told me that we don't want to be at that

3   meeting, and we are not going to -- we can help set it up,

4   or we can help make the introduction, which I eventually

5   did.

6      Q.   Right.

7      A.   But we were not going to attend.

8      Q.   So, you really had no idea what ISL was

9   attempting to do with obtaining approval from FINA, do you?

10          MR. YATES:  Objection to form.

11   BY MR. GOTEINER:

12     Q.   You don't know what deals they were suggesting?

13   You don't know what negotiations they had entered into?  You

14   don't know if they were begging Cornel to get approval?  You

15   have no idea what was going on?

16     A.   That is correct.  I was not at those meetings.  I

17   do not know that.

18     Q.   It was just as likely as not that Cornel was

19   being dishonest with ISL and trying to exercise too much

20   control over ISL; isn't that correct?

21          MR. YATES:  Objection to form.

22     A.   I have no idea.  I was not at those meetings.

23     Q.   Do you know -- you mentioned that certain venues

24   were being considered, maybe in February, and you were

25   talking about that nice little brochure -- not a brochure,



1   but there was a summary that you prepared?

2   **A.   Yes.**

3   Q.   That is marked as an exhibit.  I think it is

4   Exhibit 56.  And you said you summarized --

5   **A.   Correct.**

6   Q.   -- your understanding of what might be happening

7   under the page 366, 2018 International Swim.

8   **A.   Yes.**

9   Q.   Okay.  Now, do you recall whether you sent that

10  to either Neuburger or Marculescu?

11  **A.   No, I don't.**

12  Q.   Okay.

13  **A.   I had sent this to the Mandalay Bay folks, but I**

14  **don't recall who else I sent it to, if I sent it at all to**

15  **anyone else.  And may I just clarify that the -- the**

16  **pretty -- the pretty document that is the following pages**

17  **was produced by ISL, not by USA Swimming.  You should know**

18  **that.**

19  Q.   I understand.

20  **A.   Okay.**

21  Q.   Thank you.  So, you know, let me get back to

22  another document that you were asked about.  So, it is

23  Exhibit 57.

24  **A.   Yes.**

25  Q.   So, this was into the period where you are



```
1        A.    I believed they wanted to know what we were

2    thinking and doing so they would be able to have proper

3    information to make their own decisions.

4        Q.    In terms of which federation would have been the

5    most significant in saying to FINA, "We are going to work

6    with ISL," which federation would that have been at that

7    point in time, midpoint of 2018?

8              MR. YATES:  Objection to form.

9        A.    It would be -- I would say it would be both.

10   Swimming Australia, in particular, and British Swimming as

11   well.

12       Q.    So, those are two more important than USA

13   Swimming?

14       A.    I'm sorry, I didn't understand your question,

15   then.

16       Q.    Which of the -- well --

17       A.    I thought you meant of the other federations.

18       Q.    I am talking about of all of federations, which

19   would have been most significant to tell FINA that, "Sorry,

20   we are going to go ahead and work with ISL"?

21             MR. YATES:  Objection to form.

22   BY MR. GOTEINER:

23       Q.    Which would have been the most significant

24   federation to do that?

25             MR. YATES:  Object to form.
```



1             MR. RYCHENER:  Objection to foundation.

2             MR. YATES:  Objection to form.  Calls for opinion

3    and conclusion.

4    BY MR. GOTEINER:

5        Q.   And your answer is?

6        A.   I believe USA Swimming probably would have been

7    the most important one in this -- in the mix.

8        Q.   And why is that?

9        A.   Just the level of athletes that we have.  The

10   performance that we have had.  The interaction that we have

11   with FINA.  The interaction we had with ISL.  I think we

12   were the -- a key federation.

13           And I don't want to -- I don't want to be

14   boastful.  That is not the effort here.  But I think that

15   was -- that was important for FINA to know what we were

16   going to do, and important for ISL to know.

17       Q.   Do you think that was one reason why Cornel was

18   focusing on USA Swimming as he did?

19           MR. YATES:  Objection to form.  Assumes facts.

20   Lacks foundation.

21       A.   I can't -- I am not in Cornel's brain.  I don't

22   know that.

23       Q.   Did he tell you that?  Did he indicate to you

24   that he was particularly concerned about what USA Swimming

25   was going to do?



 1      A.   Never said that.

 2      Q.   Okay.  Did Dale do that?

 3      A.   No, I don't believe so.

 4      Q.   Okay.

 5           MR. RYCHENER:  Are we done with the power-hour

 6   deposition here?

 7           MR. GOTEINER:  That's not fair.

 8           MR. RYCHENER:  It has been going an hour.

 9           MR. GOTEINER:  It hasn't gone an hour.  That is

10   not fair.  We are less than an hour.  And I am not going to

11   take an hour.  Okay.  Thank you very much, sir.

