

**NEIL A. GOTEINER**
ngoteiner@fbm.com
D 415.954.4485

June 2, 2021

*By E-Filing*

Hon. Jacqueline Scott Corley
United States District Court
San Francisco Courthouse, Courtroom E
450 Golden Gate Avenue, 15th Floor
San Francisco, CA 94102

  Re: <u>ISL/Shields v. FINA – Case No. 18-CV-7393/7394</u>

Dear Magistrate Judge Corley:

  Pursuant to the Court's Civil Standing Order and May 6 informal discovery hearing authorizing the parties to file a letter brief, the parties submit this joint letter regarding the amount of time Plaintiffs may depose Fédération Internationale de Natation ("FINA") President Julio Maglione. The parties attest that they met and conferred regarding this issue on April 29, 2021.

           Respectfully submitted,

Dated: June 2, 2021      FARELLA BRAUN + MARTEL LLP

           By: <u>   */s/ Neil A. Goteiner*   </u>
             Neil A. Goteiner

           Attorneys for ISL and Shields, et al. Plaintiffs and the Proposed Class

June 2, 2021
Page 2



Dated: June 2, 2021                           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By:   */s/ Eric B. Fastiff*
     Eric B. Fastiff

Attorneys for Shields, et al. Plaintiffs and the Proposed Class

Dated: June 2, 2021                           LATHAM & WATKINS, LLP

By:   */s/ Christopher S. Yates*
     Christopher S. Yates

Attorneys for Defendant Fédération Internationale de Natation

    Pursuant to Civil Local Rule 5.1(i)(3), I hereby attest that the concurrence to the filing of this document has been obtained from each of the signatories hereto.

By:   */s/ Neil A. Goteiner*
     Neil A. Goteiner



**Plaintiffs' Position**

The Court previously instructed the parties to "be fair" regarding the time required for translated depositions because it is "common experience . . . that [translated depositions] take[] way longer." Jan. 14, 2021 CMC Hr'g Tr. at 6:15-7:20. FINA, however, urges the Court to block Plaintiffs' completion of their examination of FINA President Julio Maglione after less than the 7 hours the Federal Rules allow, where virtually *every* question and answer was translated in a halting, painstaking manner. The 173-page transcript – almost one half a normal 7-hour transcript – underlines the unreasonableness and unfairness of truncating the deposition.[1] Indeed, FINA also breached its own agreement that the parties would extend translated depositions by the time the translations consumed. *See* Ex. C (Pls.' March 3 email to FINA, noting the parties' agreement that they "will continue to work together in good faith to estimate the rough amount of time consumed by the translations and to extend the depositions by the same amount."). ***FINA still ignores all of these dispositive facts.*** An additional independent reason for following the Court's guidance and the parties' agreement is that Dr. Maglione, a demonstrated key witness for Plaintiffs, is retiring in June and may not testify live at trial pursuant to Plaintiffs' request, as FINA acknowledges.

The Court on May 6, after hearing FINA's various claims, asked for Plaintiffs' topics on which they intend to continue their examination. Plaintiffs' topics and examination will reflect Dr. Maglione's leadership role in FINA's anticompetitive conduct (*See* Dkt. 221-4 at 4-5), the provisional 34 exhibits not yet shown him, testimony appropriate for a summary judgment motion on Sherman Act Section 2, and further deposition required by Dr. Maglione's and other FINA witnesses' testimony. *See supra* at n.1; Dkt. 139 at 3-5 (collecting Dale Neuburger's and Cornel Marculescu's deposition testimony). Pursuant to the Court's request, the transcript and video are being made available to Your Honor through Ms. Means.

Plaintiffs' topics will include: 1) Dr. Maglione's 2018 conclusion of the pro-competitive and pro-swimmer advantages from ISL entering the swimming events market; 2) FINA's Executive Bureau sharing Dr. Maglione's conclusion; 3) FINA's decision, including Dr. Maglione's, nonetheless to destroy ISL to protect FINA's monopoly from ISL's competition; 4) Dr. Maglione's and FINA's contemporaneous knowledge that derailing ISL would injure the swimmers' financial and professional development, the national federations, and the sport of swimming; 5) whether and how FINA rationalized harming ISL; 6) whether Dr. Maglione and FINA saw any counterbalancing pro-competitive justifications for FINA using its Olympic sanction monopoly to protect FINA's monopoly over the swimming events market; 7) FINA's intent to deploy its anti-competitive scheme; 8) why FINA twice issued its sanction/penalty

