1

2

3

4                               UNITED STATES DISTRICT COURT

5                             NORTHERN DISTRICT OF CALIFORNIA

6

7    INTERNATIONAL SWIMMING                    Case No.  18-cv-07394-JSC
     LEAGUE, LTD,
8
                Plaintiff,                     **ORDER RE: WORLD AQUATICS'**
9                                              **DAUBERT MOTIONS**
            v.
10                                             Re: Dkt. Nos. 355, 356, 357
     WORLD AQUATICS,
11
                Defendant.
12

13          International Swimming League, Ltd. ("ISL") sues World Aquatics, formerly known as the

14   Fédération Internationale De Natation, and alleges its General Rule 4, which prohibited national

15   federations from affiliating with organizations not sanctioned by World Aquatics, violated

16   Sherman Act § 1.  (Dkt. No. 100; Dkt. No. 490.)[1]  In connection with its summary judgment

17   motion, World Aquatics moved to exclude ISL's damages expert testimony from Jonathan A.

18   Jensen, Patrick Crakes, and Michael J. Wagner pursuant to the Federal Rules of Evidence and

19   *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  (Dkt. Nos. 355, 356, 357.)

20   When the Court granted World Aquatics' summary judgment motion, it denied the *Daubert*

21   motions as moot, (Dkt. No. 419 at 30), and the Ninth Circuit subsequently reversed the summary

22   judgment order and remanded the case, (Dkt. No. 450).  So, the Court granted World Aquatics'

23   unopposed motion to consider the previously briefed *Daubert* motions.  (Dkt. Nos. 477, 478.)

24   Having carefully considered the parties' submissions, and with the benefit of oral argument on

25   October 20, 2022 and November 18, 2025, the Court DENIES World Aquatics' motion to exclude

26

27   _____

28   [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

1    Dr. Jensen's and Mr. Wagner's testimony and GRANTS World Aquatics' motion to exclude Mr.

2    Crakes's testimony.  Dr. Jensen's and Mr. Wagner's testimony includes a sufficiently reliable

3    factual foundation, and World Aquatics' disputes as to unconsidered evidence or alternative

4    causes go to the testimonies' weight, not their admissibility.  However, Mr. Crakes's opinions are

5    inadmissible because neither his opening report nor his reply report are based on a discernable

6    methodology.

7                                          **DISCUSSION**

8            Under Federal Rule of Evidence 702, a witness may offer expert testimony if the witness

9    "is qualified as an expert by knowledge, skill, experience, training, or education," and the

10   proponent of the witness demonstrates to the court it is more likely than not:

11           (a) the expert's scientific, technical, or other specialized knowledge
             will help the trier of fact to understand the evidence or to determine a
12           fact in issue;
             (b) the testimony is based on sufficient facts or data;
13           (c) the testimony is the product of reliable principles and methods;
             and
14           (d) the expert's opinion reflects a reliable application of the principles
             and methods to the facts of the case.
15
     Fed. R. Evid. 702.  These criteria can be distilled to two overarching considerations: "reliability
16
     and relevance."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *see also*
17
     *United States v. Valencia-Lopez*, 971 F.3d 891, 900 n.8 (9th Cir. 2020) ("[T]he district court's
18
     gatekeeping function under *Daubert* ensures that expert evidence is sufficiently relevant and
19
     reliable when it is submitted to the jury." (cleaned up)).  As a gatekeeper, the court's "task [] is to
20
     analyze not what the experts say, but what basis they have for saying it."  *Daubert v. Merrell Dow*
21
     *Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995); *see also Kumho Tire Co., Ltd. v. Carmichael*,
22
     526 U.S. 137, 152 (1999) ("The objective . . . is to make certain that an expert, whether basing
23
     testimony upon professional studies or personal experience, employs in the courtroom the same
24
     level of intellectual rigor that characterizes the practice of an expert in the relevant field.").
25
     "[J]udges are entitled to broad discretion when discharging their gatekeeping function," including
26
     in "determining whether an expert's testimony is reliable [and] in deciding *how* to determine the
27
     testimony's reliability."  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th
28

2

Cir. 2004) (quotation marks and citation omitted).

Still, trial courts should "not exclude opinions merely because they are impeachable." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quotation marks and citation omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Ultimately, "[t]he relative weakness or strength of the factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility." *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987) (quotation marks and citation omitted).

## I.    DR. JENSEN (DKT. NO. 356)

Dr. Jensen is an Assistant Professor of Sport Administration at the University of North Carolina at Chapel Hill. (Dkt. No. 360-3 ¶ 1.) ISL retained Dr. Jensen as a sports marketing expert to opine on whether ISL's being prevented from executing its December 2018 event and the public disclosure of World Aquatics' conduct toward ISL in June 2018 "harmed ISL's ability to attract sponsors, resulting in a loss of revenue from sponsorship," and to estimate those lost revenues. (*Id.* ¶ 8.) Based on the sports marketing and sponsorship landscape in 2018, Dr. Jensen opines ISL would have had a much greater chance of attracting a variety of sponsors for 2019 had World Aquatics not interfered. (*Id.* ¶¶ 9, 57.) He estimates lost revenues up to $1,759,788 for the 2018 event, $30,060,461 for the 2019 season, and $27,956,228 for the 2020 and 2021 seasons ($59 million total). (*Id.* ¶ 9(g)-(h).)