12           THE WITNESS:  You are welcome.

13           MR. YATES:  Mr. Unger, just a couple very

14   briefly.

15                        EXAMINATION

16   BY MR. YATES:

17      Q.   Counsel asked you some questions in which he used

18   the words "life support," and Las Vegas even being on life

19   support as of May 31, 2018.

20           Do you recall those questions?

21      A.   Yes.

22      Q.   As of May 31 of 2018, did USA Swimming have a

23   signed contract with ISL to host an event in December of

24   2018?

25      A.   No.



261

```
 1        Q.   And no contract was ever signed with ISL,
 2   correct, to host an event?
 3        A.   No.
 4        Q.   And USA Swimming had no signed contract with a
 5   venue at that time, correct?
 6        A.   No signed contract.
 7        Q.   And, in fact, you have already testified there
 8   were a lot of issues that needed to be worked out if USA
 9   Swimming were to host an event as of May 31 of 2018,
10   correct?
11        A.   That is correct.
12        Q.   Okay.  There were some questions about potential
13   ISL competition with FINA.  You don't personally know if
14   FINA was at all worried about ISL as a potential competitor,
15   do you?
16        A.   I don't know that.
17        Q.   Okay.  And FINA is an international federation,
18   correct?
19        A.   Yes.
20        Q.   It has a relationship with the International
21   Olympic Committee, correct?
22        A.   Yes.
23        Q.   Okay.  And as a member -- as an international
24   federation, FINA, like other international federations,
25   promulgates rules, correct?
```



MIKE UNGER
INTERNATIONAL SWIMMING LEAGUE v. FEDERATION INTERNATIONALE DE NATATION September 24, 2019

262

1        A.    Yes.

2        Q.    And international federations care about their

3   rules being followed, correct?

4              MR. GOTEINER:  Seeks speculation.  Vague and

5   ambiguous.  Seeks expert opinion.

6        Q.    That's your understanding, correct?

7        A.    I believe that -- can you repeat the question

8   again?

9        Q.    Sure.  International federations care about their

10   rules being followed, to the best of your understanding,

11   correct?

12       A.    Absolutely.

13       Q.    And what is the basis for that?

14             MR. GOTEINER:  Same objections.  Expert opinion.

15       A.    The rules must be followed and -- there is

16   clearly a reason you have a rule book.  And you want others

17   to uphold that, just like you would want to uphold it.  So,

18   it is super important.

19       Q.    Do you know FINA's concerns about ISL were -- had

20   their genesis in the fact that ISL was not following FINA's

21   rules?

22             MR. GOTEINER:  Seeks speculation about what was

23   in Cornel's mind.

24       A.    I don't know the answer to that one.  But --

25       Q.    But rules -- FINA rules are important to FINA,



1    right?

2        A.    Absolutely, yes.

3        Q.    Okay.  And if the -- if the potential ISL event

4    was not going to follow FINA's rules, you would expect that

5    to be of importance to FINA as an international federation,

6    correct?

7        A.    Yes.

8              MR. GOTEINER:  Seeks speculation.

9        A.    Yes.  Definitely would be important to FINA.

10       Q.    61.  Very last question.

11       A.    I am there.

12       Q.    This is your conversation, your teleconference

13   with USA athletes?

14       A.    Correct.

15             MR. GOTEINER:  Hold on.  Go ahead.

16   BY MR. YATES:

17       Q.    You say at the -- at the end of the -- it is the

18   last sentence, second-to-last paragraph on the first page of

19   Exhibit 61.  Counsel for ISL read the first part of that

20   paragraph.  The last part says, "At no point does it appear

21   that ISL sought FINA approval or received FINA approval, and

22   at no point did FINA grant its approval."

23             Did I read that correctly?

24       A.    Yes.

25       Q.    That was your belief as of November 1, 2018?



268

1                    REPORTER'S CERTIFICATE

2

3              I, SANDI K. PELTON, Certified Realtime

4    Reporter within Colorado, appointed to take the deposition

5    of MICHAEL UNGER, do certify that before the deposition he

6    was duly sworn by me to testify to the truth; that the

7    deposition was taken by me at 90 South Cascade, Suite 1100,

8    Colorado Springs, Colorado, on September 24, 2019; then

9    reduced to typewritten form consisting of 268 pages herein;

10   that the foregoing is a true transcript of the questions

11   asked, testimony given, and proceedings had.

12

13             I further certify that I am not related to

14   any party herein or their Counsel, and have no interest in

15   the result of this litigation.

16

17             In witness hereof, I have hereunto set my

18   hand this September 25, 2019.

19

20

21

22                    _Sandi K. Pelton_

23             _____

24             Sandi K. Pelton, RPR, RMR, CRR
               and Notary Public

25