---

[1] The 173 page count independently confirms that FINA would halve the amount of examination to which FINA agreed and which amount FINA took for its depositions. *Compare* Jan. 29, 2021 Dep. Tr. of Dale Neuburger (305 pages in 7 hours), *and* Dec. 23, 2020 Dep. Tr. of Pl. Michael Andrew (274 pages in 6 hours); *see also* Comm. Notes on Rule 30 (2000 Amendment) ("Parties considering extending the time for a deposition – and courts asked to order an extension – might consider a variety of factors. For example, if the witness needs an interpreter, that may prolong the examination."). In addition, 173 pages overstate the amount of actual testimony; much of Dr. Maglione's responses were refusals to respond to questions. *See, e.g.,* Dkt. 287-12 (Apr. 3, 2021 Letter Brief at 3-5, collecting non-responsive answers from first deposition session), and second deposition session (Ex. B at 109:16-21; 130:12-21; 147:21-148:10; 163:5-164:9; 170:11-171:18). FINA does not below contest Dr. Maglione's evasiveness and that it prolonged his deposition.

June 2, 2021
Page 4



threat, notwithstanding that Dr. Maglione viewed such a threat to be "outrageous[] and improper[]" (*see* Ex. B) (Apr. 29, 2021 Dep. Tr. at 156:20-25); 9) the relationship between FINA and the national federations, and whether FINA coerced an agreement with the national federations to boycott ISL; 10) FINA's broader plan to stop all competition, not just from ISL, through FINA's unauthorized relations rule; 11) whether FINA extended its anti-competitive conduct past early 2019; for example, in connection with its 2019 threat to discipline USA Swimming for partnering with ISL; 12) Dr. Maglione's disagreements with his Executive members about why he could not control Mr. Marculescu, as reflected in FINA internal documents; 13) why FINA issued its January 15, 2019 retraction of its penalty threat to swimmers and federations; and 14) whether ISL's entry into the market persuaded FINA to introduce its Champions Swim Series.

FINA does ***not*** specifically argue that evidence within these topics is irrelevant to a horizontal agreement case, or to an intent to monopolize and abusive monopoly case, as well as to predatory intent. *See infra* at n.6. And FINA has now retreated from its position that Plaintiffs had already deposed Dr. Maglione for nine hours.[2] Plaintiffs therefore require, and are entitled to, an additional 7 hours of actual cross-examination and the amount of testimony consistent with a 7-hour untranslated deposition in this case. *See supra* at n.1.

To anticipate what may be the Court's questions regarding the topics and in response to FINA's assertions below, some of Dr. Maglione's admissions demonstrate the *bona fides* of, and necessity for, these follow-up topics. For example: in the fall of 2018, Dr. Maglione believed that ISL was a competitive threat to FINA's business monopoly in the organization of international swim meets when ISL attempted to organize meets with national federations. *See* Ex. A (March 24, 2021 Dep. Tr. at 54:19-22; 57:1). He stated in the September 19, 2018 FINA Executive Bureau meeting that "ISL is an organization that wants to weaken FINA" by wanting to organize meets with national federations. *See* Ex. E (FINA-00000361); Ex. A at 57:1. Dr. Maglione's and FINA's view of ISL's competitive threat led FINA to use its Olympic sanction monopoly power to threaten the swimmers and the national federations, despite his testimony that the FINA Executive thought that ISL was "a good company" that was "very good" for the swimmers and the sport of swimming. *See* Ex. A. at 55:13-16; Ex. B at 108:18-21. Dr. Maglione also admitted that the additional ISL competitions would be good for athletes and swimming by growing and developing the sport. *See* Ex. A at 47:19-22; 55:15-16. Indeed, he enthusiastically admitted that "yes, yes, yes," ISL competitions were "terrific" for swimmers and the sport of swimming. *See* Ex. B at 173:1-17.

Dr. Maglione also began to testify how there were no pro-competitive justifications for FINA's anti-competitive conduct against ISL. He did not believe at any time that ISL was negative for the sport (*see* Ex. B at 121:5-11); he did not recall any specific FINA criticism of ISL or how ISL might be injurious to swimmers (*see* Ex. B at 122:9 -123:9, 123:22-124:18); and Dr. Maglione didn't recall Mr. Marculescu ever disagreeing with him about ISL being good for swimming. *See* Ex. B at 122:3-8.

---

[2] FINA first attempted to justify its violation of court guidance and its agreement with Plaintiffs by incorrectly asserting that Plaintiffs had deposed President Maglione for "close to nine hours[.]" *See* Ex. B at 187:10-13.