World Aquatics argues Dr. Jensen's report is unreliable because its opinion World Aquatics caused ISL to lose sponsorship revenue lacks a sufficient factual foundation, ignores alternative causes, and assumes unrealistic profits. World Aquatics also seeks to exclude Dr. Jensen's report as unfairly prejudicial under Federal Rule of Evidence 403, and his reply for including new opinions.

### A.    Foundation

Dr. Jensen's opinion World Aquatics' conduct caused ISL to lose sponsorship revenue is based on sufficient facts and data. Dr. Jensen begins with quantitative data, academic research, and industry trends explaining sports sponsorship spending in recent years. (*Id.* ¶¶ 10-26.) Based

on this foundation, he opines certain of ISL's features (e.g., gender equity in prize money, North American consumer interest in swimming, and the duration and team-based format) would attract sponsorship by certain brand categories. (*Id.* ¶¶ 27-29.) Dr. Jensen also explains the brand impact score methodology YouGov Sport, a sports marketing agency, used to produce a report for ISL. (*Id.* ¶¶ 33-35.) YouGov Sport's report estimated ISL's events generate more than 44 minutes of brand exposure per hour, resulting in a total sponsor exposure value of $8,588,703 per event. (*Id.* ¶¶ 35-38.) However, that figure represents the total exposure value of an ISL event, which can be allocated among several sponsors, and sponsors often do not pay for the full value of the exposure, so he estimates that because ISL is a new property, sponsors would pay for half the value: $4,294,352. (*Id.* ¶¶ 39-41.) Relying on his published study and the Wasserman report, Dr. Jensen estimates ISL could have sold 12 sponsorships for the 2019 season, (*id.* ¶¶ 42-43), and compares that estimate to the projections of comparable leagues, (*id.* ¶ 48). Then, he estimates lost revenues by multiplying that per-event figure by the number of events each season, accounting for the sponsor renewal rate and the effects of COVID-19 as described in the literature. (*Id.* ¶¶ 41, 51-56.)

Based on the estimated revenue which would have resulted from the December 2018 event, Dr. Jensen opines "the ability to execute the [December 2018 event] was critical" to demonstrate ISL's viability to sponsors, as well as generate "valuable broadcast exposure data" for sponsors to justify their investments. (*Id.* ¶¶ 31, 33, 43.) So, Dr. Jensen concludes the cancellation of the 2018 event delayed ISL's ability to retain sponsors. (*Id.* ¶¶ 43, 57(c)-(d).) He also opines publicity after World Aquatics' June 2018 letter dissuaded sponsors "looking to avoid conflict and controversy," harming ISL's ability to obtain sponsors. (*Id.* ¶¶ 32, 57(b).) Dr. Jensen adequately explains the data, assumptions, and methodologies underlying his opinions and points to adequate indicia of reliability, particularly peer-reviewed studies. *See Daubert*, 43 F.3d at 1316 (noting peer-reviewed studies are indicia of reliability); *cf. Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014) ("A doctor using a differential diagnosis grounded in significant clinical experience and examination of medical records and literature can certainly aid the trier of fact and cannot be considered to be offering 'junk science.'"). So, Dr. Jensen's testimony relies on

United States District Court
Northern District of California

1  sufficiently reliable facts and data.

2      World Aquatics' arguments Dr. Jensen's report lacks sufficient facts and data go to the

3  "weight and credibility" of his testimony, not its admissibility.  *See Bergen*, 816 F.2d at 1352 n.5.

4  World Aquatics primarily criticizes Dr. Jensen's failure to account for specific factual evidence (or

5  the lack thereof), for example, his failure to consider ISL's sponsorship contracts or

6  communications, whether Wasserman introduced ISL to sponsors, or if any sponsor specifically

7  declined to engage with ISL because of the conflict with World Aquatics.  If World Aquatics

8  believes factual evidence contradicts the facts and data Dr. Jensen relied upon, it can attack Dr.

9  Jensen's factual foundation by introducing that evidence and cross-examining him.  *See Oracle*

10  *Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 WL 5914033, at *2 (N.D. Cal. Nov. 28,

11  2011) (explaining to the extent documents contradict facts relied upon by an expert, those facts

12  can be raised and disputed at trial).

13      World Aquatics also argues Dr. Jensen's opinion the cancellation of ISL's 2018 event

14  limited sponsorship revenues in subsequent years is unreliable because even after its 2019 events,

15  ISL did not garner large revenues.  This argument is flawed because "the relevant question [is] the

16  counterfactual 'but-for' analysis," not a comparison to "real-world" alternatives.  *See In re*

17  *Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 307 (N.D. Cal. 2018), *vacated and remanded on other*

18  *grounds*, 14 F.4th 1059 (9th Cir. 2021).  In fact, Dr. Jensen provides an explanation why World

19  Aquatics' 2019 comparison is inaccurate: Because ISL waited to host events until 2019, it lacked

20  valuation data until 2020, when COVID-19 had changed the sponsorship landscape.  (Dkt. No.