FINA also does ***not*** contest below the accuracy of the above deposition summary or the relevance of Dr. Maglione's testimony. Instead, FINA asserts *ipse dixit* various points that the facts contradict:

- Plaintiffs have already deposed Dr. Maglione "on every conceivable topic" and "key" issue. *Infra* at p. 8. FINA contradicts itself by admitting that Dr. Maglione testified on only "certain" of these topics, then nonetheless asks the Court to limit Plaintiffs to FINA's description of the six incomplete topics on which Dr. Maglione testified. *Infra* at p. 10;
- Plaintiffs' examination should end with the few documents identified in motion practice, and they should be penalized for not showing the witness documents in the order that FINA would dictate. *See infra* at pp. 9-11;
- Because Dr. Maglione testified "for nearly two hours" regarding his email to Mr. Bach of the IOC – a sum that *includes* the prolonged translation – the Court should effectively preclude Plaintiffs from showing him other documents. FINA, however, does not contest that Dr. Maglione's testimony here was evasive and contradictory (*see* Dkt. 287-12 at 3-4; *supra* at n.1; *infra* at n.3), and it wrongly invites the Court to ignore Wasserman's 30(b)6) testimony that it terminated ISL after Mr. Marculescu complained to Casey Wasserman. *Compare* Dkt. 221-3 at n.2 *with infra* at n.10. FINA in any event distracts from the evidentiary power of the Marculescu/Maglione email; it underlines the degree of both Maglione's and Marculescu's predatory intent to engage the IOC to destroy ISL and to harm swimmers and the sport of swimming;
- To assert witness harassment, FINA features Plaintiffs' 4 ½ page examination (Ex. B at 177:5-178:20; 183:15-186:17, consumed in part by Dr. Maglione's insistence on ending the deposition because he was "no longer available," as FINA admits below at n.7). But Plaintiffs examined Dr. Maglione to rebut FINA's counsel's promise during the deposition to attempt to end it by arguing to the Court that Dr. Maglione was too busy or too old to complete his deposition. *See id.* at 183:15-23. And contrary to FINA's assertion, Plaintiffs' counsel did not detain the witness with "harassing" questions at the end of the deposition; Dr. Maglione did not want to retire for the day and welcomed more questions. *See id.* at 176:8-13. He apparently wanted his second day of testimony (limited to 3-4 total hours, at FINA's request) to conclude his entire examination, which Plaintiffs' counsel declined;
- Plaintiffs and the Court must accept Dr. Maglione's claim not to remember FINA's destruction of the Ring of Fire and of other FINA competitors, even before FINA's ISL boycott. Plaintiffs, FINA asserts, may not attempt to refresh Dr. Maglione's recollection with four on-point Ring of Fire documents he received. FINA's argument is particularly catch-22ish given that FINA just now asserts that its monopolistic behavior was too temporary and ISL-cabined to violate Section 2. *Compare infra* at pp. 10, n.14, *with* p. 7;
- Plaintiffs cannot return to a topic with documents to impeach Dr. Maglione's contradictory testimony. *See infra* at p. 9;[3]

---

[3] Plaintiffs require the allotted time to cross-examine Dr. Maglione on documents and to refresh his recollection about certain events. For instance, he testified that FINA never threatened a swimmer who wanted to participate in another organization's meet. *See* Ex. B at 124:25-125:21. While he admitted that such a threat would have been "outrageous and improper conduct" had it happened (Ex. B at 156:20-25), Plaintiffs want to pursue any explanation

June 2, 2021
Page 6



- Plaintiffs must rely on Mr. Neuburger's and his FINA colleagues' testimony instead of finishing Dr. Maglione's deposition, notwithstanding Plaintiffs' right to fashion their own proof, Mr. Neuburger's credibility issues regarding FINA's officers' intent, and Dr. Maglione providing predatory-compelling testimony far beyond other FINA officers testifying that ISL would be good for swimming.  *Compare infra* at p. 10-11, and n.13 *with* Dkt. 139 at p. 5, and above summary of Maglione testimony.
- The Court should reduce Plaintiffs to one-half the 7 hours of testimony allowed under the Federal Rules – and to which FINA agreed – because covering the listed topics and the documents "is not proportional to the needs of the case[.]"  *Infra* at pp. 8,11.