21  360-3 ¶ 31; Dkt. No. 360-4 ¶ 62.)

22      World Aquatics' criticism of Dr. Jensen's reliance on Wasserman's report, in part because

23  Wasserman may have been biased, also goes to weight rather than admissibility.  Dr. Jensen

24  reasonably and explicitly relied on the Wasserman report, as a "well-respected sports marketing

25  agency . . . using industry standard approaches."  (Dkt. No. 360-3 ¶ 44.)  And although he had no

26  obligation to independently validate Wasserman's conclusions, Dr. Jensen did evaluate

27  Wasserman's comparison to data in SportsBusiness's Sponsorship Deals Database.  (*Id.* ¶ 48.)  To

28  the extent World Aquatics distrusts the Wasserman report, it can seek to undermine the report's

1  significance at trial.  *See Oracle Am., Inc.*, 2011 WL 5914033, at *1-2 (explaining "damages

2  experts [] rely on sources of information reasonably relied upon as long as the foundational facts

3  are properly laid at trial," since the "traditional and correct way to proceed is for a foundational

4  witness to testify first-hand at trial to the foundational fact . . . and to be cross-examined[,] [t]hen

5  the expert can offer his or her opinion on the assumption that the foundational fact is accepted by

6  the jury" (cleaned up)).

7      So, Dr. Jensen's report has a sufficiently reliable factual foundation.

8      **B.    Alternative Causes**

9      "Generally, an expert need not rule out every potential cause in order to satisfy *Daubert*, as

10  long as the expert's testimony addresses obvious alternative causes and provides a reasonable

11  explanation for dismissing specific alternate factors identified by the defendant."  *Stanley v.*

12  *Novartis Pharms. Corp.*, 11 F. Supp. 3d 987, 1001 (C.D. Cal. 2014) (cleaned up); *see also In re*

13  *Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973 (C.D. Cal. 2012) (explaining these "flaws .

14  . . typically go to the weight, rather than the admissibility, of the expert's testimony").  "In some

15  cases, however, the analysis may be 'so incomplete as to be inadmissible as irrelevant.'"

16  *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (quoting *Bazemore v. Friday*,

17  478 U.S. 385, 400 n.10 (1986)).  For example, an expert's failure to consider a "'major factor' . . .

18  which should have been included . . . renders [] analysis so incomplete as to be inadmissible as

19  irrelevant."  *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 975-76 (cleaned up) (excluding

20  expert opinion on concert ticket prices for failure to consider artist popularity); *see also Claar v.*

21  *Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (affirming exclusion of experts who

22  "made [no] effort to rule out other possible causes for the injuries plaintiffs complain of, even

23  though they admitted that this step would be standard procedure before arriving at a diagnosis").

24      World Aquatics argues Dr. Jensen's testimony is inadmissible because he did not seriously

25  consider factors besides World Aquatics' own conduct which may have caused ISL to lose

26  sponsorship revenue.  In particular, press coverage surrounding ISL's failure to pay its vendors

27  and athletes, Mr. Grigorishin's criticism of the Olympics, and ISL's publicized mismanagement

28  might have dissuaded sponsors.  (Dkt. No. 356 at 16-17.)  In his reply, Dr. Jensen considered a

United States District Court
Northern District of California

6

few public statements and concluded his "opinion [was] unchanged," apparently because "none of these alleged other factors involved threats to swimmers to disqualify them from Olympic participation." (Dkt. No. 360-4 ¶ 8 n.4.) But Dr. Jensen's reply does not further explain why these alternate factors would not affect sponsors, especially in light of his earlier acknowledgment sponsors avoid organizations which might place them in controversy. (Dkt. No. 360-3 ¶ 32.)

ISL's attempts to respond to World Aquatics are unavailing. First, Dr. Jensen's consideration of market trends, and factors like COVID-19, sponsor attrition, the importance of data, and ISL's new emergence does not necessarily alleviate his responsibility to consider other major factors specifically affecting ISL's sponsorships. (*Id.* ¶¶ 31, 43, 52, 53.) Second, even if "[i]t is impossible to credit the notion that the alleged public controversies arising in 2020 and beyond caused ISL to lose revenue in 2018 and 2019, when the bulk of the lost revenues occurred," controversies arising in 2020 would at least be relevant to his 2020 and 2021 lost revenue estimates. (Dkt. No. 378 at 23.)