Regarding their misdirecting proportionality mantra throughout this case – that the violation and damages ended January 15, 2019 – FINA ignores (for this motion only) its argument that it is Plaintiffs' burden to show predatory intent.  FINA's disproportionate theme also sidesteps: 1) FINA's ***continuing*** predatory abusive threat of sanctions in 2019 (*see* Dkt. 170 at p. 4-5); 2) relatedly, that FINA refuses to stipulate to injunctive relief, requiring this action to proceed; 3) the on-point relevance of Dr. Maglione's admissions describing FINA's predatory, exclusionary scheme and justifying the completion of his deposition; and 4) that damage claims of this size belie FINA's assertion that completion of a defendant president's deposition is disproportionate.  Contrary to FINA's wishes, FINA's January 15, 2019 announcement did not limit Plaintiffs' damages.  Rather, ISL has substantial claims in the millions of dollars for lost profits and "but for" expenses to mitigate FINA-caused antitrust injury.  FINA's claim that a "large amount in controversy" does not weigh in favor of additional discovery (*infra* at n.8) contradicts the Federal Rules' plain language about proportionality.  *See* Fed. R. Civ. Pro. 26(b)(1).  In addition, the swimmer class intends to show damages that exceed $29 million.  *See* Dkt. 200 (*Shields*).  FINA's disproportionate trope thus ignores doctrine that antitrust damages from just FINA's 2018 violations continued into subsequent seasons.  *See, e.g.*, *Oltz v. St. Peter's Community Hosp.*, 19 F.3d 1312, 1314 (9th Cir. 1994); and 5) Further, FINA ignores: a) the significant legal precedent for international sports administration: *i.e.*, will U.S. courts align with the European Commission prohibiting Olympic sanctioning federations from blocking athletes from earning money in competing leagues (*see* Dkt. 170 at p. 5); and b) national press interest in this matter and in the dominance of FINA and the IOC over athletes' economic lives.[4]  Finally, FINA's proportionality concern rings hollow.  We are not involved in an expensive and burdensome document production.  FINA will spend far more than 7 hours resisting Dr.

---

for why the June 5, 2018 memorandum (Ex. F) (ISL000887) and October 30 Torino letter (Ex. G) (ISL013019) were not threats and why FINA issued them.  Another example requiring cross-examination is his testimony about his and Mr. Marculescu's efforts to obtain Thomas Bach's/IOC's involvement in destroying ISL and his reasons; so far his testimony squarely contradicts the document.  *See* Dkt. 287-12 at 3-4.   A third example is his inconsistent testimony about the extent of his involvement in the aborted October 2018 MOU.  *See* Ex. A at 25:13-17 ("And they [ISL] offered that money but, to me, I didn't like that amount of money."); *compare* Ex. B at 106:24-107:5 ("I learned later, because I had not been informed, that there were conversations.").  FINA's attempt to block examination of Dr. Maglione here is particularly objectionable given its refusal to deal defense and pending motion for sanctions.
[4] *See, e.g.,* Tariq Panja, *A Familiar Rebellion Spreads to International Swimming*, N.Y. Times, (Dec. 20, 2018), https://www.nytimes.com/2018/12/20/sports/swimming-fina.html; Alex Perry, *The Plot to Kill the Olympics*, Outside, (Apr. 19, 2021), https://www.outsideonline.com/2422385/plot-kill-olympics; Rick Maese, *Pro Swimmers face opportunities, obstacles in quest for more prize money*, Washington Post, (Jan. 3, 2019), https://www.washingtonpost.com/sports/2019/01/03/pro-swimmers-face-opportunities-obstacles-quest-more-prize-money/.



Maglione's examination in its attempt to block his further testimony. Finishing Dr. Maglione's deposition, as FINA previously agreed to do, is more than proportional and efficient.

Indeed, Dr. Maglione's testimony foreshadows a strong likelihood that his complete deposition will provide compelling testimony supporting a Section 2 summary judgment motion – specifically, that no reasonable jury could find any plausible pro-competitive justifications legitimizing FINA's use of its Olympic sanction monopoly to threaten the swimmer class and to exclude competition in the swimmers' labor and international swimming competitions markets *See* Dkt. 200 (*Shields*) (D. Rascher Decl. at ¶¶ 16-18); *see, e.g., Otter Tail Power Co. v. U.S.*, 410 U.S. 366, 377-79 (1973) ("The record makes abundantly clear that Otter Tail used its monopoly power in the towns in its service area to foreclose competition or gain a competitive advantage, or to destroy a competitor, all in violation of the antitrust laws."). That FINA did so knowing that its "either-the-swimmers-or-FINA" demand of USA Swimming would injure the sport of swimming and swimmers, as Mr. Neuburger threatened and admitted to USA Swimming's Mike Unger (Ex. D) (USAS-002166),[5] demonstrates FINA's predatory[6] and exclusionary conduct against the swimmers and ISL. Such additional evidence from Dr. Maglione would appear to end the need for summary judgment analysis of pro-competitive purpose or rule of reason.