Ultimately, however, because courts are "willing[] to accept a degree of uncertainty" in antitrust damages, the Court concludes Dr. Jensen's failure to consider certain alternative causes does not render his analysis "so incomplete as to be inadmissible as irrelevant." *See J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981) (explaining willingness given "difficulty of ascertaining business damages . . . [because] [t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation"); *Bazemore*, 478 U.S. at 400 n.10. *In re High-Tech Employee Antitrust Litigation*, No. 11-CV-02509-LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014), is helpful. When defendants argued an expert's analysis "[wa]s incapable of segregating the impact on compensation attributable to the challenged agreements from the effects on compensation attributable to [] *other* agreements and unilateral conduct," the court noted the Ninth Circuit requires antitrust plaintiffs to "distinguish between losses attributable to lawful competition and those attributable to unlawful competitive conduct." *Id.* at *16 (citing *City of Vernon v. So. Cal. Edison Co.*, 955 F.2d 1361, 1371-72 (9th Cir. 1992)). However, the court rejected the defendants' argument "a damages model must *precisely* segregate out effects of every possible factor,

7

including legal conduct, that could impact the dependent variable, in order to be admissible under *Daubert* [because it] directly contravenes well-established Supreme Court and Ninth Circuit authority holding that damages in antitrust cases often cannot, and therefore need not, be proven with exact certainty." *Id.* at *18 (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 123 (1969) ("[D]amages issues in [antitrust] cases are rarely susceptible to the kind of concrete, detailed proof of injury which is available in other contexts.")); *cf. Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (holding while "a [damages] model . . . must measure only those damages attributable to that theory, . . . [c]alculations need not be exact").

Dr. Jensen's report suffers from a similar flaw; while he accounts for all possible lost revenues, he does not segregate lost revenues caused by World Aquatics' allegedly unlawful conduct from those caused by all possible other factors. However, although press coverage of ISL controversies, including this lawsuit, may have dissuaded sponsors, it is not obvious when sponsors became aware of the controversies and how those controversies would have affected their willingness to sponsor ISL. At oral argument, for example, ISL argued its lawsuit might have in fact encouraged sponsors to support ISL. So, the potential alternative causes Dr. Jensen omitted are not so indisputably "major factors" as, for example, artist popularity is for ticket sale prices. *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 974-75 ("The Court cannot simply assume that variables omitted . . . would have impacted the results[,] . . . [but] [c]ommon sense dictates that a more popular music artist typically will command higher ticket prices"). So, potential alternative causes for ISL's lost revenues may be a fruitful ground for World Aquatics to present a factual foundation and cross-examine Dr. Jensen at trial. Ultimately, however, because Dr. Jensen's testimony offers a reliable and explicit methodology, based on reliable and explicit facts and data, he presents a basis for estimating lost revenues sufficient for World Aquatics to cross-examine him as to the factors he did not consider. *See Moore v. James H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982) ("[A]n antitrust plaintiff is only obligated to provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations.").

So, Dr. Jensen's failure to account for public controversies which may have affected ISL's

United States District Court
Northern District of California

1  sponsorship revenues does not make his testimony inadmissible. World Aquatics can instead raise

2  these concerns at trial to influence the weight and credibility a juror may give Dr. Jensen's

3  testimony.

4      **C.    Unrealistic Assumptions**

5      World Aquatics also argues Dr. Jensen's estimate of ISL's lost profits fails because it does

6  not properly include a comparator, and is therefore so high as to be speculative. Although World

7  Aquatics attempts to construe its criticism as one to Dr. Jensen's methodology, it is a criticism of

8  Dr. Jensen's conclusion which does not provide grounds for excluding his report. *See Primiano*,

9  598 F.3d at 564 (explaining "problem [must be] methodology, not the conclusion to which the

10  evidence would lead"); *see also Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely

11  on principles and methodology, not on the conclusions that they generate.").

12      **D.    Rule 403**

13      World Aquatics also argues notwithstanding its *Daubert* arguments, Dr. Jensen should be

14  wholly excluded under Federal Rule of Evidence 403 because his testimony is unfairly prejudicial.

15  Specifically, Dr. Jensen's testimony "would allow ISL to use [Dr. Jensen's] façade of expertise to

16  cover up the absence of evidence" ISL actually has. (Dkt. No. 356 at 19-20.) World Aquatics'

17  argument is not persuasive. World Aquatics can demonstrate ISL's lack of evidence as a factual

18  matter, and use that evidence to create doubts around Dr. Jensen's opinion. But the possibility of

19  misleading a jury because Dr. Jensen is an "expert" is not grounds to exclude his testimony as a

20  whole under Rule 403. *See In re Pac. Fertility Ctr. Litig.*, No. 18-CV-01586-JSC, 2021 WL

21  1054374, at *5 (N.D. Cal. Mar. 19, 2021) ("[T]hat evidence is potentially damaging is not itself a

22  basis to exclude it.").

23      **E.    Scope of Reply**

24      Under Federal Rule of Civil Procedure 26, an expert's original report must contain "a

25  complete statement of all opinions the witness will express." Fed. R. Civ. P. 26(a)(2)(B)(i). So,

26  an expert's reply must be "intended solely to contradict or rebut evidence on the same subject

27  matter identified by another party," Fed. R. Civ. P. 26(a)(2)(D)(ii), and "cannot be used to advance

28  new arguments or new evidence" or to "set forth an alternate theory." *Matthew Enter., Inc. v.*

9

*Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2016 WL 4272430, at *2 (N.D. Cal. Aug. 15, 2016) (quotation marks and citations omitted).  A "reply report [must] make[] proper use of new arguments, analyses, tests and supporting data solely to support [the expert's] original opinions and to rebut the criticisms by Defendants' experts."  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-MD-01827-SI, 2014 WL 12639392, at *2 (N.D. Cal. Dec. 10, 2014).