FINA also disputes none of these legal points regarding the significance of Dr. Maglione's testimony to date. Instead, it resurrects its "refusal to deal" mischaracterization of Plaintiffs' case. FINA ignores that the complaints' gravamen is that FINA abused its monopoly to coerce a boycott of ISL (and therefore had no legitimate basis to extort MOU terms from ISL in the first place, irrespective of whether Mr. Grigorishin indicated that *some* of FINA's terms were reasonable). Indeed, FINA contradictorily suggests that its "refusal to deal" defense treats ISL as having the choice to walk away from what FINA calls a "reasonable" contract to end FINA's extortion. Second, FINA admitted that the parties still had material disagreements when ***FINA, not Plaintiffs*, broke off negotiations of a possible MOU.** *See* Dkt. 275-32 at 13-11; *see also* Ex. H (ISL132928) (October 19, 2018 Goteiner email to FINA counsel Morand, asking to conclude negotiations on the MOU). That Mr. Goteiner's letter contained a litigation threat to FINA's boycott doesn't help FINA here (*see infra* at n.14); ISL's August 17, 2018 letter suggesting a meeting to end the boycott also threatened litigation, and the parties proceeded to negotiate. *See* ISL013430. FINA's other decision-based attempt to discount the significance of Dr. Maglione's testimony inappositely relies on *Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.*, 141 F.3d 947, 952 (9th Cir. 1998). *Adaptive* involved an allegedly

---

[5] Mr. Neuburger to Mr. Unger: "Bottom line: USA Swimming will need to make an uncomfortable decision that will make FINA unhappy or ISL/athletes unhappy. But I don't think you will be able to sit on the fence or be a bystander to the situation."

[6] FINA's scheme was predatory monopolistic conduct because FINA, with overwhelming monopoly and monopsony power, demonstrated its willingness to degrade the Olympics and in the short term to harm itself, the swimmers and the national federations, all for the sole purpose of harming its competitor, ISL in the distinct market for the organization of international swimming competitions. Such illegal conduct was economically rational and made common sense only because FINA expected to recover losses from its Olympic degradation and self-harm in the long term through the maintenance of its monopoly and monopsony power in markets for organizing international swimming competitions and to acquire the talent of the world's best swimmers for these competitions. *See*, e.*g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608, 610-11, n.39 (1985) (discussing demonstration of intent of illegal predation in context of monopolist's willingness to sacrifice service to consumers and goodwill in exchange for long run injury to competitor).



anticompetitive exclusion of the plaintiff from a supply market; shortly after the exclusion, defendants recognized another competitor to replace the plaintiff. The facts at bar are far from the short-lived possible competition reduction of *Adaptive*. First, in that case the controversy began with plaintiff's own acquisition of its principal competitor, which reduced competition and permitted the plaintiff to raise prices. 141 F.3d at 948-49. For this case to resemble *Adaptive*, after ISL's exclusion FINA would have had to immediately authorize another independent competitor in the market for organizing swim competitions. But in sharp contrast to *Adaptive*, FINA used its Olympic sanction monopoly to block and eliminate *all competition* at least from 2017 to early 2019, focusing on ISL from April 2018 through early January 2019 (not just in November 2018), and continuing its sanctioning threat against the ISL-USAS partnership through the fall of 2019. See Dkt. 170 at p. 4-5.

### **FINA's Position**

ISL has already deposed Dr. Maglione over two separate sessions on every conceivable topic at issue in this case. His testimony confirmed what FINA's counsel indicated to ISL all along—that Dr. Maglione, who is 85 years old and will soon step down as FINA's President, had limited involvement in the core events at issue and has little recall of the precise details over the few matters he was involved in (as is to be expected of someone his age). While ISL now wants seven additional hours to depose Dr. Maglione on various vague and overbroad lines of inquiry, that genuineness of that request is belied by the fact that ISL spent the final thirty minutes of Dr. Maglione's last deposition session harassing him about companies he is affiliated with in Uruguay and his involvement in things that have absolutely nothing to do with the case—even after Dr. Maglione became frustrated and requested to end the session.[7] *See* Ex. B at 176:2-187:3. ISL simply cannot show the requisite good cause for the Court to grant it even more time to further depose Dr. Maglione. *See Medlock v. Taco Bell Corp.*, No. 1:07-cv-1314-SAB, 2014 WL 2154437, at *4 (E.D. Cal. May 22, 2014) ("The party seeking an extension of time beyond seven hours bears the burden of demonstrating good cause to justify such an extension."). Nor is ISL's request proportional to the needs of the case;[8] it will impose additional undue burden upon Dr. Maglione and allow ISL additional opportunity to harass him.