Dr. Jensen did not exceed the proper scope of a reply report.  World Aquatics' rebuttal expert John Kosner criticizes Dr. Jensen's use of Tier 1 sports properties as comparators for ISL, which Mr. Kosner contends is a Tier 3 sport.  (Dkt. No. 377-4 ¶¶ 8, 43-46.)  So, Dr. Jensen's discussion of Tier 3 comparators properly rebuts Mr. Kosner's report.  Mr. Kosner also contended there was "not a single example" of a thriving early sports league in their early years, so Dr. Jensen's reply appropriately provided counterexamples, including with his research on the Sponsorship Deals Database.  (*Id.* ¶ 6; Dkt. No. 360-4 ¶ 18.)

So, World Aquatics' motion to exclude Dr. Jensen's testimony is DENIED.

## II.    MR. WAGNER (DKT. NO. 355)

Mr. Wagner is an advisor at an economic consulting firm and an inactive Certified Public Accountant.  (Dkt. No. 360-20 ¶¶ 2-3.)  ISL retained him to opine on its economic damages.  (*Id.* ¶ 1.)  He estimates because of World Aquatics' alleged conduct, ISL lost sponsorship profits of $40,703,289 (from 2018 to 2021) and bore increased expenses of $5,893,273 (in 2019 only), resulting in damages of $46,596,562.  (*Id.* ¶¶ 12-16, Table 1.)  To estimate lost sponsorship profits, Mr. Wagner begins with Dr. Jensen's estimated "but-for" sponsorship revenues, and subtracts estimated "but-for" sponsorship and event expenses, as well as actual revenues and expenses.  (*Id.* ¶¶ 17-21, Table 2.)  Mr. Wagner states because of World Aquatics' actions, ISL was unable to obtain negotiated supplier rates in 2019, but was able to in 2020, so he relies on the 2020 rates to estimate additional production expenses for 2019.  (*Id.* ¶¶ 23-29, Table 3.)

### A.    Relevance

To be relevant, an expert's testimony must "assist the trier of fact to understand or determine a fact in issue."  *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013) (explaining

question is whether the expert's "testimony has substance such that it would be helpful to a jury"). "For an expert's testimony to help the trier of fact understand the evidence, 'the subject matter at issue must be beyond the common knowledge of the average layman.'" *Mata v. Oregon Health Auth.*, 739 F. App'x 370, 372 (9th Cir. 2018) (citation omitted). But experts do not necessarily need to perform "complicated mathematical calculations to be admissible." *Mountaineers Found. v. Mountaineers*, No. 2:19-CV-1819-RSL-TLF, 2022 WL 1061925, at *5 (W.D. Wash. Apr. 8, 2022); *see also Lewert v. Boiron, Inc.*, 212 F. Supp. 3d 917, 926 (C.D. Cal. 2016) ("[U]nder Rule 702, an expert's testimony need not be complicated to offer special expertise."), *aff'd*, 742 F. App'x 282 (9th Cir. 2018). So, although an accountant's job is to "compile the costs and do the math," accounting work requires specialized expertise, judgment about what to include and exclude, and reviewing and synthesizing various numbers, and so can "meet[] the standard for expert testimony." *See Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 4008822, at *6 (W.D. Wash. Aug. 5, 2013).

Mr. Wagner's report is helpful to a trier of fact and therefore relevant. Using his accounting skills, Mr. Wagner considered a broad range of ISL's financial records and input rates and cost differentials, decided what to include and exclude, and summarized his calculations and approach to be comprehensible to a trier of fact. Although Mr. Wagner's work included some "simple math calculations" "a juror may be able to do," "it would be unreasonable to expect jurors to analyze" all these records. *See Perez v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2019 WL 1491694, at *4 (N.D. Cal. Apr. 4, 2019). So, Mr. Wagner's presentation is helpful for a jury to understand how to calculate damages and therefore relevant. *See Woods v. Congagra Foods Lamb Weston, Inc.*, No. 4:15-CV-05067-SAB, 2016 WL 4719886, at *3 (W.D. Wash. June 3, 2016) (explaining "simple arithmetic" is helpful because "[e]xperts on economic damages generally base their testimony on intuitively reasonable conceptions on how to develop a damages estimate").