Plaintiffs' brief makes clear that they will say anything to suggest that additional testimony from Dr. Maglione is relevant to their claims. But the reality is, ISL has deposed Dr. Maglione on all relevant topics and the additional testimony ISL now requests will be cumulative in light of the testimony already taken in this case.[9] Throughout two deposition sessions with Dr. Maglione, ISL deposed the soon to be former FINA President on every issue it has identified as key to its case. Since ISL first noticed Dr. Maglione's deposition, it has consistently referred to a few documents underlying the need to depose him: Dr. Maglione's December 3, 2018 email to IOC President Thomas Bach (Ex. I) (FINA_ISL-SHIELDS-00005695), an October 31, 2017

---

[7] Dr. Maglione requested that the parties close out the deposition multiple times. Ex. B at 176:2-13 ("The four hours of the meeting of chatting are over now […] I'm just no longer available."); 178:22-179:5 ("I want to finish […] If I must continue in […] this questioner more hours […] I think that the rule is eight hour, and we have now more than eight hour."). ISL's counsel even acknowledged that he had gone over the time allotted for the day. *Id.* at 187:4-9 ("We're past -- past the time we were supposed to end it[.]").

[8] ISL is wrong that its claim for damages—however speculative—justifies additional deposition testimony from Dr. Maglione. A large amount in controversy alone does not justify unnecessary, cumulative, and burdensome discovery. *See Grondal v. United States*, 2021 WL 354414 at *6-7 (E.D. Wash. Feb. 2, 2021) (holding that a large claim for damages alone does not justify a party's excessive request for discovery).

[9] Although the Court at the May 6, 2021 discovery conference already rejected ISL's argument about deposition transcript pages as "dispositive," ISL advances it again, yet cannot offer any authority to support it.

June 2, 2021
Page 9



email from Cornel Marculescu to Dr. Maglione regarding the World Swimming Association (Ex. J) (FINA_ISL-SHIELDS-00009425), and the minutes from FINA's September 19, 2018 Executive Meeting (Ex. E).  *See* Dkt 221-4 (December 23, 2020 Letter Brief); Dkt. 253 (February 19, 2021 Joint Case Management Statement); Dkt. 288 (April 3, 2021 Letter Brief).  Based on those few documents, ISL claimed that Dr. Maglione was a "central" player in FINA's alleged anticompetitive scheme.  *See* Dkt. 288.

In the two days that ISL deposed Dr. Maglione, counsel for ISL questioned him exhaustively on those documents.  To no surprise, Dr. Maglione's testimony revealed that he was only peripherally involved with the issues in this case.  During Dr. Maglione's first deposition, counsel for ISL spent roughly 112 minutes questioning Dr. Maglione about his single brief email to IOC President Mr. Bach.  *See* Dkt. 288 at 7, n.4.  And rather than revealing a personal, instrumental role in FINA's alleged anticompetitive conduct, Dr. Maglione testified that the email was drafted and sent at the request of Mr. Marculescu.  Ex. A at 17:19-22; 21:1-15.  For nearly two hours, counsel for ISL questioned Dr. Maglione about his communications with Mr. Bach—with whom Dr. Maglione had spoken "on[ce] or tw[ice] at most"—on the already-disproven theory that FINA interfered with ISL's relationship with Wasserman. Ex. A at 30:10-17.[10]  And while ISL asserts the Wasserman issue is still live and worthy of more testimony from Dr. Maglione, the support ISL has is a conversation that Mr. Marculescu—not Dr. Maglione—had with Casey Wasserman.[11]  Ultimately, ISL has already had ample opportunity to question Dr. Maglione on the only document ostensibly tying him to the alleged misconduct and, as with the other issues, is reaching for straws to justify more time to try to muddy the record.

ISL similarly had ample time to question Dr. Maglione on the other key documents it has represented demonstrate Dr. Maglione's central role.  ISL extensively questioned Dr. Maglione about any involvement in the World Swimming Association and the associated "Ring of Fire" event.  And while ISL previously characterized Dr. Maglione as "apparently aligned with Messrs. Marculescu and Neuburger, the heretofore most active of the FINA anti-competition proponents, both against ISL and the overlapping Ring of Fire Tour" (Dkt. 288 at 3), Dr. Maglione testified repeatedly that he had very little involvement with the issues concerning the World Swimming Association and was unaware of the "Ring of Fire."[12]  Ex. A at 57:4-59:10; Ex. B at 129:4-132:25; 137:4-141:10; 145:15-146:13.  It is unclear why ISL thinks that four more "on-point Ring of Fire documents" might refresh Dr. Maglione's memory on the issue where the two documents ISL introduced at his previous deposition had no such effect and where ISL had moved on from the issue as a result.  *See* Ex. B at 137:22-140:17.  Similarly, ISL also

---

[10] Discovery confirmed that no one from the IOC ever contacted anyone at Wasserman about ISL, and that Wasserman's decision to terminate its relationship with ISL was a decision that Mr. Casey Wasserman himself made, independently, without any influence from FINA, the IOC, or anyone else.  *See* Ex. K (C. Holmes Dep. Tr. at 166:8-167:8; 396:22-397:16); Ex. L (C. Wasserman Dep. Tr. at 115:1-6; 119:18-121:22).