Citing *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 5148390 (N.D. Cal. Nov. 6, 2017), World Aquatics argues Mr. Wagner's report consists of basic arithmetic and does not present specialized expertise helpful to a jury. However, *Waymo* is distinguishable. In

United States District Court
Northern District of California

*Waymo*, Mr. Wagner "simply multipl[ied] the units of time espoused by [another expert] with dollar amounts lifted from [Uber's] slide" to calculate future profits. *Id.* at *5. The court excluded Mr. Wagner's testimony because it adopted just two inputs from others, then "performed grade-school arithmetic counsel can do on an easel." *Id.* Here, Mr. Wagner relies on others' inputs, including Dr. Jensen's lost revenue estimates, ISL's documents, and Dr. Rascher's declaration, but accounts for many more inputs than in *Waymo*. And although World Aquatics argues Mr. Wagner's high-level formula for damages can be simply summarized for a jury, Mr. Wagner's work to develop the formula; identify, analyze, and adjust the input data; and calculate each input required some specialized expertise more than used in *Waymo*. *See also BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, No. 5:15-cv-01370-EJD, 2019 WL 1117537, at *3 (N.D. Cal. Mar. 11, 2019) (describing Mr. Wagner's admitted testimony calculating lost profits).

Because Mr. Wagner's report relies on some specialized accounting expertise and is useful to a jury, it is not inadmissible as irrelevant.

## B.    Reliability

World Aquatics also contends Mr. Wagner's testimony is not reliable because it relies on speculative inputs, fails to consider non-conduct factors, and ignores distinctions between ISL and related entities. Ultimately, while World Aquatics' contentions create fodder for cross-examination and may affect the weight and credibility of Mr. Wagner's testimony, they do not affect its admissibility.

### 1.    Input Data

World Aquatics argues Mr. Wagner's testimony is not reliable because he did not verify the input facts and data upon which his testimony relies, and contests those facts and data. However, under Federal Rule of Evidence 703, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. An expert therefore has no obligation to independently verify the facts upon which they base their opinion if those facts are part of the broader case. *See Oracle Am., Inc.*, 2011 WL 5914033, at *1-2 (explaining "damages experts [] rely on sources of information reasonably relied upon as long as the foundational facts are properly laid at trial," since the "traditional and correct way to proceed

United States District Court
Northern District of California

1  is for a foundational witness to testify first-hand at trial to the foundational fact . . . and to be

2  cross-examined[,] [t]hen the expert can offer his or her opinion on the assumption that the

3  foundational fact is accepted by the jury" (cleaned up)); *see also In re Arris Cable Modem*

4  *Consumer Litig.*, 327 F.R.D. 334, 364 (N.D. Cal. 2018) ("Defendant cites no authority for the

5  proposition that an expert must independently sort through all of the discovery in a case in order to

6  determine the relevant evidence.").

7        World Aquatics criticizes Mr. Wagner's reliance on ISL records and projections and on Dr.

8  Jensen's opinions.  Mr. Wagner explains using such records and opinions is "standard practice"

9  and "generally accepted in the industry," and "it is common industry practice to take inputs as true

10  for a given calculation."  (Dkt. No. 360-22 ¶¶ 53, 56.)  Because Mr. Wagner makes clear exactly

11  which ISL records he relies upon, World Aquatics can dispute the facts in those records at trial and

12  then cross-examine Mr. Wagner on the grounds his opinion rests on incorrect facts.  *See In re*

13  *Arris Cable Modem Consumer Litig.*, 327 F.R.D. at 364 ("To the extent that Defendant believes

14  that [the expert] failed to consider relevant evidence of record or formed opinions based on

15  unreliable data, Defendant is free to cross-examine [the expert] at trial on the foundation for his

16  opinions.").  To support its argument, World Aquatics relies on cases in which the expert did not

17  actually disclose the facts supporting his opinion, making it impossible to cross-examine the

18  expert based on his factual assumptions.  *See United States v. Cervantes*, No. 12-CR-792-YGR,

19  2016 WL 491599, at *7 (N.D. Cal. Feb. 9, 2016) ("He offers to recite the alleged history of

20  *Nuestra Familia* without explaining how he collected this historical information."); *In re ConAgra*

21  *Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014) ("He does not identify any variables he intends

22  to build into the models, nor does he identify any data presently in his possession to which the

23  models can be applied.").

24        Mr. Wagner's reliance on Dr. Jensen's opinion also does not make his testimony

25  unreliable.  "An expert is permitted to rely on the opinion of another expert," and a party "may

26  raise specific objections to specific questions" at trial if he is "improperly vouching" for another

27  expert's opinions.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, Nos. M 07-1827 SI, C 10-

28  1064 SI, 2013 WL 124347, at *1 (N.D. Cal. Jan. 8, 2013).  So, Mr. Wagner was not required to

United States District Court
Northern District of California

1  independently validate Dr. Jensen's opinion as to lost revenues before relying on it as one input in

2  his overall calculation of damages.  *See Ridgeway v. Wal-Mart Stores, Inc.*, No. 08-CV-05221-SI,

3  2016 WL 4728668, at *5 (N.D. Cal. Sept. 12, 2016) (rejecting argument expert "did not

4  independently verify Dr. Phillips's calculations before incorporating them into his own report"),

5  *aff'd*, 946 F.3d 1066, 1087 (9th Cir. 2020) ("Ultimately, as the district court held, Wal-Mart's

6  problem with Phillips's testimony went to weight, not to admissibility.").