[11] Dr. Maglione was not involved in the two minute encounter between Mr. Marculescu and Mr. Wasserman.  ISL already asked Dr. Maglione about the meeting in Tokyo where that conversation allegedly took place, and Dr. Maglione testified that he had no knowledge that Mr. Wasserman was there and never spoke to Mr. Wasserman.  Ex. A at 42:9-43:6.  Mr. Wasserman also confirmed this.  Ex. L at 114:18-25.

[12] In ISL's April 3, 2021 Letter Brief regarding Julio Maglione's deposition, it cited to Ex. J, an email from Mr. Marculescu to Dr. Maglione as evidence of Dr. Maglione's alignment with Messrs. Marculescu and Neuburger. Dkt. 288.  But Dr. Maglione testified that he had no recollection of the email, that he had no recollection of George Block, and that "this Ring of Fire thing is new to me."  Ex. B at 140:1-8.



June 2, 2021
Page 10 

June 2, 2021
Page 10 

questioned Dr. Maglione regarding the September 19, 2018 FINA Executive Meeting minutes. Ex. A at 55:17-57:3.

Beyond the few "key" documents that underlie ISL's original request to depose Dr. Maglione, ISL also questioned him on every other essential issue in this case. ISL questioned Dr. Maglione extensively about FINA's June 5, 2018 memorandum as well as internal FINA communications leading up to that the issuance of the memorandum. Ex. B at 124:25-126:24; 153:21-154:6; 159:6-172:25. Dr. Maglione repeatedly testified that he had no recollection of the memorandum or the communications leading up to it, which counsel for ISL acknowledged. *Id.* at 165:5-9 ("But the point is you don't recall it."). Dr. Maglione also testified about **(1)** the ISU Speed Skating case (*Id.* at 147:10-148:10); **(2)** his lack of knowledge of and lack of communications with Wasserman (Ex. A at 34:1-16; 43:2-48:22; 79:9-80:14); **(3)** FINA's 2018 Negotiations with ISL (Ex. A at 52:24-54:8; Ex. B at 102:20-103:2; 105:25-107:9); **(4)** FINA's perception of ISL (Ex. A at 25:1-21; 54:19-57:3; 78:7-18; Ex. B at 100:25-101:19; 105:16-24; 108:13-109:21; 111:14-112:20; 120:19-124:24); **(5)** FINA's discussions about ISL in 2019 (Ex. A at 47:15-22; 61:19-62:11); and **(6)** FINA's Champion Swim Series (Ex. B at 173:18-175:24; 181:16-183:14). There is nothing from Dr. Maglione's deposition testimony to support ISL's repeated yet incorrect assertion that Dr. Maglione had a "leadership role in FINA's anticompetitive conduct."

The additional lines of inquiry ISL now identifies as justifying additional deposition time go well beyond the essential issues in this case and are overbroad considering Dr. Maglione's limited role in FINA's interactions with ISL. Notably, Dr. Maglione was already questioned on certain of ISL's proposed additional topics. For example, ISL seeks to further question Dr. Maglione regarding "why FINA twice issued its sanction/penalty threat, notwithstanding that Dr. Maglione viewed such a threat to be 'outrageous and improper,'" even though ISL questioned Dr. Maglione regarding the June 5, 2018 memorandum, and Dr. Maglione already testified that he had no recollection of the memorandum or events leading up to it. *See* Ex. B at 161:20-172:25. ISL also already questioned Dr. Maglione about "FINA's [supposed] broader plan to stop all competition, not just from ISL, through FINA's unauthorized relations rule" and "whether ISL's entry into the market persuaded FINA to introduce its Champions Swim Series." Ex. B at 131:1-133:11 (testifying regarding FINA's history with respect to the application of the unauthorized relations rule); 173:18-175:24 (testifying that the Champions Swim series was not meant to compete with ISL and that he did not recall why FINA started the new series).

Moreover, it is unclear why ISL believes that Dr. Maglione's testimony that ISL was "good" for swimmers necessitates further questioning on that issue. Beyond the fact that such comments are neither new in this case[13] nor constitute evidence that FINA's actions were anti-competitive,[14] ISL's reference to such testimony is self-defeating: ISL admits that it already has

---

[13] ISL's attempt to portray Dr. Maglione's testimony that ISL was "good" for the sport as new and worthy of further inquiry ignores that other FINA Executives already provided the same testimony. *See, e.g.*, Ex. M (D. Neuberger 30(b)(6) Dep. Tr. at 72:9-73:3) ("If we didn't think that ISL as a partner, as a collaborator, as one to bring additional opportunities was good for FINA, then we wouldn't have done so. And, parenthetically, if it's good for FINA, it would be good for its national federations by its very nature."); Ex. N (S. Ramsamy Dep. Tr. at 46:21-47:5) (testifying that the sport of swimming would benefit from the cooperation between FINA and ISL).