7         World Aquatics' contentions as to the reliability of the facts and opinions Mr. Wagner

8  relied upon therefore go to the basis for Mr. Wagner's expert opinion and his acceptance of both

9  factual and other expert testimony, which are questions of weight and credibility for a jury, not

10  questions of reliability for admissibility.  *See In re Pac. Fertility Ctr. Litig.*, No. 18-CV-01586-

11  JSC, 2021 WL 842739, at *4 (N.D. Cal. Mar. 5, 2021) ("[T]he weaknesses in an unpersuasive

12  expert opinion can be exposed at trial, through cross-examination or testimony by opposing

13  experts." (quotation marks and citation omitted)).

14                    **2.    Alternative Causes**

15         World Aquatics also argues Mr. Wagner's report, like Dr. Jensen's, is unreliable because

16  Mr. Wagner does not account for "significant intervening events . . . entirely unrelated to [World

17  Aquatics'] alleged conduct" which, according to World Aquatics, would have "indisputably

18  implicated potential damages." (Dkt. No. 355 at 17-18.)  Specifically, World Aquatics argues Mr.

19  Wagner should have accounted for COVID-19's impact on ISL's "but-for" production costs, ISL's

20  failure to pay vendors, ISL's delays in purchasing flights and hotels, the cost differentials between

21  locations, and press coverage surrounding ISL's "mismanagement." (*Id.*; Dkt. No. 403 at 16-17.)

22  As with Dr. Jensen's report, the omission of these factors goes to the weight of Mr. Wagner's

23  testimony, not its admissibility.  *See Stanley*, 11 F. Supp. 3d at 1001 ("Generally, an expert need

24  not rule out every potential cause in order to satisfy *Daubert*, as long as the expert's testimony

25  addresses obvious alternative causes and provides a reasonable explanation for dismissing specific

26  alternate factors identified by the defendant." (cleaned up)).  Furthermore, Mr. Wagner does at

27  least explain how he accounted for COVID-19's effects in his estimates of 2020 production costs,

28  hotel room rates, and airfare costs.  (Dkt. No. 360-20 ¶ 26; Dkt. No. 360-22 ¶¶ 17, 22, 27.)  ISL's

and World Aquatics' dispute about whether ISL's delay in purchasing flights and hotels was due to World Aquatics' conduct is an assumption Mr. Wagner relied upon, which can be challenged at trial. So, although Mr. Wagner's choices in accounting for non-conduct factors may provide grounds for World Aquatics' cross-examination, they are not grounds for excluding his testimony as a whole.

### 3. Distinctions Between ISL and Other Entities

World Aquatics argues Mr. Wagner's report is unreliable because it does not distinguish between lost sponsorship profits and increased costs owed to or by ISL, as opposed to the various other entities with whom ISL coordinated to make and receive payments. At trial, World Aquatics intends to argue "ISL was not the party that incurred many of the costs underlying its damages estimates." (Dkt. No. 487 at 9.) ISL intends to respond "all of the damages were ultimately incurred by ISL, including by assignment and ratification" with other entities. (*Id.* at 3.) Mr. Wagner's testimony therefore relies on ISL's assumption it would have received all lost sponsorship profits and has borne all increased costs. (Dkt. No. 360-22 ¶ 52 ("[T]he majority, if not all, of these entities made payments on behalf of ISL and therefore, the distinction is irrelevant.").) So, to the extent ISL fails to convince a jury it ultimately incurred all damages, ISL's failure will undermine a key factual assumption for Mr. Wagner's report. However, because Mr. Wagner has made clear his assumption, that a jury may not accept his assumption as true does not provide grounds to exclude his report. *Cf. Dorman Prods. Inc. v. Paccar, Inc.*, 201 F. Supp. 3d 663, 690 (E.D. Pa. 2016) ("Like any damages expert, Mr. Wagner offers his testimony on the assumption that any necessary legal predicate to admissibility of the damages will be proven at trial.").

So, World Aquatics' motion to exclude Mr. Wagner is DENIED.

## III.    MR. CRAKES (DKT. NO. 357)

Mr. Crakes is a sports media expert whose firm is "focused on insight discovery, content rights acquisitions and negotiations, distribution strategy, brand identity, content creation, relationship management, audience segmentation & business operations across TV, digital, sports and music." (Dkt. No. 360-17 ¶ 1.) ISL retained him to opine on whether World Aquatics'

United States District Court
Northern District of California

interference with ISL's December 2018 event "delayed ISL's development as a viable media property impacting its ability to gain media network distribution and reducing its growth as a sports property and in turn revenue." (*Id.* ¶ 9.)  Mr. Crakes opines due to delaying the 2018 event and losing Wasserman as a partner, ISL lost an important chance to prove its viability, secure a media distribution deal, and earn resulting profits.  (*Id.* ¶ 16.)  Specifically, "had the 2018 event occurred such a distribution deal with a major media network probably would have been available in 2019, and that probability would have increased if Wasserman had remained agency of record." (*Id.* ¶ 17.)