[14] ISL's suggestion that testimony about FINA's view of ISL as good for the sport would support a summary judgment motion on its Section 2 claim is misplaced. ISL cannot even show exclusionary conduct, since FINA's approval of the inaugural 2018 Turin Event, which ISL claims was unreasonably withheld, was offered to ISL on

June 2, 2021
Page 11



this testimony from Dr. Maglione. There certainly is no need for additional time to elicit cumulative testimony from Dr. Maglione to say, yet again (and like numerous other members of FINA's Executive) that the ISL concept was good for the sport.

ISL's claim that it now has 34 more documents to review with Dr. Maglione is also irreconcilable with ISL's prior refrain that it needed to depose him on only a handful of documents, but also ISL's counsel's approach in Dr. Maglione's two prior depositions. ISL introduced a total of 7 exhibits over two days of deposition. On the first day, ISL only introduced a single document and refused to introduce additional documents at Dr. Maglione's request where it was apparent those documents could potentially have assisted his memory of pertinent events. *See, e.g.,* Ex. A at 54:4-17 (requesting to see letter ISL's counsel sent to FINA in October threatening litigation); 77:1-7 (requesting to see documents regarding FINA's 2018 negotiations with ISL so it would be "easier to answer [counsel's] questions"). ISL's request now for more time to "cross-examine Dr. Maglione on documents and to refresh his recollection about certain events" is disingenuous, particularly when it had no intention of assisting Dr. Maglione's recollection previously, and instead chose to depose him for hours on issues he barely recalled. *Id.* at 55:19-22 (informing ISL's counsel that "dates are really a mess for me.").

Finally, there is no prejudice to ISL because ISL has deposed every FINA executive with any remote involvement in the issues in the case—and even obtained leave of court to take more than 10 depositions so that it could depose members of the FINA Executive who were actually involved in the events at issue. ISL already elicited much of the testimony it claims it now needs through its 30(b)(6) deposition of Dale Neuburger.[15] *See* Ex. O (Plaintiffs' Third Amended 30(b)(6) Notice to FINA). Any additional testimony ISL now seeks from Dr. Maglione will be cumulative of that deposition, as well as the depositions of FINA Vice Presidents Husain Al Musallam, Sam Ramsamy, and former FINA Executive Director Cornel Marculescu. And FINA already informed ISL that it will not call Dr. Maglione in its case-in-chief at any trial, so there is no risk to ISL that Dr. Maglione will suddenly be a key player in this case.

There is a time when courts should say enough is enough when litigants seek additional fact discovery; we are past that time. ISL's request for additional testimony from Dr. Maglione

---

terms ISL itself admitted were reasonable. Nor can ISL establish injury to competition, given that within a matter of months following the conflict between FINA and ISL in the fall of 2018, ISL successfully began hosting events in 2019. *See Adaptive Power Solutions, LLC v. Hughes Missile Systems Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("[A] temporary decline in the number of competitors … is not significant enough to be classified as an injury to competition under the Sherman Act."). And Mr. Goteiner's October 19, 2018 email—which came after ISL abandoned the MOU discussions and announced it was hosting the 2018 event with the Italian Federation, and which threatened litigation—is not evidence that the parties were still negotiating. *See* Ex. H. In any event, there certainly is no duty to deal under the threat of litigation and Mr. Goteiner's letter does not change the fact that ISL never accepted FINA's offer on terms which it admitted were reasonable. *See, e.g., Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 414 F. Supp. 3d 1256, 1269 (N.D. Cal. 2019) (granting summary judgment to the defendants on plaintiffs' refusal to deal claim where it was "undisputed that Defendants only refused to deal with [Plaintiff] after [Plaintiff] began threatening litigation").

[15] Several of the topics ISL identifies in this letter brief were already topics of examination in FINA's 2021 30(b)(6) deposition. For example, 30(b)(6) Topic No. 6 covers ISL's additional identified topic No. 9; 30(b)(6) Topic No. 12 covers ISL's additional identified topic No. 14; 30(b)(6) Topic No. 24 covers ISL's additional identified topic No. 12; 30(b)(6) topic No. 3 covers ISL's additional identified topic No. 11; and 30(b)(6) Topic Nos. 4 and 5 cover ISL's additional identified topic No. 4. *See* Ex. O.

June 2, 2021
Page 12



is disproportionate, and ISL has failed to demonstrate good cause for more time. The request should be denied.