The Court excludes Mr. Crakes's opening report because it cannot discern the methodology he used to arrive at his opinions.

> A proposed expert's testimony [] must have a reliable basis in the knowledge and experience of his discipline.  This requires district courts, acting in a "gatekeeping role," to assess whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue.  It is not the correctness of the expert's conclusions that matters, but the soundness of his methodology.

*Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) (cleaned up; quoting *Kumho Tire*, 526 U.S. at 148; *Daubert,* 509 U.S. at 592-93, 597).  ISL describes the methodology used in Mr. Crakes's opening report and rebuttal as "relying on his industry expertise to explain how a new sports property typically develops."  (Dkt. No. 380 at 11.)  But although Mr. Crakes explains his industry experience and the sources he reviewed for this case, he does not explain the actual methodology he used to conclude the 2018 event cancellation played a meaningful role in ISL's viability and ISL otherwise "probably" would have secured a major distribution deal in 2019.  (Dkt. No. 360-17 ¶ 17.)  At most, Mr. Crakes references ISL's "strong" "core intangibles" like the popularity of swimming, the presence of Olympic-level athletes, the "exciting format," and "endemic sponsors."  (*Id.* ¶¶ 16, 25.)  However, Mr. Crakes stated in deposition an expert in the sport media industry would typically assess an emerging company like ISL by evaluating its support structures and digital presence, brand appeal, ratings data, sponsors, and management team.  (Dkt. No. 357-5 at 15-16, 19, 29, 36-37, 50-51.)  And Mr. Crakes admits he did not consider these factors in reaching his opinion.  (*Id.* at 36-37, 50-51.)  Although there

16

may not be a "one size fits all" methodology for evaluating sports properties, (Dkt. No. 380 at 15), Mr. Crakes must provide ***some*** methodology or explanation of his reasoning so that the Court can evaluate its reliability.  Without such explanation, Mr. Crakes's conclusions appear based on "personal opinions and speculation rather than on a systematic assessment" of the facts at issue. *Ollier*, 768 F.3d at 860 (cleaned up); *see id.* at 860-61 (in Title IX case, affirming exclusion of school administrator experts whose "methodology [was] not at all clear").

As to Mr. Crakes's reply, ISL argues it "applies the same model and methodology used in his opening report—relying on his industry experience to explain how a new sports property typically develops."  (Dkt. No. 380 at 11.)  As explained above, exactly what this "model and methodology" entails beyond his generalized "industry experience" is unclear.  Because Mr. Crakes's reply report suffers from the same flaws as his opening report, the Court strikes it as well.

Furthermore, to the extent Mr. Crakes's reply includes a more detailed methodology than his opening report, that methodology relies upon a detailed analysis of Tier 3 sports properties and new opinions as to how "a smaller sports media promotion such as ISL might be a good fit at some level within a network's larger content portfolio and what factors might impact such a decision."  (Dkt. No. 360-18 ¶ 9.)  As new methodologies, opinions, and theories absent from Mr. Crakes's opening report, these constitute improper rebuttal.  *See FTC v. Qualcomm, Inc.*, No. 17-CV-00220-LHK, 2018 WL 6522134, at *1 (N.D. Cal. Dec. 11, 2018) ("A party's rebuttal report is not the time to change methodologies to account for noted deficiencies; instead, it is to respond to criticisms of such methodologies." (cleaned up)); *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 18-CV-07591-CRB, 2022 WL 1203075, at *1 (N.D. Cal. Apr. 22, 2022) ("Responding to an identified omission with new analysis is not proper rebuttal opinion."); *see also In re MacBook Keyboard Litig.*, No. 5:18-CV-02813-EJD, 2022 WL 1604753, at *8 (N.D. Cal. Jan. 25, 2022) ("The test of whether an expert's opinion constitutes rebuttal or a 'new' opinion, however, is not whether a rebuttal expert employs new testing or methodologies but instead, whether a rebuttal attempts to put forward new theories outside the scope of the report it claims to rebut." (quotation marks and citation omitted)).  ISL argues Mr. Crakes's analysis is

proper because it is "of the same subject matter" as the report it rebuts.  *See Kirola v. City & Cnty. of San Francisco*, No. 07-CV-3685-SBA (EMC), 2010 WL 373817, at *2 (N.D. Cal. Jan. 29, 2010).  But Mr. Crakes's reply goes much further than responding to Mr. Kosner's criticisms of his initial opinions and assumptions; instead, it develops new theories of Tier 3 sports business models, a network's content portfolio, and purchase agreements.

So, World Aquatics' motion to exclude Mr. Crakes's testimony is GRANTED.

<strong>CONCLUSION</strong>

For the reasons stated above, the Court GRANTS World Aquatics' motion to exclude Mr. Crakes but DENIES World Aquatics' motion to exclude Dr. Jensen and Mr. Wagner.

This Order disposes of Docket Nos. 355, 356, 357.

**IT IS SO ORDERED.**

Dated: November 21, 2025

_____
JACQUELINE SCOTT CORLEY
United States District Judge